UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

BRIAN GUILFORD, as Personal Representative
of the Estate of Deven Guilford,                                          Case No. 15-cv-01053

        Plaintiff,                                                                Hon. Paul L. Maloney

V

SGT. JONATHON FROST,
in his individual capacity, jointly and severally,

        Defendant.

_____/

| | |
|---|---|
| Hugh M. Davis (P12555) | James L. Dyer (P32544) |
| Cynthia Heenan (P53664) | Andrew J. Brege (P71474) |
| Attorneys for Plaintiff | Attorney for Defendant |
| Constitutional Litigation Associates, P.C. | Johnson, Rosati, Schultz & Joppich, P.C. |
| 450 W. Fort St., Ste. 200 | 822 Centennial Way, Ste. 270 |
| Detroit, MI 48226 | Lansing, Michigan 48917 |
| (313) 961-2255/Fax: (313) 922-5130 | (517) 886-3800 |
| Davis@ConLitPC.Com | jdyer@jrsjlaw.com |
| Heenan@ConLitPC.Com | abrege@jrsjlaw.com |
| Info@ConLitPC.Com | |

James F. Graves (P14288)
Stephen Sinas (P71039)
Attorneys for Plaintiff
Sinas Dramis Brake Boughton & McIntyre, P.C.
3380 Pinetree Rd.
Lansing, MI 48911-4207
(517) 394-7500
jimgraves@sinasdramis.com
stevesinas@sinasdramis.com

John C. Philo (P52721)
Maurice & Jane Sugar Law Center For
Economic & Social Justice
4605 Cass Ave.
Detroit, MI 48201-1256
(313) 993-4505
johnphilo1@comcast.net

_____/

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**\*\*\*Oral Argument Requested\*\*\***

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ii

INDEX OF AUTHORITIES .........................................................................................iii

FACTS .................................................................................................................... 1

STANDARD OF REVIEW ..........................................................................................11

ARGUMENT ...........................................................................................................12

      I.     Defendant Frost is entitled to qualified immunity ...........................................12

            A.     Qualified Immunity Generally..............................................................12

      II.    The Fourth Amendment and Excessive Force, Generally.................................14

      III.   Plaintiff cannot establish Sgt. Frost's actions were objectively unreasonable or violate clearly established Fourth Amendment Rights.............15

            A.     Sgt. Frost had probable cause to initiate the traffic stop......................15

            B.     Sgt. Frost did not unnecessarily prolong the traffic stop and had reasonable suspicion and probable cause to detain Guilford ...........16

            C.     It was objectively reasonable for Sgt. Frost to point his taser at Guilford when ordering him from the vehicle. .....................................18

            D.     It was objectively reasonable to order Guilford to lie down next to the vehicle while attempting to effectuate the arrest.......................20

            E.     Sgt. Frost's Use of the Taser was objectively reasonable .....................21

            F.     Sgt. Frost was justified in his use of deadly force and entitled to qualified immunity .......................................................................22

CONCLUSION ........................................................................................................25

ii

## INDEX OF AUTHORITIES

<u>**Cases**</u>

*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)...................................................................14

*Anderson v. Liberty Lobby, Inc.*, 477 US 242 (1986) .....................................................11

*Berger v. New York*, 388 U.S. 41 (1967).........................................................................15

*Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002)............................................................23

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006).......................................................23

*Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993)...................................................................19

*Davenport v. Causey*, 521 F.3d 544 (6th Cir. 2008)..........................................22, 23, 24, 25

*Delaware v. Prouse*, 440 U.S. 648 (1979) ......................................................................15

*Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996) ...................................... 18, 19, 24

*Drewitt v. Pratt*, 999 F.2d 774 (4th Cir. 1993) ...............................................................19

*Estate of Sowards v. City of Trenton*, 125 Fed. Appx. 31 (6th Cir. 2005) ........................15

*Fox v. DeSoto*, 489 F.3d 227 (6th Cir. 2007) ..................................................................21

*Graham v. Connor*, 490 U.S. 386 (1989) ............................................... 13, 14, 22, 23, 24

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)......................................................................12

*Hoover v. Walsh*, 682 F.3d 481 (6th Cir. 2012) ...............................................................17

*Kelley v. McCafferty*, 283 Fed. Appx. 359 (6th Cir. 2008) ...............................................20

*Kendall v. Hoover*, 751 F.2d 171 (6th Cir. 1984)..............................................................11

*Livermore v. Lubelan*, 476 F.3d 397 (6th Cir. 2007) .................................................. 18, 19

*Malley v. Briggs*, 475 U.S. 335 (1986).............................................................................12

*Maryland v. Pringle*, 540 U.S. 366 (2003) ......................................................................14

*Minchella v. Bauman*, 72 Fed. Appx. 405 (6th Cir. 2003) ................................................22

*Mullenix v. Luna*, 577 U.S. _, 136 S.Ct. 305 (2015) ........................................................13

*Pearson v. Callahan*, 555 U.S. 223 (2009) ......................................................................12

*Pickard v. Hardy*, No. 3:15-cv-P305, 2016 WL 865327 (W.D. Ky., Mar. 2, 2016) ...........................................................................................20

*Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994)...............................................19

*Risbridger v. Connelly*, 275 F.3d 565 (6th Cir. 2002).......................................13

*Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015) .............................................11

*Rush v. City of Lansing*, 644 Fed. Appx. 415 (6th Cir. 2016) ...........................23

*Sallenger v. Oakes*, 473 F.3d 731 (7th Cir. 2007) ............................................24

*Saucier v. Katz*, 533 U.S. 194 (2001) ...................................... 12, 13, 14, 22, 23

*Scott v. Harris*, 550 U.S. 372 (2007) .................................................................11

*Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006) .............................12

*Solomon v. Auburn Hills Police Department*, 389 F.3d 167 (6th Cir. 2004) ...........................................................................................22

*Standifer v. Lacon*, 587 Fed. Appx. 919 (6th Cir. 2014) ...................................11

*Stricker v. Twp. Of Cambridge*, 710 F.3d 350 (6th Cir. 2013) ..........................20

*Tennessee v. Garner*, 471 U.S. 1 (1985).....................................................13, 14

*United States v. Bell*, 555 F.3d 535 (6th Cir. 2009) ....................................15, 16

*United States v. Blair*, 524 F.3d 740 (6th Cir. 2008) ........................................15

*United States v. Everett*, 601 F.3d 484 (6th Cir. 2010).....................................16

*United States v. Hill*, 195 F.3d 258 (6th Cir. 1999) ..........................................16

*Untalan v. City of Lorain*, 430 F.3d 312 (6th Cir. 2005) ...................................23

