*BRIAN GUILFORD, as Personal Representative of the Estate of Deven Guilford v
SGT. JONATHON FROST*

**Case No. 15-cv-01053**

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**Exhibit 3 - Frost deposition transcript**

# *In The Matter Of:*

## Brian Guilford, et al. v. Eaton County, et al.

## Sergeant Jonathon Frost

## September 9, 2016



Court Reporting and Video

Sergeant Jonathon Frost
September 9, 2016

Page 11

1       that covers the activation of high beams towards an

2       oncoming vehicle within 500 feet.

3   Q.  Do you distinguish between steady activation of high

4       beams and/or flashing lights to get the other vehicle

5       to cut down their high beams?

6   A.  As -- I'm trying to understand your question.

7   Q.  Okay.

8   A.  Whether the high beams are steadily on or whether they

9       are they're flashing, my interpretation is that they

10      are both illegal actions according to the Michigan

11      Motor Vehicle Code.

12  Q.  So nobody should ever flash their lights?

13  A.  Correct.

14          MR. DYER:  That question assumes there's an

15      oncoming vehicle, of course?

16          MR. DAVIS:  I'm sorry?

17          MR. DYER:  That question assumes there was an

18      oncoming vehicle, of course?

19          MR. DAVIS:  I'm real deaf.

20          MR. DYER:  Your previous question assumed that

21      there was an oncoming vehicle.  I assume that question

22      also assumes there was an oncoming vehicle?

23          MR. DAVIS:  Yes, you're right.

24  BY MR. DAVIS:

25  Q.  Is there anything a driver can do to attempt to get an

Sergeant Jonathon Frost
September 9, 2016

Page 12

1          on coming vehicle to lower their high beams if they

2          are within 500 feet and obstructing the vision of the

3          vehicle which is being driven toward it?

4     A.   **The safest thing a driver can do when faced with a**

5          **situation like that is to not operate their high beams**

6          **than take the risk of having both drivers having**

7          **difficulty seeing.  Instead, it's my understanding,**

8          **that the driver should look at the fog line and use**

9          **that as a reference to continue in their current**

10         **direction.**

11    Q.   Is that a part of your training?

12    A.   **No.**

13    Q.   You did go to a police training academy, did you

14         not?

15    A.   **Yes.**

16    Q.   Where?

17    A.   **I went to Mid-Michigan Police Academy at Delta College**

18         **in Bay City.**

19    Q.   And how long was that course?

20    A.   **That course was part of my associate's degree, and the**

21         **course ran for a semester of college.**

22    Q.   During that course, was any part of it traffic

23         enforcement?

24    A.   **Yes.**

25    Q.   And did any part of it touch on the topic which we've

Sergeant Jonathon Frost
September 9, 2016

Page 27

1          MR. DYER:  Object to form, foundation; and the

2          question is also argumentative.

3          Answer it if you can.

4          THE WITNESS:  No, it didn't.

5   BY MR. DAVIS:

6   Q.   You knew that your lights in one fashion or another

7        were eliciting responses from oncoming vehicles that

8        night, didn't you?

9   **A.   I suspected it to be a possibility.**

10  Q.   Did you or did you not stop one or more vehicles who

11       flashed their lights at you that night?

12  **A.   The only vehicle I stopped for flashing their lights**

13       **at me that night was the one --**

14  Q.   I'm sorry?

15  **A.   The only vehicle I stopped for flashing their lights**

16       **at me that night was driven by Deven Guilford.**

17  Q.   Okay.  Did you tell him that you had stopped others

18       for the same thing?

19  **A.   Yes.**

20  Q.   Why did you do that?

21  **A.   I did that as a technique to help deescalate the**

22       **situation in an effort to help him understand that the**

23       **flashing of his high beams was not that erroneous of**

24       **an offense in an effort to try to bring him back down**

25       **to a level where I could have a conversation with him**

Sergeant Jonathon Frost
September 9, 2016

Page 28

1      and gain compliance.

2   Q.  So you believed that lying to him about what you had

3      done earlier would help the situation?

4   A.  Yes.

5   Q.  Please explain to me why you thought that.

6   A.  He was very anxious, irritated with the traffic stop

7      to begin with.  It was my hopes that if we downplayed

8      the seriousness of it that maybe he would then start

9      to become more compliant and we could get a dialogue

10      going.

11   Q.  Did you ever say, Look, this is not a serious offense;

12      there's no reason for you to be upset?

13   A.  Not in those specific words.

14   Q.  Okay.  You initially told him because you knew he had

15      a cell phone that it was okay if he recorded the

16      encounter, did you not?

17   A.  Yes.

18   Q.  And he did?

19   A.  Correct.

20   Q.  And it was apparently at some point when he started to

21      make a call with that cell phone that somehow your

22      concerns were aroused; is that right?