*Vakilian v. Shaw*, 335 F.3d 509 (6th Cir. 2003)................................................12

*White v. Pauly*, 580 U.S. _ (2017)....................................................................13

## Federal Court Rules

Fed. R. Civ. P. 56(a).............................................................................................11

## Michigan Statutes

M.C.L. § 257.311 ...................................................................................................... 16, 17

M.C.L. § 257.653a ......................................................................................................21

M.C.L. § 257.699(c) ....................................................................................................15

M.C.L. § 257.700(b) ....................................................................................................15

M.C.L. § 257.901 ........................................................................................................17

M.C.L. § 764.15(1)(a) .................................................................................................17

## Other

Wis. Stat. § 347.12(1)(b) ............................................................................................16

## FACTS

On February 28, 2015, Sgt. John Frost was assigned as the night shift road patrol supervisor position with the Eaton County Sheriff's Department. His normal work hours were 6 p.m. until 6 a.m. His patrol area was the "out county" area, the largest part of Eaton County and distinct from the more populous and urban North-East corner of Eaton County formed by Delta Township, which contains part of the City of Lansing and the commercial and retail district on Lansing's West side.

After completing some routine paperwork, Sgt. Frost left the office in Charlotte at about 7 p.m. to conduct some patrol activity, and to meet with the other road patrol supervisor stationed at the Delta Township office.  (Ex 3, Frost at 54-55)  Sgt. Frost was driving a brand new 2015 Ford Explorer SUV, which was fully marked as a police vehicle. (*Id.*)  Sgt. Frost was wearing a fully marked Eaton County Sheriff's Department uniform, and a winter jacket with an embroidered star stating "Sergeant, Eaton County, MI" and his shirt had a metal badge stating "Sergeant, Eaton Co."  He was also wearing a "body camera" since the Eaton County Sheriff was one of the very first departments in the area to implement the use of these devices.

Frost's first traffic stop was for a vehicle with a burned out headlight.  (Ex 1, Frost body cam video 1)  After asking for the driver's license, registration and proof of insurance and verifying the identity of the driver, Sgt. Frost released the driver with a warning, despite the fact the driver was lacking some of the required paperwork, and the registration was not current. The driver did not have his vehicle registration on his person, but provided his driver's license and proof of insurance, which matched the Secretary of State records for ownership of the vehicle. Since he identified himself and cooperated with the traffic stop, Sgt. Frost did not issue a ticket.  Sgt. Frost advised the driver to get his headlight fixed, and obtain a proper proof of registration. This traffic stop ended at 8:21 p.m. The exchange between Sgt. Frost and the

1

occupants of this vehicle was, in all respects, amicable.  (*Id.*)[1]  After the completion of this first traffic stop, Sgt. Frost continued eastbound on M-43 near Cochran Road, heading toward the Delta Office.  M-43 is a two lane state trunk line highway with a posted speed of 55 MPH.

Four minutes after completing his first traffic stop, at approximately 8:25 p.m., Sgt. Frost made his second traffic stop of the evening. Prior to exiting his vehicle, Sgt. Frost stated that he was "stopping this car for flashing me with their brights. I did not have my brights on." (Ex 2, video body cam 2 at 8:24:41)[2]

Sgt. Frost approached the vehicle and told the driver he stopped him for flashing his high beams, despite the fact that his vehicle's high beams were not on.  (*Id.* at 8:25:11)  He requested that the driver provide his driver's license, proof of insurance and proof of registration.  (*Id.*)  Rather than complying, or identify himself in any way, the driver argued with Sgt. Frost concerning the reason for the traffic stop. The driver said, "Yes, you did [have your brights on] sir...I couldn't see, I couldn't see...Dude, trust me, I know...You turned them off when you came around."  (*Id.* at 8:25:13-31)

Sgt. Frost again requested the driver's license, registration, and proof of insurance a second time, but the driver continued to argue with Sgt. Frost, saying, "I watched you turn them off."  (*Id.* at 8:25:32)  Frost asked a third time for the driver's license, registration, and proof of insurance.  (*Id.* at 8:25:34)  The driver responded again by arguing with Sgt. Frost saying, "I did nothing wrong."  (*Id.*)  Sgt. Frost asked again said "Driver's license, registration, proof of insurance, please."  (*Id.* at 8:2:40)

---

[1] Prior to this traffic stop, another driver had flashed his high beams at Sgt. Frost. Since this is a violation of the Michigan Traffic Code, Sgt. Frost attempted to stop the vehicle but was unable.  (Ex 3, Frost at 55)
[2] The incident was transcribed by the Michigan State Police.  A copy of the transcript is attached as Exhibit 4.

The driver, who still had not identified himself, then began to question Sgt. Frost's identity, and his authority to make the traffic stop, and he asked Sgt. Frost to provide three forms of identification, saying, "I don't even know you're an officer, three forms of identification." (*Id.* at 8:25:47)  Sgt. Frost again asked the driver for his license, registration, and proof of insurance, and identified himself as Sgt. Frost.  (*Id.* at 8:25:51)  He repeated, "My name is Sgt. Frost of the Eaton County Sheriff's Office."  (*Id.* at 8:25:54-58)  The driver responded by asking to see Sgt. Frost's badge number.  (*Id.*)  Frost attempted to explain that the driver could not see his badge number, since the Eaton County Sheriff's Office does not issue numbered badges.  (Ex 3, Frost at 97-98)  He told the driver, he "cannot see my badge number."  (Ex 2, video body cam 2 at 8:26:02)

At this point, the driver started recording with his cell phone.  He stated "I am video and audio recording for my safety and your safety." (*Id.* at 8:26:17)  The driver then stated "you just told me that I could not have your badge number, that's against the law, sir." (*Id.* at 8:26:23)  Sgt. Frost responded by saying "my badge number, no, you asked me to show it to you." (*Id.*)  The driver again interrupted saying, "yes, and you said no." Frost continued to explain saying, "I cannot show it to you, my badge number . . ." (*Id.* at 8:26:25)  But he was again interrupted by the driver.

At this point, given the lack of cooperation from the driver, Sgt. Frost radioed Eaton County Central Dispatch for backup.  City of Grand Ledge Police Officer Garrett Schlossberg also heard the radio traffic and began heading toward the stop.  (Ex 5, Schlossberg at 12-16)

The driver then asked if he was being detained. Sgt. Frost responded by saying "<u>Yes you are. . .   You flashed me with your high beams</u>." (*Id.* at 8:26:40)  The driver continued to argue.  Sgt. Frost stated:

> Refusing to give me your ID in a traffic stop is a misdemeanor, right now, you are committing a misdemeanor, you have two choices, you can get with the program and start complying with this traffic stop, or you're going to be taken to jail, those are your two choices.  Driver's license, registration, and proof of insurance, please.  (*Id.* at 8:26:55-27:14)

This was at least the sixth time Sgt. Frost repeated his request that the driver provide his license, registration, and proof of insurance.