23   A.  Yes.

24   Q.  Why?

25   A.  During the traffic stop, certain comments and

Sergeant Jonathon Frost
September 9, 2016

Page 29

```
 1        statements were made that made me believe that he was

 2        possibly involved with some kind of a sovereign

 3        citizen- or militia-type movement.

 4   Q.   Okay.  And that was when he didn't want to show you

 5        his license or wasn't admitting that he didn't have a

 6        license or before he admitted that the license wasn't

 7        on him; is that right?

 8           MR. DYER:  Object to the form of the question.

 9           Go ahead and answer.

10           THE WITNESS:  That was one indicator.

11   BY MR. DAVIS:

12   Q.   Okay.  What else?

13   A.   Another indicator that I observed or heard was when he

14        asked me for three forms of identification.  He had

15        only rolled his window down part way which seemed odd

16        at the time.  He made statements that he was recording

17        for my safety and for his, and those are the ones that

18        stick out.  I may have -- I would have to go back and

19        review and see if there was anything else.  But those

20        are the ones that come to mind currently.

21   Q.   We agree, don't we, that he always either called you

22        sir or officer and was polite, isn't that true?

23   A.   He did call me sir or officer.

24   Q.   You agree he was polite?

25   A.   To an extent he was polite.  The inflections in his
```

Sergeant Jonathon Frost
September 9, 2016

Page 30

```
 1         voice to me said otherwise at the time, but he was
 2         saying sir or officer.
 3    Q.   It's not unusual for people to resent being pulled
 4         over, is it?
 5    A.   I have run into people in the past who have resented
 6         being pulled over; but throughout my ten years of
 7         experience, most incidents that happen at the side of
 8         the car are fairly cordial.
 9    Q.   Have you had experience with people who are happy
10         being pulled over?
11    A.   No.  I wouldn't say happy is the word.
12    Q.   Therefore, if resent is too strong a word, the fact of
13         the matter is most people don't like being pulled
14         over --
15    A.   Cor --
16    Q.   -- and you're used to that, right?
17    A.   Correct.
18    Q.   Now, can you describe for me the training -- actual
19         training, if any, you had had with regard to what is
20         known as the sovereign citizen's movement as of that
21         evening?
22    A.   Training that I had received at that time was an
23         in-service training put on by Deputy Holiday where he
24         specifically went into some of the sovereign citizen
25         movements and things to expect and indicators.  Other
```

Sergeant Jonathon Frost
September 9, 2016

Page 31

1    **things that I had seen were training bulletins that**
2    **came across my e-mail.**

3    Q.   Had you ever actually encountered a person who
4         described themselves as a sovereign citizen?

5    A.   **Not on the road.**

6    Q.   Had you been given to understand that a lot of
7         teenagers think of themselves as sovereign citizens?

8    A.   **There was no specific age that someone could be a**
9         **sovereign citizen that I remember.**

10   Q.   But based on the responses that you've described from
11        Mr. Guilford, even though he was polite, you suspected
12        that he considered himself to be a sovereign
13        citizen?

14   A.   **I suspected it was a possibility, yes.**

15   Q.   And not only that, according to you, you suspected
16        that he had friends nearby who were also sovereign
17        citizens who were on the ready and who would be
18        willing to come and attack you?

19   A.   **I suspected it was a possibility, yes.**

20   Q.   Based on what?

21   A.   **Based on the statements that he had made and the**
22        **training that I had received previously.**

23   Q.   I'm sorry?

24   A.   **Based on the statements he had made and the training I**
25        **had received previously.**

Sergeant Jonathon Frost
September 9, 2016

Page 32

1   Q.   Have you ever spoken to an officer who has been
2        attacked by sovereign citizens during a traffic
3        stop?

4   A.   **No.**

5   Q.   Have you ever been made aware of any incident where an
6        officer has been attacked by sovereign citizens from
7        the vicinity?  Not the object of the traffic stop, but
8        in the vicinity of the traffic stop.

9   A.   **No.**

10  Q.   But at the point that Mr. Guilford began to make a
11       telephone call, according to you, you became concerned
12       that he was broadcasting in some fashion to the
13       sovereign citizen's movement or militia and attempting
14       to bring them to the scene?

15  A.   **I was concerned that it was possible, yes.**

16  Q.   Did he ever finish dialing, if you can recall, when he
17       was making that call?

18  A.   **I don't recall.**

19  Q.   Did you ever hear him say anything into the phone
20       during that call?

21  A.   **I don't remember.**

22  Q.   Did you ask him who are you calling?

23  A.   **No.**

24  Q.   Other than merely dialing his cell phone, did he say
25       or do anything which gave rise to your suspicions?