At this point, the driver stated, "I do not have my license, and am going to get it.  . . .I do not have it. . . because I just drove my brother to the church."  (*Id.* at 8:27:15-24)   In response, Frost asks the driver to confirm that he does ". . . not have your driver's license on your person, correct?"  (*Id.* at 8:27:24)   However, at this point the driver then changed his story and stated, "Yes I do [have my license] . . . you do not have to see it."  (*Id.* at 8:27:27-30)   The driver then continued to argue that the reason for the traffic stop was improper, and that he had not flashed his bright lights, rather Sgt. Frost had his bright lights displayed.

Sgt. Frost next told the driver that the stop would have been handled totally differently if he had cooperated and complied with his request to provide his identifying information, which had been repeatedly requested.  (8:27:54)   In an effort to obtain compliance, Sgt. Frost also tried to explain to the driver that he was driving a brand new vehicle, that he had been flashed earlier in the shift because the headlights are new and brighter than on other cars.  (*Id.* at 8:28:03-20)   This was mere speculation on Sgt. Frost's part, since that night was the first time he had driven this vehicle and he had no particular familiarity with its headlights.  (Ex 3, Frost at 27-28)   Regardless, Frost hoped that explanation might satisfy the driver, calm him down and get him to voluntarily comply with the lawful requirements of a traffic stop.  (*Id.*)

4

In a further attempt to calm down the driver, Frost also told him that he had stopped other people earlier, who had flashed their bright lights at him[3], but he did not issue any citations.  (*Id.*; Ex 2, video body cam 2 at 8:28:20)  Initially, this did seem to calm down the driver, who stated in reply, "Oh, I'm sorry, then. I'm sorry."  (*Id.* at 8:28:21)  Frost then repeated, for at least the seventh time, his request that the driver comply with the statutory requirements of a traffic stop and provide his license, registration, and proof of insurance.  (*Id.* at 8:28:22)

Unfortunately, the driver did not respond as Sgt. Frost had hoped. He simply responded incorrectly, that he was not required to comply with Sgt. Frost's request[4].  (*Id.* at 8:28:38)  Sgt. Frost repeated, "you do have to give me your driver's license." (*Id.* at 8:28:45).   Again, the driver refused.

At this point, Sgt. Frost radioed dispatch and asked for a "priority" backup. Central Dispatch asked the Grand Ledge Police to help, as they had the closest car.  (Ex 5, Schlossberg at 13)  Ofc. Schlossberg, who had heard the initial request for back-up, now began to head toward Sgt. Frost's location. (Ex 5, Schlossberg at 13-16)  He activated his emergency signals and proceeded to the scene.  (*Id.*)

 After the request for priority back up, the driver began to make a call on his cell phone, but did not inform Sgt. Frost who he was calling. Concerned that the driver was calling for assistance at the scene of the traffic stop, Sgt. Frost decided that he had to immediately arrest

---

[3] As mentioned above, Sgt. Frost had actually only conducted one other traffic stop that evening before his encounter with Deven Guilford. While that driver had not flashed his bright lights, as had Deven, he had "brake checked" Sgt. Frost and mentioned his belief that Frost's headlights were brighter than normal or in "high beam."

[4] Deven Guilford's father and girlfriend reported to investigators that in the weeks before his death, he had been watching a lot of "YouTube" videos focused on police encounters, and that Deven believed these videos were examples of police violating citizens' rights. It is possible these videos were the source of a mistaken belief that he was not required to provide identifying documents during a traffic stop.

the driver, and secure him in his police vehicle. (Ex 3, Frost at 28-29)[5] He opened the driver side door, and told the driver to "get out of the car" and grabbed the driver to pull him from the car. (Ex 2, video body cam 2 at 8:28:53-59) However, the driver stated "no" indicating that he would not leave his vehicle. Sgt. Frost warned the driver he was "gonna get tazed." (*Id.* at 8:29:03) The driver yelled, "do not touch me, officer! Do not touch me, you cannot open my car!" (*Id.* at 8:8:29:04) In response, Sgt. Frost backed away and again commanded the driver to exit the car. (*Id.* at 8:29:16) Then Sgt. Frost pulled his Taser and told the driver to get out of the car, and again warned he could be tazed. (*Id.* at 8:29:17)

The driver eventually did get out of the car. (*Id.* at 8:29:26) Sgt. Frost ordered him to get down on the ground, while pointing his Taser at the driver. The driver then knelt down, but continued to point his cell phone at Sgt. Frost. Sgt. Frost told the driver to "get on the ground, right there, facing me." (*Id.* at 8:29:35) The driver eventually went to his belly, but propped himself up on his elbows, while he appeared to either talk into his cell phone, or use it to record the events, or both. Sgt. Frost ordered the driver to put his arms out to the side. (*Id.* at 8:29:42) The driver did move his left arm slightly toward the side, but continued to hold his right hand forward, holding the cell phone, and facing it toward Sgt. Frost. As such, Sgt. Frost could not complete the handcuffing. At this point, the driver stated that he did not have a weapon. In an attempt to get the driver's hands behind his back, so he could complete the handcuffing process, Sgt. Frost took the phone and tossed it a few feet ahead. (*Id.* at 8:29:54) The cell phone was not damaged, but continued to record for about 25 additional minutes. (Ex

---

[5] Sgt. Frost had recently received training on sovereign citizen and Michigan Militia interactions. The driver's actions were consistent with several of the "hallmakrs" of someone adhering to the tenants of either or both of those groups. (See Ex 3, Frost at 28-37; Ex 6, sovereign citizens legal updates and training materials)

7, phone video 2)  The driver responded yelling, "you can't do that."  (Ex 2, video body cam 2 at 8:29:58)

Sgt. Frost then reached for the driver's arms, saying "son, get your hands behind your back, you're under arrest."[6]  (*Id.* at 8:29:59)  The driver responded saying "you can't do that." Sgt. Frost told the driver two more times to get his hands behind his back, since he was under arrest, but the driver continued to resist, did not comply, and started to turn toward Sgt. Frost. (*Id.* at 8:30:00-04)  Concerned that voluntary compliance with the arrest and handcuffing was not going to occur, and aware that he was actually located on the traveled portion of M-43 near the fog line, Sgt. Frost decided he needed to use his Taser to complete the handcuffing process.  (Ex 3, Frost at 52, 60-64) He fired his Taser at the driver's back, but the Taser was ineffective.[7]  At that point, the driver began to up, caught Sgt. Frost off balance, and was able to stand up. (Ex 2, video body cam 2 at 8:30:04-05)  The driver turned quickly toward Sgt. Frost with his hands and arms raised and charged at him.  (Ex 2, video body cam 2 at 8:30:05-08)

Sgt. Frost stepped backward toward the shoulder and swale of M-43, but was momentarily blinded by his patrol vehicle's spotlight.  (Ex 3, Frost at 95)  Sgt. Frost held his left hand up in an attempt to fend off additional blows, and placed his right hand on his gun to prevent the driver from taking it, but was struck by the driver violently in the left temple, causing him to drop the Taser. (*Id.* at 72-79)  This first blow dazed Sgt. Frost, causing him near loss of consciousness and what he described as memory lapse.  (*Id.*)

---

[6] While this may be the first time Sgt. Frost used the word "arrest," he had previously told the driver that he "was detained" and would be going to jail if he did not cooperate.