Sergeant Jonathon Frost
September 9, 2016

Page 33

1  A.   None other than the ones that I had previously

2       mentioned.

3  Q.   But that mere dialing of the cell phone was sufficient

4       to induce you to reach into the vehicle and attempt to

5       remove him before ordering him out of the vehicle?

6            MR. DYER:  Object to the form and foundation of

7       the question.  It's inconsistent with his past

8       testimony.

9            Go ahead and answer.

10           THE WITNESS:  When the -- as I was standing

11      outside of his car and I began to get the indicators

12      of that he may possibly be involvement in a movement

13      like that, I made the decision at that point that if

14      he decided to do anything other than videotape with

15      his phone and decided to try to make a phone call that

16      I was going to have to stop that phone call from being

17      made to possibly protect myself and the other deputies

18      that may be responding to the scene.

19 BY MR. DAVIS:

20 Q.   You had already called for backup, right?

21 A.   Yes.

22 Q.   And how far away was the backup?

23 A.   I wasn't entirely sure.

24 Q.   Wouldn't have been hard for you to find out, would

25      it?

Sergeant Jonathon Frost
September 9, 2016

Page 34

1    A.    **During the traffic stop, it would have been**

2          **difficult.**

3    Q.    You had called for backup?

4    A.    **Yes.**

5    Q.    Okay.  You had communications equipment on your body

6          that you could check with the dispatcher or some

7          person responsible for that and say where is

8          so-and-so; how long will it be before they're here?

9    A.    **That could have been a possibility.**

10   Q.    But you didn't do that?

11   A.    **No.**

12   Q.    Did you make a conscious decision not to do that?

13   A.    **No.**

14   Q.    If you believed that you might be getting into a

15         confrontation or a developing troublesome incident,

16         however you want to put it, why would you not want to

17         deescalate until your backup arrived?

18   A.    **I'm trying to understand your question.**

19   Q.    You believe that somehow or another Mr. Guilford was

20         at least somewhat resentful, if not becoming upset,

21         with the encounter with you, right?

22   A.    **Yes.**

23   Q.    And you believed that he night be associated with some

24         loose sovereign citizen militia grouping that might

25         represent some danger to you, right?

Sergeant Jonathon Frost
September 9, 2016

Page 35

1    A.    Yes.

2    Q.    And you knew and had already called for backup,

3          right?

4    A.    Yes.

5    Q.    And you could have made a determination about when the

6          backup would arrive, couldn't you?

7    A.    **The -- when I requested backup, I knew that the**

8          **closest possible unit would get there as soon as they**

9          **possibly could.  The distance that they there and the**

10         **time that they were traveling was irrelevant at that**

11         **point.**

12   Q.    This is at night?

13   A.    **Yes.**

14   Q.    M-43 near Mulinek (phonetic) is not a particularly

15         heavily traveled road is it?

16   A.    **It's a very heavily traveled road.**

17   Q.    How so?

18   A.    **It's an M route.**

19   Q.    Huh?

20   A.    **It's an M route.  It's a big go-between between**

21         **Grand Ledge and the other areas off to the west.  It's**

22         **a very heavily traveled road.**

23   Q.    All right.  Have you looked at the video to determine

24         during the period of time that you were there by the

25         road how many cars went by?

Sergeant Jonathon Frost
September 9, 2016

Page 36

1   A.   No.

2   Q.   Do you have any independent recollection.

3   A.   No.  I remember cars going by, but I wasn't

4        counting.

5   Q.   I understand.  So if I said more or less than five,

6        could you answer?

7   A.   No.

8   Q.   Okay.  So assuming that some backup was coming and

9        would get there as fast as possible, you didn't think

10       that it was necessary to or beneficial to determine

11       how long that might be?

12  A.   No.

13  Q.   And you didn't think that it was beneficial to wait

14       however long that might be?

15  A.   No.

16  Q.   And you believed that Mr. Guilford might be somehow

17       connected with the sovereign citizen militia movement,

18       right?

19  A.   Yes.

20  Q.   And you believed that he had the ability to rally

21       those forces to the location before your backup got

22       there?

23  A.   Believed it was a possibility to get them there either

24       before my backup arrived, as my backup was arriving,

25       or after my backup was already on scene.

Sergeant Jonathon Frost
September 9, 2016

Page 37

1  Q.  Why did you think that?

2  **A.  Based on the statements he's made during the traffic**

3  **stop and the training that I had gotten previously, it**

4  **was a possibility in my mind.**

5  Q.  You have used the word "possibility" repeatedly during

6      this deposition.  With regard to any of the questions

7      that I have put to you where you've used the word

8      "possibility" in the answer, are there any of them

9      that you would be willing to substitute the word

10     probability for?