[7] Later, it was discovered that only one of the taser prongs was imbedded in the driver's back. The other either did not imbed, or came out during the subsequent struggle.

The driver was able to pin Sgt. Frost on his back in the snow, and sit on top of him. While in this position, the driver repeatedly struck Sgt. Frost in the head and face. (*Id.* at 75-76) Sgt. Frost could taste blood in his mouth, he saw and felt blood in his eyes, and his eye sight was beginning to blur. He felt as though he would lose consciousness. (*Id.* at 92) Fearing that if he did lose consciousness, he would be defenseless and shot with his own weapon, Sgt. Frost decided his only option was to shoot his attacker. (*Id.* at 74) Sgt. Frost drew his weapon, and fired, but the first shot malfunctioned.

After successfully clearing the misfire, Sgt. Frost fired seven times in rapid succession at very close range into the body of his attacker. (Ex 8, Autopsy report; Ex 7, phone video 2). All seven shots impacted the attacker, who fell forward on top of, but toward Frost's side. (Ex 3, Frost at 76-77) Sgt. Frost radioed central dispatch that he had shot someone and was injured. From the point Sgt. Frost fired his Taser, until the first gun shot a mere 10-11 seconds elapsed. All seven gunshot occurred within 3.5 seconds.[8]

The first officer to arrive was Ofc. Schlossberg of the Grand Ledge Police Department. (Ex 5, Schlossberg at 12-16) He found Sgt. Frost kneeling in the snow, near another individual lying in the snow. (*Id.* at 17-18) Sgt. Frost reported to Ofc. Schlossberg that the attacker had pinned him down, was beating on him/clobbering him and he had no choice but to shoot. (*Id.* at 20; Ex 9, Schlossberg report) Grand Ledge Police Lieutenant Chris Blievernicht arrived shortly thereafter. He approached Sgt. Frost, whose face was covered in blood, and asked if he was okay. (Ex 10, Blievernicht at 13-14)[9] Sgt. Frost could not holster his weapon at that time

---

[8] MSP Sgt. James Young, based on an analysis of Guilford's cell phone audio, determined the timing of the shots. The transcript from his deposition is not available as of the time of filing, but the exhibit from Sgt. Young's deposition is attached as Exhibit 14. Sgt. Young's transcript excerpts will be filed as a supplement when it becomes available as Exhibit 15.

[9] Lt. Blievernicht thought Sgt. Frost might pass out, based on the amount of blood on his face and his dazed look. (Ex 10, Blievernicht at 15, 32)

because his holster was full of snow.  (*Id.*)  Afterwards, the attacker was identified as Deven Guilford, Plaintiff's decedent (hereinafter "Guilford").

Sgt. Frost was transported by ambulance to the Sparrow (Lansing) Hospital emergency room. The examining physician found no loose teeth, but did find bruising to an area near his left eye, a laceration in the middle of his forehead, swelling of the upper lip, and a left forehead abrasion; all characterized as "significant facial trauma" with possible jaw and eye socket fractures.  (Ex 11, Frost medical records)[10]  A CT scan disclosed no fractures.  (*Id.*)  Sgt. Frost was discharged from Sparrow just before 2 a.m. with a finding of decreased distance vision, blurred vision, and headaches. The examining ophthalmologist stated that Sgt. Frost had sustained a subconjunctival hemorrhage.  (*Id.*)

An autopsy was conducted by Eaton County Medical Examiner, Dr. Michael Markey. Guilford's cause of death was multiple gunshot wounds, with a total of seven wounds to the front of his body, and 2 exit wounds; one in the back, and one in an arm. The holes in Guilford's t-shirt corresponded with injuries to his body. The description of each wound is summarized below, in the order appearing in the autopsy report. The autopsy report does not provide an opinion concerning the order in which the seven gunshot wounds occurred.  (Ex 8, Autopsy Report)

> Head wound - One bullet entered the upper right front scalp into his right cerebrum and cerebellum, causing multiple skull fractures. This bullet did not exit the body. The main mass of a jacketed bullet was found in back of the neck, with fragments in right forehead and brain. Trajectory was from right to left from front to back, and downward. Shot occurred at close, near-contact range, evidenced by soot on skin. No muzzle imprint noted. This wound was fatal.

---

[10] Ayad George, M.D., who performed the Sgt. Frost's follow up medical examinations testified that Sgt. Frost's would were caused by blunt force trauma, consistent with fist blows, and not sharp objects.  Dr. George's deposition transcript is not available as of the time of filing, but the relevant excerpts will be supplied upon their availability as Exhibit 16.

Right chest - One bullet entered front right upper chest, high on his chest and below collar bone, then traveled into right lung, right hemidiaphragm, liver, right kidney, and back. A deformed jacketed bullet found in right lower back. The trajectory was minimally right to left, front to back, and steeply downward. This shot occurred at intermediate range and gunpowder stippling was found.

Epigastrium (upper midline of belly) - One bullet entered upper central belly region, traveled into the liver, and the esophagus as it meets stomach, and the descending aorta, 11th thoracic vertebrae, and mid-lower left back. Bullet did not exit body. This shot occurred at intermediate range and gunpowder stippling was found.

Left arm pit - One bullet entered the left arm pit and traveled to left back, fracturing left 5th rib, causing a left lung contusion. This bullet did not exit the body and was recovered from the upper left back. The trajectory left to right, slightly front to back. Intermediate range, soot and gunpowder stippling found.

Lateral left lower chest - One bullet traveled to base of left lung, left hemidiaphgragm, spleen, left kidney, left 12th rib. The trajectory left to right, front to back, slightly downward. Fired from intermediate range, gunpowder stippling was found.