11     MR. DYER:  Object to the form and foundation of

12     the question.

13     Don't answer.  Unless you specify a specific

14     question, don't answer that.

15     I just told him not to answer.  I just told him

16     not to answer that question --

17     MR. DAVIS:  Okay.

18     MR. DYER:  -- unless you present a specific

19     question where he's used the word "possibility."

20 BY MR. DAVIS:

21 Q.  With regard to the -- Guilford's ability to rally the

22     sovereign citizen militia movement to his aid before

23     your backup arrived, did you consider that to be a

24     probability?

25 **A.  I considered it to be an unknown.**

Sergeant Jonathon Frost
September 9, 2016

Page 52

1    **A.**    **Yes.**

2    Q.    And as I understand it, you directed him to put his

3          hands behind his back?

4    **A.**    **As I was trying to handcuff him, yes.**

5    Q.    Okay.  When you say as I was trying to handcuff him,

6          do you mean that he laid down you then kneeled on,

7          let's say, his lower back as opposed to up near his

8          shoulders and that was the point at which you

9          attempted to try to handcuff him?

10   **A.**    **Yes.**

11   Q.    Had you taken your handcuffs out?

12   **A.**    **No.**

13   Q.    You were trying to get his hands together?

14   **A.**    **Yes.**

15   Q.    And he did or did not resist?

16   **A.**    **He did resist.**

17   Q.    How?

18   **A.**    **As I told him to put his hands behind his back and I**

19         **tried to reach for his hands, he continually pulled it**

20         **away and would not give it to me.**

21   Q.    Okay.  Did you have any difficulty getting him to lie

22         down in the first place?

23   **A.**    **Yes.**

24   Q.    What?

25   **A.**    **Originally, I asked him to get to his knees.  I**

Sergeant Jonathon Frost
September 9, 2016

Page 54

1    **A.**    **Yes.**

2    Q.    Not before that?

3    **A.**    **Not that I remember.  I would have to review the**

4          **video.**

5    Q.    Okay.  Even though you now say that you didn't

6          actually stop anyone for flashing their lights at you

7          that night before Mr. Guilford, okay, in fact, people

8          had flashed their lights at you, right?

9    **A.**    **There had been one other car that flashed their lights**

10          **during my travels that evening.**

11    Q.    Okay.  Are you saying that you had no awareness that

12          even though your instrument panel said that your

13          lights were on dim that they were being perceived as

14          bright by oncoming traffic?

15    **A.**    **I considered it a possibility.**

16    Q.    That being the case, what was the purpose of stopping

17          Mr. Guilford for flashing his lights at you?

18    **A.**    **To make a traffic stop.**

19    Q.    Why?

20    **A.**    **The -- when I came into work that night, I found out**

21          **that there was a new vehicle that I hadn't had the**

22          **opportunity to drive.  I was excited to drive a new**

23          **vehicle.  The vehicle seemed fairly impressive.  My**

24          **whole goal for leaving my office that night and**

25          **traveling to Delta to meet with Sergeant Tiestort was**

Sergeant Jonathon Frost
September 9, 2016

Page 55

| | | |
|---|---|---|
| 1 | | **to pull over cars on my way there so that I could see** |
| 2 | | **how the vehicle performed, see how the lights worked,** |
| 3 | | **get some familiarization with the vehicle -- or some** |
| 4 | | **extra familiarization with it.  My -- I was out trying** |
| 5 | | **to stop any vehicle I could.** |
| 6 | Q. | You were out trying to stop any vehicle you could for |
| 7 | | anything that you could? |
| 8 | A. | **Anything that was considered a traffic violation,** |
| 9 | | **yes.** |
| 10 | Q. | But you didn't stop the person who flashed you |
| 11 | | before? |
| 12 | A. | **I attempted to, but I wasn't able to.** |
| 13 | Q. | If you believed that there was a possibility that your |
| 14 | | lights were -- appeared to be bright, why would you |
| 15 | | want to stop somebody for flashing? |
| 16 | A. | **Because it was a traffic violation.** |
| 17 | Q. | Because any flashing of lights is a traffic |
| 18 | | violation? |
| 19 | A. | **Yes.** |
| 20 | Q. | So when you stopped -- have you ever made a statement |
| 21 | | that you can recall that you didn't intend to give |
| 22 | | Mr. Guilford a citation? |
| 23 | A. | **If I made a statement?  I don't remember if I made a** |
| 24 | | **statement or not.** |
| 25 | Q. | Isn't it true that you weren't going to give him a |

Sergeant Jonathon Frost
September 9, 2016

Page 60

1   Q.   -- all right?

2           After you went into the car and attempted to pull

3        Mr. Guilford out, he resisted, right?

4   A.   **Yes.**

5   Q.   And at that point, you drew your taser?

6   A.   **Yes.**

7   Q.   And pointed it at him and told him to get out of the

8        car?