Right wrist - One bullet entered through the top near wrist knob, traveled into right ulna and radius it did not exit body and was recovered from anterior lateral right forearm. The trajectory was left to right, outside back to upward. Fired from intermediate range, gunpowder stippling was found. This bullet path fractured wrist bones and effectively disabled the right hand.

Right forearm - One bullet entered roughly the mid-front forearm and grazed the ulna near the elbow. Most of the bullet exited at the elbow, but fragments were recovered from nearby tissue. The trajectory was right to left, anterior to posterior, and upward (distal to proximal). Fired from an intermediate range, gunpowder stippling was found. (Ex 8, Autopsy Report)

Toxicology studies showed levels of THC and THC-COOH, consistent with someone who had been using marijuana over a period of time, and active THC (7.2 ng/mL) suggested that Guilford had last used marijuana within 3-4 hours or sooner of his death. The THC metabolite

numbers (28.6 ng/mL of blood and 293 ng/mL from urine) were consistent with recent smoking. A pill bottle labeled "green crack, 90% sativa/10% indica, 1 gram" was found in the car's arm rest, and a partially smoked hand rolled cigarette containing unknown substance found inside the pill bottle.  (Ex 8, Autopsy Report)

In the opinion of Dr. Markey, the close in range of fire, the unusual location of some of the wounds, and the varying trajectories of the wounds was most consistent with the participants both moving in space, and moving in relationship to each other and the gun fired by Sgt. Frost. He also opined that his findings in the autopsy were "consistent with the altercation" that had been described by Sgt. Frost.  (Ex 12, Markey at 134-135, 141)  This is also consistent with the rapid, jerky motions demonstrated in the body cam video.  (Ex 2, body cam 2 at 8:30:07-18)

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" for purposes of summary judgment if prove of the fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover*, 751 F.2d 171, 174 (6th Cir. 1984).  A dispute over material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 248 (1986).  In considering a motion for summary judgment the court must view the facts under all reasonable inferences in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, where video depicts the material facts of the incident the court may adopt those facts as established in the video. *See Scott v. Harris*, *supra*; *Standifer v. Lacon*, 587 Fed. Appx. 919 (6th Cir. 2014); *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015).

11

When the defendant raises qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to summary judgment. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

## ARGUMENT

## I.    DEFENDANT FROST IS ENTITLED TO QUALIFIED IMMUNITY

Sgt. Frost is entitled to qualified immunity on all allegations made against him. Sgt. Frost's actions, including initiating the traffic stop, attempting to arrest, and using force, were all objectively reasonable under the circumstances. Further, Plaintiff cannot establish that a reasonable officer in Sgt. Frost's position, presented with the same information, would have believed that his or her actions violated any clearly established constitutional right.

## A.    QUALIFIED IMMUNITY GENERALLY

The Supreme Court held that in civil suits for money damages, government officials are entitled to qualified immunity for discretionary acts which do not violate clearly-established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to protect public officials from undue interference with their duties and from potentially disabling threats of liability. *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003). Qualified immunity applies irrespective of whether the official's error was a mistake of law, fact, or fact and law. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity, therefore, "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (emphasis added).

Qualified immunity requires a two-part inquiry. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). The two inquiries are: (1) "whether a constitutional right would have been violated on the facts alleged" and (2) "whether the right was clearly established," which "must be

12

considered on a more specific level." *Id.* at 200.  "This [second] inquiry, it is vital to note, must

be undertaken in light of the specific context of the case, not as a broad general proposition".

*Id.*  "A right is clearly established if there is binding precedent from the Supreme Court, the

Sixth Circuit, the district court itself, or other circuits that is directly on point." *Risbridger v.*

*Connelly*, 275 F.3d 565, 569 (6th Cir. 2002); *see also Mullenix v. Luna*, 577 U.S. _, 136 S.Ct.

305, 308 (2015).

In *White v. Pauly*, 580 U.S. _ (2017), the Supreme Court reversed a denial of qualified

immunity in a deadly force case.  There, the Court cautioned lower courts against defining

"clearly established rights" too broadly:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. *See*, *e.g.*, *City and County of San Francisco v. Sheehan*, 575 U. S. ___, ___, n. 3 (2015) (slip op., at 10, n.3) (collecting cases). The Court has found this necessary both because qualified immunity is important to "'society as a whole,'" ibid., and because as "'an immunity from suit,'" qualified immunity "'is effectively lost if a case is erroneously permitted to go to trial,'" *Pearson*[, *supra*].
>
> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U. S. 731, 742 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. *Anderson v. Creighton*, 483 U. S. 635, 640 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*, at 639.
>
> The panel majority misunderstood the "clearly established" analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment.

*White*, *supra* slip opinion at *6.  The Court further cautioned that, in the excessive force

context, *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1

(1985) do not create clearly established law unless in an "obvious case." *White*, *supra* at *7.

## II.    THE FOURTH AMENDMENT AND EXCESSIVE FORCE, GENERALLY

While it is true that, in general, "both the right to be free from unreasonable seizures and to be free from the use of excessive force under the Fourth Amendment are clearly established," it is well settled that not every use of force amounts to a constitutional violation. *Adams v. Metiva*, 31 F.3d 375, 386-87 (6th Cir. 1994) (citations omitted).  The U.S. Supreme Court in *Graham*, *supra* at 395, held that all claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop or other "seizure" should be analyzed under the Fourth Amendment's "objective reasonableness" standard.    The reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*. at 396-97.  The Court must allow for "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation."  *Id*. at 396-397.  "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."  *Saucier*, *supra* at 205.  Determining whether the force used by a law enforcement officer is "reasonable" under the Fourth Amendment requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interest at stake."  *Graham*, *supra* at 396.

Apprehension of an individual by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.  *Garner*, *supra* at 7.  *Garner* stated that deadly force can be used when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. . ."  471 U.S. at 11-12.  "Probable cause," while "incapable of precise definition," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (unanimous), means that the facts and circumstances of which the officer is

aware are reasonably viewed as accurate are "sufficient onto themselves to warrant a man of reasonable caution to believe that 'deadly force is necessary.'" *See Berger v. New York*, 388 U.S. 41, 55 (1967).