9   A.   **Yes.**

10  Q.   And he complied?

11  A.   **Yes.**

12  Q.   And you told him to get down on his hands and knees,

13       and he complied?

14  A.   **Yes.**

15  Q.   And you told him to lie down and he complied?

16  A.   **Yes.**

17  Q.   Was your taser in your hand all that time?

18  A.   **Yes.**

19  Q.   When you got down and attempted to handcuff him, was

20       your taser still in your hand?

21  A.   **Yes.**

22  Q.   So you only had one hand with which to manipulate both

23       of his and put on the cuffs?

24  A.   **It would -- I can -- once the hands are behind the**

25       **back, I can hold both hands with one hand place my**

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 61

1          **taser back in the holster and then use that hand to**

2          **retrieve my handcuffs and do the handcuffing.**

3    Q.    Okay.  But when he didn't comply, you never put your

4          taser away?

5    **A.    No.**

6    Q.    Okay.  When he didn't comply --

7               MR. DYER:  Before you move on --

8               MR. DAVIS:  I'm sorry?

9               MR. DYER:  -- I think the record might be

10         unclear.  You asked a question in the negative, and he

11         responded with a negative.  You might want to clarify

12         that.

13              MR. DAVIS:  Okay.

14   BY MR. DAVIS:

15   Q.    When he didn't comply with the handcuffing, you got

16         off of him, right?

17   **A.    The -- yes, I did get off of him.**

18   Q.    Okay.  And then at some point -- and your taser

19         remained in your hand at that time?

20   **A.    Yes.**

21   Q.    And then you tased him?

22   **A.    No.  I'm -- I don't think I'm fully understanding what**

23         **you're asking.  As far as the -- the series of events**

24         **go, I'm trying to answer your questions as best as**

25         **possible; but I think maybe we're miscommunicating**

Sergeant Jonathon Frost
September 9, 2016

Page 62

1      somewhere.  There was a  point where I got off of

2      Deven's back, but that was only after the taser was

3      deployed.  At no time did I get off of his back before

4      the taser was deployed.

5   Q.   Okay.  So when he resisted your attempt to handcuff

6        him, you tased him at that time?

7   A.   Yes.

8   Q.   Okay.  Where and how?

9   A.   I deployed my taser into his upper back.

10  Q.   How was he dressed?

11  A.   I believe, if I remember properly, in a T-Shirt -- a

12       T-Shirt, I think.

13  Q.   And did you use probe or stun mode?

14  A.   The taser has two modes, the drive stun or the probes.

15       The only way to use the drive stun is to reach over

16       and remove the cartridge head that has the probes.  I

17       used the probes.

18  Q.   And did they come into contact with Mr. Guilford?

19  A.   I believe they did.

20  Q.   Okay.  And did he react?

21  A.   Yes.

22  Q.   How?

23  A.   He yelled.  And if I remember properly, he yelled and

24       got up quickly.

25  Q.   Were you still on his back when he got up?

Sergeant Jonathon Frost
September 9, 2016

Page 63

1   A.   I was -- when he got up, I got -- with the force of

2        him coming up, I was knocked off balance and came up

3        off of his back.

4   Q.   Okay.  But you didn't lose your balance and fall?

5   A.   No.

6   Q.   After the incident was over, did you see

7        Mr. Guilford's body entwined in any fashion with the

8        taser wires?

9   A.   I don't remember if it was entwined in him.  I

10       remember, I believe, I was entwined in it.  I don't

11       remember if it was around him or not.

12  Q.   Did you ever hear Mr. Guilford say you don't have the

13       right to touch me?

14  A.   I would have to look back at the video to make sure,

15       but I think so.

16  Q.   When Mr. Guilford resisted or complained when you went

17       into the car and grabbed him, you backed off at that

18       point?

19  A.   Yes.

20  Q.   And drew the taser at that point?

21  A.   Yes.

22  Q.   Why didn't you, knowing that backup was coming, wait

23       until you had someone else there?

24  A.   The reason I didn't wait for anybody else is that we

25       were on the side of the road.  It was not necessarily

Sergeant Jonathon Frost
September 9, 2016

Page 64

1      a safe situation for either one of us, and I believed

2      that I could protect myself and him better by

3      affecting the arrest and getting us both off the side

4      of the road.

5   Q.   Well, he was in the car, right?

6   A.   Yes.

7   Q.   Why not leave him in the car?

8   A.   Because I didn't know what was in the car.  He had

9        escalated the situation to the point where he was

10       going to be taken into custody, and I didn't know if

11       there were weapons or other items that I needed to be

12       concerned with inside the vehicle.