### III.   PLAINTIFF CANNOT ESTABLISH SGT. FROST'S ACTIONS WERE OBJECTIVELY UNREASONABLE OR VIOLATE CLEARLY ESTABLISHED FOURTH AMENDMENT RIGHTS[11]

#### A.   SGT. FROST HAD PROBABLE CAUSE TO INITIATE THE TRAFFIC STOP

"Stopping and detaining a motorist constitute[s] a 'seizure' within the meaning of the Fourth Amendment." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (alteration in original) (*quoting Delaware v. Prouse*, 440 U.S. 648, 653 (1979). For a traffic stop to be valid, the police officer must have probable cause to believe a traffic violation has occurred. *Id*. (*citing United States v. Blair*, 524 F.3d 740 (6th Cir. 2008)). M.C.L. § 257.700(b) states:

> Whenever the driver of a vehicle approaches an oncoming vehicle within 500 feet, such driver shall use a distribution of light or composite beam so aimed that the glaring rays are not projected into the eyes of the oncoming driver.
> The lowermost distribution of light, specified in [M.C.L. § 257.699(c)], shall be deemed to avoid glare at all times regardless of road contour and loading.[12]

Here, it is undisputed that Guilford admitted he flashed his high beams at Sgt. Frost. It is further undisputed Sgt. Frost initiated the traffic stop because Guilford flashed his high beams while he was driving past him. M.C.L. § 257.700(b) does not contain a specific exemption for temporary or intermittent "flashing" lights at oncoming traffic.[13] As Sgt. Frost explained at his

---

[11] Plaintiff has filed a motion to file a second amended complaint, which separately asserts each segment of the incident as a separate claim. In the proposed second amended complaint, Plaintiff's also assert as damages Guilford's death for each of the separated segmented claims. For example, Plaintiff asserts that initiating the traffic stop proximately caused Guilford's death. The Sixth Circuit has rejected similar arguments based on proximate cause principles. *See, e.g., Estate of Sowards v. City of Trenton*, 125 Fed. Appx. 31, 40-42 (6th Cir. 2005).

[12] M.C.L. § 257.699(c) requires a "low beam" setting for headlights on a motor vehicle.

[13] For example, the equivalent Wisconsin statute has a specific exemption for intermittent flashing an

deposition, if an oncoming vehicle has their highbeams on, the other driver should look to the fogline rather than risk both drivers having highbeams flashed at them. (Ex 3, Frost at 11-12). This is consistent with the Michigan Secretary of State's driver's manual, which specifically states: "It is illegal to use or even flash high-beam headlights within 500 feet of an oncoming vehicle," while also advising that the high beams can momentarily blind for several seconds. (Ex 13, Excerpt from "What Every Driver Must Know," SOS-133, at 74; entire document is available at https://www.michigan.gov/documents/wedmk_16312_7.pdf, last accessed on 1/27/2017). Therefore, Sgt. Frost had probable cause to initiate the traffic stop. Further, given there is no explicit exception for flashing, or momentarily blinding, another vehicle, and the state agency administering driver's licenses has specifically and publicly indicated the illegality of the action, no reasonable officer in Sgt. Frost's position would have believed that initiating a traffic stop violated any clearly established constitutional right. Therefore, qualified immunity is applicable to any claim based on the initial traffic stop.

**B. SGT. FROST DID NOT UNNECESSARILY PROLONG THE TRAFFIC STOP AND HAD REASONABLE SUSPICION AND PROBABLE CAUSE TO DETAIN GUILFORD**

Generally, a traffic stop must only last as long as necessary to effectuate the purpose of the stop, such as to issue a ticket or warning. *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). That is, any detention beyond the initial stop must be "reasonably related in scope to circumstances justifying the initial interference." *Davis*, *supra* 353 (*quoting United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)). Officers may extend a stop if events during the stop provide "reasonable suspicion that the individual has engaged in more extensive criminal conduct." *Bell*, *supra* at 539. M.C.L. § 257.311 requires anyone operating a motor

---

oncoming vehicle. *See* Wis. Stat. § 347.12(1)(b) ("This paragraph does not prohibit an operator from intermittently flashing the vehicle's high-beam headlamps at an oncoming vehicle whose high-beam headlamps are lit.").

vehicle in Michigan to carry his or her driver's license with them, and to produce the same upon request of an officer. Failure to produce a driver's license on demand or to carry it while driving constitutes a misdemeanor. M.C.L. § 257.901. A police officer may arrest an individual who commits a misdemeanor in the officer's presence. M.C.L. § 764.15(1)(a).

In Michigan, it is clearly established that a police officer may arrest an individual and place him in handcuffs for violating these statutes, when the violations occur in the presence of the officer. In *Hoover v. Walsh*, 682 F.3d 481, 499 (6th Cir. 2012), police pulled over an individual who refused to produce his driver's license, in violation of M.C.L. § 257.311 and 257.901. The Court held:

> The officers who stopped Mr. Hoover had probable cause to arrest him for violating the Michigan law that requires a driver to keep his driver's license in his immediate possession at all times while operating a vehicle and to provide it to police officers on request. See Mich. Comp. Laws § 257.311 (2007). Such a violation constitutes a misdemeanor. Mich. Comp. Laws § 257.901 (2007); see also *People v. Boykin*, 31 Mich. App. 681, 188 N.W.2d 100, 101 (1971). The parties agree that Corporal Walsh requested Mr. Hoover's driver's license and that Mr. Hoover did not produce one during the length of their interaction. Consequently, the officers had probable cause to arrest Mr. Hoover before they asked him to exit his vehicle, put him in handcuffs or transported him to the police station.

*Id.* at 499-500 (footnotes omitted).

Here, it is undisputed Guilford was not compliant with the traffic stop. Despite not raising his voice, he repeatedly refused at least eight lawful demands for his driver's license. Rather than comply, he chose to argue with Sgt. Frost, demonstrating he had no intention of compliance. After several minutes and several commands, he then admitted he did not have his driver's license on him, another violation. While he changed his story, his noncompliance remained—he insisted he never needed to produce his license. Under clearly established precedent, Sgt. Frost had probable cause to arrest him at that time.

17

In fact, Sgt. Frost even gave Guilford another opportunity to comply without arrest, explaining that if he continued to refuse to produce the license, he was going to jail. Consistent with his actions throughout the encounter, Guilford chose obstinacy over simple compliance. He then decided to make a phone call, without warning Sgt. Frost. Sgt. Frost had probable cause to make the arrest, and chose to effectuate it by opening the door and forcing the non-compliant Guilford out of the car. There is no constitutional right to a prior order to exit a vehicle before an officer may open the door, particularly where probable cause exists for an arrest. Therefore, no constitutional violation occurred when Sgt. Frost opened the door. No reasonable officer could have believed that attempting to arrest Guilford at that point violated any clearly established constitution right. As such, qualified immunity applies to the attempted arrest and opening of the door to the vehicle.