13   Q.   Did you say put your hands on the steering wheel and

14        leave them that way?

15   A.   No.

16   Q.   Did you ask him if he had any weapons?

17   A.   No.

18   Q.   Did you do anything to determine whether or not there

19        was any danger from what was in the car?

20   A.   No.

21   Q.   Did you do anything to determine how close your backup

22        was?

23   A.   No.

24   Q.   As I understand it, when you reached into the car or

25        entered the car, you smelled marijuana?

Sergeant Jonathon Frost
September 9, 2016

Page 72

1    **A.**    **To protect it.**

2    Q.    You're trained in hand-to-hand combat.  You're trained

3          in weaponless hand-to-hand combat.  He didn't have any

4          weapons that you knew of.  And you had at least two

5          weapons that wouldn't necessarily involve the use of

6          deadly force, right?

7                MR. DYER:  Object to form and foundation of the

8          question, and it's argumentative.

9                But go ahead and answer.

10               THE WITNESS:  Yes.

11   BY MR. DAVIS:

12   Q.    Why did you reach for your gun?

13   **A.**    **The incident happened so quickly that I did not have**

14         **time to draw a baton and extend it or to reach with**

15         **my -- reach for my flashlight with my left arm which**

16         **was brought up to guard my face.  The only thing I**

17         **could do at the time and I had time for was to put my**

18         **hand on my gun so I could protect it and I knew where**

19         **it was.**

20   Q.    You agree that Mr. Guilford was smaller than you?

21   **A.**    **No.**

22   Q.    You think he was larger than you?

23   **A.**    **I remember thinking that he was big in stature when he**

24         **got out of the car.  I don't remember if he was**

25         **specifically bigger than me or not, but I don't**

Sergeant Jonathon Frost
September 9, 2016

Page 73

1          remember thinking I'm bigger than him.

2    Q.    At that time -- I'm sorry, how tall are you?

3    A.    I'm five foot, nine.

4    Q.    And at that time, how much did you weigh?

5    A.    Between 180 and 185 pounds, I believe.

6    Q.    Okay.  If the Michigan State Police report says 190,

7          do you dispute that?

8    A.    No.

9    Q.    If the Michigan State Police report says that

10         Mr. Guilford was 160 pounds, do you dispute that?

11   A.    No.

12   Q.    There came a point in the continuing altercation

13         between you and Mr. Guilford that you believed you

14         were going to lose consciousness?

15   A.    Yes.

16   Q.    Have you ever lost consciousness?

17   A.    I have been put under for surgery and nearly passed

18         out while in formation one time in the Marines.

19              THE REPORTER:  I'm sorry --

20   BY MR. DAVIS:

21   Q.    It was based on those experiences that you came to

22         that conclusion?

23   A.    Yes.

24              MR. DYER:  Did you get that?

25              THE REPORTER:  I did not get clearly his answer

Sergeant Jonathon Frost
September 9, 2016

Page 74

1        about had he ever had that -- passed out or felt that

2        before.

3             You said one time?

4             THE WITNESS:  I was put under for -- I had been

5        put under for surgery before and while standing in

6        formation as a Marine.

7             THE REPORTER:  Okay.

8   BY MR. DAVIS:

9   Q.   And according to you, that was why you decided to

10       shoot?

11  **A.   I decided to shoot because I was in fear for my**

12       **life.**

13  Q.   In your report you talk about having blood in your

14       eyes.  Is that your testimony?

15  **A.   Yes.**

16  Q.   Have you ever seen the videos from Dahlgren and

17       Tiestort from their body cams?

18  **A.   I believe so.  I would have to look at them to make**

19       **sure.  I'm not sure.**

20  Q.   When, if ever, did you wipe the blood from your

21       eyes?

22  **A.   I don't think I did.**

23  Q.   Would you agree that Dahlgren and Tietstort's cams did

24       not show blood in your eyes?

25  **A.   I don't know.  I would have to see them.**

Sergeant Jonathon Frost
September 9, 2016

Page 75

1          MR. DAVIS:  You're about through, aren't you?

2          THE VIDEOGRAPHER:  Three minutes.

3          MR. DAVIS:  Three minutes or so?

4          THE VIDEOGRAPHER:  On this disc.

5          MR. DAVIS:  Okay.

6    BY MR. DAVIS:

7    Q.   When you went down, if I understand it, you say you

8         rolled to your right?

9    A.   **I don't know.**

10   Q.   When you went down, was your gun out?

11   A.   **I don't know.**

12   Q.   At some point after you went down, if you didn't

13        already have your gun out, you got it out?

14   A.   **I don't ever remember drawing my gun.**

15   Q.   Do you remember making a determination to begin

16        firing?