### C. IT WAS OBJECTIVELY REASONABLE FOR SGT. FROST TO POINT HIS TASER AT GUILFORD WHEN ORDERING HIM FROM THE VEHICLE.

In the Sixth Circuit, claims of excessive force should be analyzed in segments, such that a Court's review is limited to officers' actions in the moments preceding the use of force and that other actions leading up to that moment are deemed irrelevant. *See Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007); *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996). The Court should consider only the seizure itself, and not the events leading up to the seizure:

> The proper approach . . . is to view excessive force claims in segments. That is, the court should first identify the "seizure" at issue here and then examine "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances."

*Livermore*, *supra* at 406. The *Dickerson* Court explained the purpose behind this segmented approach:

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Dickerson*, *supra* at 1161-1162 (*quoting* **Plakas v. Drinski**, 19 F.3d 1143, 1150 (7th Cir. 1994) and *citing with approval* **Drewitt v. Pratt**, 999 F.2d 774, 778–80 (4th Cir. 1993) and **Cole v. Bone**, 993 F.2d 1328, 1333 (8th Cir. 1993).

Here, the information Sgt. Frost had when he chose to pull his Taser and order Guilford from the car was: (1) Guilford had committed a traffic violation, (2) Guilford was argumentative from the beginning of the encounter, (3) Guilford refused at least eight demands to produce his license, a misdemeanor, (4) Guilford claimed he was not in possession of his driver's license, another misdemeanor, (5) Guilford refused the officer's commands, and instead, chose to make a phone call to an unknown individual, (6) Guilford physically resisted when Sgt. Frost tried to physically remove him from the vehicle, (7) Sgt. Frost did not know if Guilford had any weapons in the vehicle. Further, Sgt. Frost even warned Guilford he could be tased if he did not exit the vehicle, before Sgt. Frost even unholstered the Taser. Further, as the video makes clear, Guilford did not even begin his feigned compliance until he actually saw the Taser pointed at him—when Sgt. Frost first opened the door and tried to remove him, Guilford's response was to pull away, yell at the officer, and shout that the officer could not open his door or touch him. No reasonable officer could have believed that pointing a Taser at an individual in these circumstances constituted excessive force. *See*, *e.g.*, **Kelley v. McCafferty**, 283 Fed. Appx.

19

359, 363-64 (6th Cir. 2008) (holding officers may point a weapon at individual they reasonably, even if mistakenly, believe is dangerous); *Stricker v. Twp. Of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) (finding that pointing Taser to gain compliance from individual during execution of warrant was objectively reasonable under Fourth Amendment); *see also* *Pickard v. Hardy*, No. 3:15-cv-P305, 2016 WL 865327 (W.D. Ky., Mar. 2, 2016) (holding officer may point Taser at a recalcitrant inmate without violating Eighth Amendment).

### D.   IT WAS OBJECTIVELY REASONABLE TO ORDER GUILFORD TO LIE DOWN NEXT TO THE VEHICLE WHILE ATTEMPTING TO EFFECTUATE THE ARREST

Plaintiff asserts Guilford's constitutional rights were violated when Sgt. Frost ordered him to lie down on the ground next to vehicle near the fog line.  While Plaintiff provides scant factual basis for this claim, let alone legal justification, it is clear there is no constitutional right to be arrested at the exact location of one's choosing.  While Plaintiff makes the allegation that Sgt. Frost could have ordered Guilford, who demonstrated non-compliance throughout the incident, to the front or back of the vehicle, they provide no legal justification for such an order. Clearly, the constitution does not require that individuals must be ordered to lie either in front or behind their vehicles when placed under arrest.[14]  Further, while Plaintiff alleges injury as a result of being ordered to lie down on the paved fog-line area, there is no evidence of such. The video clearly demonstrates Guilford was ordered to the ground, and only after numerous commands, does he comply.  Sgt. Frost did not use any takedown maneuvers, such as a leg sweep.  Even when on the ground, Guilford continues his non-compliance by refusing to put his arms to his side, and then, to put them behind his back.  To the extent Plaintiff is asserting a constitutional right to free from the potential danger of oncoming or passing traffic, the claim

---

[14] Plaintiff's claim is also absurd.  Essentially, they assert Guilford should have been ordered to lie down in the snow near the swale / ditch, as opposed the clear, paved portion of the skirt.

would be equally unsustainable.  It is undisputed Sgt. Frost's patrol vehicle had its flashing lights, alerting oncoming traffic to slow down and approach with caution.[15]  *See* M.C.L. § 257.653a.  Additionally, the site where Guilford was ordered to lie down was the same spot Sgt. Frost had been standing for the first several minutes of the encounter—without being hit by passing traffic.  There is simply no legal or factual support that Guilford's constitutional rights were violated in away way when he was ordered to lie next to the fog line of the road.  No reasonable officer in Sgt. Frost's position could have believed that ordering the recalcitrant and non-compliant Guilford to the ground violated any clearly established constitutional rights.

### E.   SGT. FROST'S USE OF THE TASER WAS OBJECTIVELY REASONABLE

As noted above, the Sixth Circuit (together with a majority of its sister Circuits) applies the segmented analysis to use of force claims.  Plaintiff asserts Sgt. Frost's decision to use his Taser after unsuccessfully attempting to handcuff Guilford constituted excessive force.  This is clearly untenable under the law and the uncontroverted facts.

Here, together with the facts Sgt. Frost had leading up to his decisions to point the Taser at Guilford and order him to the ground, Sgt. Frost had the following: (1) Guilford refused at least three commands to put his hands behind his back, (2) Guilford was yelling back at Sgt. Frost, (3) Guilford's arms are seen in the video tensed, rather than moving toward his back, and (4) rather than comply, Guilford turned around toward Sgt. Frost as Sgt. Frost was attempting to place his arms behind his back.

"[W]hen viewed from the prospective of a reasonable officer on the scene and not with 20/20 hindsight", ***Fox v. DeSoto***, 489 F.3d 227, 236 (6th Cir. 2007), it is clear Sgt. Frost's use of the Taser was a reasonable, non-lethal use of force to attempt to bring this situation under

---

[15] Sgt. Frost's body camera video shows a vehicle travelling westbound able to safely pass the scene as Guilford exited the vehicle.  (See Ex 2, body cam 2 at 8:29:27)

control.   Given that deference must be given to officers making split-second decisions, *Graham*, *supra*, and that an officer may use more force than necessary when he reasonably believes a suspect may fight back, ***Saucier***, *supra*, qualified immunity should apply to the use of the Taser.  Guilford had already demonstrated a consistent refusal to comply with Sgt. Frost's lawful commands.  The first time he even feigned compliance was when Sgt. Frost unholstered and pointed the Taser at him.  Even then, however, Guilford's compliance was guarded, at best. He refused to put his arms out, refused to put the phone down, refused to put his arms behind his back.  In those seconds, particularly where Guilford continues to argue, yells back at Sgt. Frost, tenses his arms, and turns toward him, Sgt. Frost was justified in believing force was necessary to effectuate compliance and complete the arrest.  Sgt. Frost reasonably believed the force necessary to gain compliance was his electronic control device, his Taser.  His decision to deploy it at that time was reasonable.   No reasonable officer could have believed it was a violation of a clearly established constitutional right.  As such, Sgt. Frost is entitled to qualified immunity.