17   A.   **Yes.**

18   Q.   When?

19   A.   **I made the determination to begin firing when the --**

20        **when I was being hit over and over and over again and**

21        **I couldn't get myself out of the situation.  I was**

22        **laying there not sure what was going to happen; and I**

23        **knew that I was in a fight that I was losing very,**

24        **very quickly; and it was a very -- it was just**

25        **violent, a very violent fight that I was losing.**

Sergeant Jonathon Frost
September 9, 2016

Page 76

1   Q.   How long between the time that Guilford attacked or

2        hit you or whatever, how much time elapsed between the

3        time of that event and the time that you started

4        firing?

5   A.   **I have no idea.**

6   Q.   If the records were to show that it was eight seconds,

7        do you disagree with that?

8   A.   **I don't know.  So I --**

9   Q.   But all of the knocking you down, you rolling to the

10       side, you getting your gun out, you attempting to

11       fire, the gun jamming and you ending up in the ditch

12       fearing loss of consciousness, do you agree that all

13       of that happened within eight seconds?

14  A.   **I don't know how long it happened.  I -- whatever the**

15       **report says, I guess would be accurate; but I don't**

16       **know.**

17            MS. HEENAN:  We need to break here, Buck.

18            MR. DAVIS:  Okay.

19            THE VIDEOGRAPHER:  This marks the end of DVD

20       Number 1.  The time is 12:58:24 p.m.

21                  (Recess taken.)

22            THE VIDEOGRAPHER:  We're back on the record.  The

23       time is 1:13:24 p.m., beginning of Disc Number 2.

24  BY MR. DAVIS:

25  Q.   After you finished firing -- and I take it that you

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 77

1       fired until somehow or another Mr. Guilford fell off

2       of you?

3   A.  I fired until the -- the hitting stopped.

4   Q.  Was he still on top of you at that time?

5   A.  Yes.

6   Q.  So did you push him off?

7   A.  Yes.  I had to crawl out from underneath him.

8   Q.  There's a difference between crawling out from

9       underneath and pushing off?

10  A.  To the best of my knowledge, he fell with his -- he

11      fell over my left side.  I had to take my left hand

12      which was up and put it on him and physically crawl

13      out from underneath him.  As to the exact movements

14      that my body made, I don't remember.

15  Q.  Okay.  From being -- do you agree that when the

16      shooting started and ended, that you were in a ditch

17      on the -- beside the road?

18  A.  Yes.

19  Q.  How did you get from the position where he was lying

20      down beside the car, on the roadside of the car,

21      around to the ditch?

22  A.  When I went in to try to make my arrest and I put my

23      knee on his back, he was moving around.  At one point

24      we already covered that I deployed my taser.  When I

25      deployed my -- when I knew that I was going to go in

Sergeant Jonathon Frost
September 9, 2016

Page 78

1      there and there was a possibility that there was going

2      to be a fight, I said to myself if we're going to have

3      a fight I want to move it to the other side of the

4      vehicle so that we're not fighting on the side of a 55

5      mile per hour road.

6           So when he came up -- after I tased him, he came

7      up so quickly that it knocked me off balance.  I began

8      back-pedaling.  My goal what was to back-pedal around

9      the front of the vehicle and onto the other side of it

10     so that the fight could happen there.  It's my

11     training and experience that when a fight is going to

12     occur it's going to most likely go to the ground.

13          So as I attempted to back-pedal, I was hit on the

14     left side of my head.  And I don't know what happened

15     between when I got hit and when I -- when we were in

16     the snow.

17  Q.  Okay.  When he got up, he did so apparently so rapidly

18      that you lost balance?

19  A.  Yes.

20  Q.  Did you go down?

21  A.  No.

22  Q.  Did you catch yourself leaning against the car?

23  A.  I started back-pedaling.  I don't remember if I

24      touched the car at that point.

25  Q.  Okay.  And at that point, you thought there was going

Sergeant Jonathon Frost
September 9, 2016

Page 79

1       to be a fight?

2    A.    **Yes.**

3    Q.    At that point, why couldn't you have gotten your baton

4          or your flashlight?

5    A.    **There was no time.**

6    Q.    In other words, he got up so fast that even though you

7          were back-pedaling he was able to turn around and come

8          at you before you could get any weapon out?

9    A.    **Yes.**

10   Q.    And, in fact, the only weapon you got out or tried to

11         get out was your firearm?

12   A.    **My -- I did place my right hand on my gun, but I did**

13         **not try to draw it.   I was there to protect it only.**

14   Q.    And at some point it came out?

15   A.    **Yes.**

16   Q.    And that was, according to you, after y'all had gone

17         around the car and were on the ditch side of the

18         car?

19   A.    **It was sometime between when he hit me for the first**

20         **time and when my memory restarts in the snow.**

21   Q.    So are you saying that one blow caused you to lose

22         memory?