### F.   SGT. FROST WAS JUSTIFIED IN HIS USE OF DEADLY FORCE AND ENTITLED TO QUALIFIED IMMUNITY

The case of ***Davenport v. Causey***, 521 F.3d 544 (6th Cir. 2008) outlines the facts and circumstances that have been held to be important when evaluating whether an officer had probable cause to believe deadly force is necessary.  One consideration is whether the suspect poses an immediate threat to the safety of the officer.  *Davenport, supra* at 551.  The court also discussed "the demeanor of the suspect," *citing **Solomon v. Auburn Hills Police Department***, 389 F.3d 167, 174 (6th Cir. 2004) (quoting ***Minchella v. Bauman***, 72 Fed. Appx. 405, 408 (6th Cir. 2003) (unpublished)).  *Davenport* also held:

> More force is also proper, which could include deadly force, if the suspect was fighting with the police, ***Untalan v. City of Lorain***,

430 F.3d 312, 317 (6th Cir. 2005), or was intoxicated and non-compliant, *Monday v. Oullette*, 118 F.3d 1099, 104-05 (6th Cir. 1997).

Here the recorded events clearly establish the argumentative, uncooperative and belligerent attitude of Guilford.  Further, the record clearly, unequivocally and uncontrovertibly establishes the injuries suffered by Sgt. Frost requiring his need to defend himself using deadly force.   Here the events of Plaintiff's assault on Sgt. Frost took place in approximately 14 seconds.   Sgt. Frost was struck in the head and was concerned that he was about to lose consciousness.  He was struck and sustained a severe cut which compromised his vision.  As Plaintiff continued to strike him, he felt his only recourse was to use his gun.  The courts have held that an officer must be given some leeway when a court analyzes the reasonableness of his decision.  It is first important to remember that what is a "reasonable" belief could also be a mistaken belief, and that the fact it turned out to be a mistaken does not undermine its reasonableness as considered at the time of the acts.  *Davenport*, *supra*, at 552 citing *Saucier*, *supra* at 205.  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, *supra* at 396.  As noted above, more leeway is provided to the officer in determining reasonableness when the "circumstances are tense, uncertain, or rapidly evolving" and the officer is forced to "make a split-second judgment." *Id*. at 397.  The court is required to provide a "measure of deference to the officer's on-the-spot judgment about the level of force necessary." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) *quoting Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).  This "measure of deference" 'carries a great weight' when all parties agree that the events in question happened very quickly,' as here." *Untalan*, *supra* at 315; *see also Rush v. City of Lansing*, 644 Fed. Appx. 415, 423-424 (6th Cir. 2016) (finding that officer was entitled to qualified immunity where he fired a second shot

23

at plaintiff with a knife, only seconds after the first shot, because it was not unreasonable for the officer to conclude the plaintiff "as still posing a threat when he fired the second shot, even if he was ultimately mistaken in making a split-second assessment.").

There are also facts and circumstances that should not be considered. The facts and circumstances are viewed objectively, from the perspective of a reasonable officer, and therefore the subjective intent or motivation of the officer is irrelevant. *Graham*, *supra* at 397. Also irrelevant is whether or not the officer had other means of force at his disposal. *Davenport*, *supra* at 552. The Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances. *Dickerson*, *supra* at 1160.

Here, as in *Davenport*, there are many factors "counseling" force. Guilford was repeatedly non-compliant with Sgt. Frost's repeated instructions. Guilford actively resisted arrest and violently attacked Sgt. Frost. It is clear that he caused Sgt. Frost's serious injury, and almost rendered him unconscious using blows with his fist. Closed fist blows may constitute deadly force. *Davenport*, *supra* at 552-553 (*quoting Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007)). As in the *Davenport* case, Mr. Guilford had only been stopped for a traffic violation and yet was reacting in a non-compliant, argumentative, belligerent, and subsequently violent manner.[16] Sgt. Frost had already attempted to deescalate the situation by explaining why Guilford was stopped, that he had been flashed previously, etc. However, Guilford remained uncooperative. While Guilford used the word "sir" during the initial part of the encounter, his behavior then was uncooperative, at best. When he finally exited his vehicle, he continued his non-compliance while Sgt. Frost attempted to handcuff him. He tensed his

---

[16] We could only speculate the presence of marijuana was the reason for his irrational behavior.

body and refused to put his hands behind his back.  Sgt. Frost's use of the Taser, a non-lethal force measure, was ineffective against the resistant Guilford.

The video clearly establishes Guilford get up and attack Sgt. Frost.  This was clearly a violent and angry attack by Guilford.  While he was not armed with an external weapon, as noted above, closed fist blows may be deadly.  It is undisputed Guilford landed several of these on Sgt. Frost, almost causing unconsciousness.  Once Mr. Guilford began his attack things evolved very rapidly and the court must give deference to Sgt. Frost's on-the-spot decision making.  Here as in the *Davenport* case, there is no constitutional violation.  Sgt. Frost repeatedly warned Mr. Guilford that if he would simply cooperate the traffic stop would go in a completely different direction.  Not even Sgt. Frost could anticipate the assault by Guilford that would require Sgt. Frost to use force.  No reasonable officer could have believed that the use of deadly force in this situation would have violated Guilford's clearly established constitutional rights.  As such, Sgt. Frost is entitled to qualified immunity.

## CONCLUSION

For the above stated reasons, Defendant requests that this Court find that no constitutional violation occurred and that Sgt. Frost is entitled to qualified immunity.

**WHEREFORE**, Defendant request this Honorable Court grant summary judgment and award attorney fees and costs wrongfully sustained herein.

Respectfully submitted,

JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C.

/s/ James L. Dyer_____
James L. Dyer
Attorney for Defendant
822 Centennial Way, Ste. 270
Lansing, MI 48917
(517) 886-3800
Dated:  January 31, 2017                P32544

25

**PROOF OF SERVICE**

I hereby certify that on January 31, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record identified in the caption.

Respectfully submitted,

JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C.

/s/ James L. Dyer_____
James L. Dyer
Attorney for Defendant
822 Centennial Way, Ste. 270
Lansing, MI 48917
(517) 886-3800
P32544

Dated: January 31, 2017