23   A.    **Yes.**

24   Q.    And when memory returned, you're in the snow?

25   A.    **Yes.**

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 92

1   A.   **Just to clarify, we're looking at Exhibit --**

2   Q.   I'm sorry, 5.

3   A.   **-- 5.  And, yes, I do.**

4   Q.   All of the apparent injuries that are shown in that

5        photograph according to you were caused by

6        Mr. Guilford striking you with his fist?

7   A.   **They were caused during the altercation with**

8        **Mr. Guilford, yes.  I stated earlier that there was**

9        **that bit of time between when I was first hit and we**

10       **ended up in the snow that I'm not entirely sure what**

11       **happened.  So I don't want to say for confident**

12       **that -- where injuries came from because I just don't**

13       **know.**

14  Q.   Okay.  Did Mr. Guilford ever hit you with anything but

15       his fist that you can recall?

16  A.   **I don't -- not that I know of.**

17  Q.   And you described in other parts of your testimony

18       that Mr. Guilford -- and in your report that

19       Mr. Guilford kept swinging at you and hitting you and

20       swinging at you and hitting you until the point that

21       you thought you might lose consciousness; is that

22       right?

23  A.   **Yes.**

24  Q.   Do you have any idea how many times that was?

25  A.   **No.**

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 95

1  Q.   Did you see them write down notes regarding whatever

2       questions they asked?

3  **A.   I don't remember.**

4  Q.   You may have thought about it.  I assume you have.  As

5       a trained police officer and a former military man

6       who's trained in hand-to-hand combat with or without

7       weapons, have you thought about why you were unable to

8       defend yourself against Guilford?

9  **A.   Yes.**

10          MR. DYER:  Object to the form and foundation of

11       the question.

12          Go ahead and answer.

13          THE WITNESS:  Yes.

14  BY MR. DAVIS:

15  Q.   Why?

16  **A.   When I came around the front of the vehicle, I was**

17       **blinded by my spotlight which gave him an -- which I**

18       **lost him.  I couldn't see him anymore at that point.**

19       **I couldn't see where he was coming from.  I couldn't**

20       **see -- and he cleaned my clock.  He -- to the point**

21       **that I don't remember between what happened when he**

22       **hit me to when we came to in the snow and he's on top**

23       **of me.  And at that point, I had -- I was already**

24       **losing the fight.**

25  Q.   You came around the vehicle after Guilford got up and

Sergeant Jonathon Frost
September 9, 2016

Page 97

1   A.   Yes.  So that I could effect my arrest.

2   Q.   In your taser training, have you ever been told that

3        the effect of a taser makes it more difficult for a

4        person to control their bodily movements?

5   A.   Yes.

6   Q.   Why did you think that using a taser would help him

7        comply?

8   A.   **Because once the taser is deployed even though he may**

9        **not be able to consciously put his arms behind his**

10       **back, I can actually grab ahold of them while he's**

11       **being tased and move the arm behind his back.**

12  Q.   So you didn't use the taser to get him to put his

13       hands behind his back, you used the taser so that you

14       could put his hands behind his back?

15  A.   **I used the taser to effect my arrest.  Regardless as**

16       **to how the taser impacted him, whether he willingly**

17       **put them back there or I reached out and grabbed them,**

18       **it was a tool used to effect the arrest.**

19            MS. HEENAN:  Is that --

20            MR. DAVIS:  Huh?  I (inaudible) --

21  BY MR. DAVIS:

22  Q.   Did you ever say to him that you could not give him

23       your badge number?

24  A.   **Yes.**

25  Q.   Why?

Sergeant Jonathon Frost
September 9, 2016

Page 98

1   A.   **Our badge numbers are not actually on our badges.**

2   Q.   Does that mean you don't know your badge number?

3   A.   **I know my badge number.**

4   Q.   Then why couldn't you give it to him?

5   A.   **His specific question was I need to see your badge**

6        **number or something to that effect.  I would have to**

7        **go back to the video and look for sure.**

8   Q.   Do I understand that there was a stop that you made

9        earlier that night not for flashing lights but for

10       some other traffic violation in which the citizen that

11       you stopped told you that your lights were bright?

12  A.   **Yes.**

13  Q.   Okay.  If that were the case and you knew that your

14       lights were bright, why would you stop someone for

15       flashing their lights at you?

16            MR. DYER:  Again, the question has been asked and

17       answered.

18            Answer it again.

19            THE WITNESS:  Because it was a violation of the

20       law.

21  BY MR. DAVIS:

22  Q.   If you were concerned about the arrival of some sort

23       of supporters for Mr. Guilford, why did you think it

24       was more beneficial and safe to have him out of the

25       car and potentially not cooperating rather than in the