UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

BRIAN GUILFORD, as Personal Representative
of the Estate of Deven Guilford,

          Plaintiff,

v.

SGT. JONATHON FROST,
in his individual capacity

          Defendants.

Case No. 15-1053
Hon. Paul L. Maloney
Mag. Ray Kent

_____/

# **Exhibit 9**

# **Frost Interview, p. 4**

# Tab 2

# Frost Interview

# EATON COUNTY SHERIFF'S OFFICE

## Internal Investigation Notice

| OFFICER: Sgt. Frost | DATE: 6/29/15 | UNIT: County Patrol | RANK: SGT. |
|---|---|---|---|
| INCIDENT BEING INVESTIGATED: 15-1401 | | | |
| DATE OCCURRED 2/28/15 | | INTERNAL AFFAIRS FILE NO. 2015-02 | |

THIS MEMO SHALL SERVE AS YOU OFFICIAL NOTICE THAT CITIZEN COMPLAINT HAS BEEN FILED AGAINST YOU, OR AN INCIDENT INVOLVING YOUR OFFICIAL DUTIES WITH THE SHERIFF'S OFFICE HAS BEEN DEEMED WORTHY OF AN INTERNAL INVESTIGATION.

YOU HAVE THE FOLLOWING RIGHTS:

- ☐ NOTIFICATION OF NATURE OF INVESTIGATION.
- ☐ IDENTIFICATION OF WITNESSES ACCUSING YOU.
- ☐ UNION REPRESENTATION DURING QUESTIONING IN THIS MATTER.
- ☐ OR LEGAL COUNSEL, AT NO EXPENSE TO THE COUNTY.

IF THIS IS A CRIMINAL INVESTIGATION:

- ☐ IF YOU REFUSE TO ANSWER QUESTIONS DURING THIS INVESTIGATION YOU WILL BE ORDERED TO ANSWER.
- ☐ ANSWERS GIVEN DUE TO A DIRECT ORDER WILL NOT BE USED AGAINST YOU IN A COURT OF LAW.
- ☐ IF YOU PERSIST IN YOUR REFUSAL TO ANSWER QUESTIONS, ADDITIONAL DISCIPLINE UP TO AND INCLUDING TERMINATION WILL BE SOUGHT FOR INSUBORDINATION.

| Please report for an interview with: Capt. Campbell | Date: Thursday July 2nd, 2015 |
|---|---|
| Location: ECSO Training Room | Time: 0900 |

| EMPLOYEE SIGNATURE: | DATE: 07/02/15 |
|---|---|
| UNION SIGNATURE: | DATE: 7/2/15 |
| INVESTIGATOR/SUPERVISOR SIGNATURE: | DATE: 7/2/15 |

# Internal Investigation Admonishment

The sheriff has ordered me to conduct an internal investigation; I will be asking you a series of questions pertaining to this investigation. Before proceeding I shall read to you the following admonishment:

1.  The purpose of this interview is to investigate an incident involving your official duties as a member of the Eaton County Sheriff's Office, which occurred on February 28, 2015 on M-43 west of Cochran Road, ECSO report #15-1401.

2.  This is not a criminal investigation, any information you provide will not be used in any criminal investigation.

3.  Confidentiality will be maintained to the extent possible to protect privacy.

4.  Full, truthful cooperation is expected from everyone; therefore I am now ordering you to answer all questions truthfully.

5.  Retaliation against any witnesses for participating in the investigation is forbidden by organizational policy and possibly federal and state law.

6.  You are ordered not discuss this investigation with anyone other than your Union Representative and/or your attorney, if you have retained one.

7.  The Sheriff considers reports of alleged employee misconduct/ citizens' complaints seriously and will investigate them methodically.

8.  Failure to be completely honest and cooperate fully in this investigation shall result in discipline up to and including termination.

9.  You are entitled to Procedural Justice as set forth in the Eaton County Sheriff's Office Rules and Regulations Section 2.4

10. Any admissions or statements made during this interview may be used in this internal investigation.


Do you understand this admonishment as I have explained it to you?

Do you have any questions before we proceed?



# EATON COUNTY
## OFFICE OF THE SHERIFF
### TOM REICH, SHERIFF

JEFFREY COOK, UNDERSHERIFF    JEFFREY A. WARDER, CHIEF DEPUTY

1025 Independence Blvd • Charlotte MI 48813 • Phone 517-543-3512 • 517-372-8217 • Fax 543-2922

### IA 2015-02

### INTERVIEW WITH SERGEANT JONATHAN FROST

July 2, 2015

This is Captain Jeff Campbell. The time is now approximately 9:15 a.m. We are located at the Eaton County Sheriff's Office Training Room. With me today is Sgt. Jonathan Frost from the Eaton County Sheriff's Office and representing him is Attorney Steve Lett from the FOP.

This interview is in regards to Eaton County complaint number 2015-1401, Internal Affairs number 2015-02.

CAMPBELL    Before we get started, Sgt. Frost, I'm going to read you this Admonishment, and I would like you to follow along with me and then I'll ask you to sign it at the end.

The sheriff ordered me to conduct an internal investigation. I'll be asking you a series of questions pertaining to this investigation. Before proceeding, I shall read to you the following admonishment:

1. The purpose of this interview is to investigate an incident involving your official duties as a member of the Eaton County Sheriff's Office, which occurred on February 28, 2015, on M-43 west of Cochran Road. This is in regards to Eaton County report number 2015-1401.

2. This is not a criminal investigation. Any information you provide will not be used in any criminal investigation.

3. Confidentiality will be maintained to the extent possible to protect privacy.

4. Full, truthful cooperation is expected from everyone; therefore I am now ordering you to answer all questions truthfully.

IA 15-02 - Interview with Sgt. Frost
July 2, 2015
Page 2

5.  Retaliation against any witnesses for participating in this investigation is forbidden by organizational policy and possibly federal and state law.

6.  You are ordered not to discuss this investigation with anyone other than your Union Representative and/or your attorney if you have retained one.

7.  The Sheriff considers reports of alleged employee misconduct or citizens' complaints seriously and will investigate them methodically.

8.  Failure to be completely honest and cooperate fully in this investigation shall result in discipline up to and including termination.

9.  You are entitled to procedural justice as set forth in the Eaton County Sheriff's Office Rules and Regulations Section 2.4.

10. Any admissions or statements made during this interview may be used in this Internal Investigation.

CAMPBELL    Do you understand this Admonishment as I have explained it to you?

FROST       Yes.

CAMPBELL    Do you have any questions before we precede?

FROST       No.

CAMPBELL    I'm going to initial it with my badge number here. I would like you to do the same. Mr. Lett, I would like you to do that as well, please. Thank you.

CAMPBELL    Sgt. Frost, what I would like to do is just start with the beginning of your shift on February 28th and take it from there. What time did you start that night?

FROST       On February 28th I started at 1800 hours. I was working the night shift supervisor position from 1800 to 0600.

CAMPBELL    Were you the only supervisor on duty that night?

FROST       In the out-County. There was another supervisor on in Delta. I came in, got ready for work, went and got in the new Ford Explorer that we had just recently purchased, and decided to go out on Patrol. I traveled up M-50 north to 43, turned eastbound on 43, and I was going to head into Delta

IA 15-02 - Interview with Sgt. Frost
July 2, 2015
Page 3


Township and discuss the FTO program with Sgt. Tietsort because I had just got back from the FTO Supervisor course.

CAMPBELL   So about what time do you think you left the office?

FROST   By the time I got some paperwork in order, I probably left the office around 1900.

CAMPBELL   Ok, so between the office in Charlotte and M-43 when you traveled up Cochran Road.   Did you make any traffic stops or do any other activities?

FROST   I attempted to make one traffic stop while I was heading eastbound on 43, I didn't have any reason to pull the vehicles over on 50, I was running radar, I didn't find anybody speeding or anything like that.  As I traveled eastbound on 43, I was the lead car in the line of other cars.  A car flashed their brights at me; I pulled over to the right side to turn around on the vehicle.  I didn't realize there was such a long line of cars behind me.  After they got by and then the other cars went by, I couldn't tell which vehicle it was that had flashed me so I just continued eastbound.

CAMPBELL   So you didn't stop that particular car?

FROST   No I couldn't go back to it.

CAMPBELL   But that one was for flashing its bright at you?

FROST   Correct.

CAMPBELL   Ok.

FROST   As I continued eastbound on 43, another vehicle passed me with a headlight out.  I was able to turn around on that vehicle and catch up to it.  By the time I caught up to it, it was already dark, and I was behind it and I wasn't positive it was the one with the headlight out because I had to pass a couple cars to get to it.  Once I got to it, I was watching it trying to see if I could tell from behind which headlight was out.  They quickly hit their brakes, so I was in a passing area and there were no oncoming vehicles so I went around it.  As I went around it, I could see in my mirror it was the vehicle with the headlight out, so I then slowed back down and got behind it.  Had a brief conversation with the driver of that car that I stopped him for his headlight being out.  He stated something that he thought my brights were on.  I said no they weren't.  He and I had a very cordial conversation.  I let him off with a warning for his headlight, and I believe

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 4

he didn't have his valid proof of insurance or his registration, and everything came back fine on the computer.

CAMPBELL  So no tickets issued in that particular instance.

FROST  No.

CAMPBELL  Was this the first time that you've driven that vehicle?

FROST  Yes.

CAMPBELL  So we just had that vehicle in service what maybe a few days prior.

FROST  A day or two and those few days I was at training.

CAMPBELL  This was the absolute first time you'd ever driven it.

FROST  Correct.

CAMPBELL  Any other activity prior to the actual incident that were

FROST  No. I turned back around and started heading eastbound again to go meet with Sgt. Tietsort.

CAMPBELL  Take it from there.

FROST  I turn back around, started heading eastbound again, that time, after a couple minutes, a vehicle flashed two times with their high beams. I spun on it to make a traffic stop, got behind it, initiated my traffic stop, and then as I was doing the traffic stop like I usually do, I would turn on my body camera, dictate who I was, what the reason for the stop was, and then proceeded from there.

CAMPBELL  I know in the video you mentioned that you're bright headlights were not on.

FROST  Correct.

CAMPBELL  What exactly did you do to verify that?

FROST  After the other driver had said something, as I pulled out, I checked to make sure the blue light came on the dash, that I could actually see the difference in the headlights, and I did. When the blue light came on the

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 5

dash, the headlights got brighter. When I turned it off, the blue light went off, the headlights went dim, so I knew when what ended up being Devin's vehicle flashed me, I looked down to make sure that the blue light wasn't on the dash, and when I turned before I wasn't actually behind his vehicle, I was still at an angle out into the field and there were no other cars coming, I pulled back on the handle for the brights to make sure that the brights would come up so that I could confirm that they in fact were not. So I wanted to make sure I didn't have some kind of vehicle defect or something. That was a new vehicle, I hadn't driven it before. I did a brief familiarization with it before I actually got in it and took off for the shift that day, but I wanted to confirm that I wasn't about to pull somebody over for a violation when I actually had my high beams on.

CAMPBELL   So you did physically verify that prior to this stop and even as you were about to make that stop?

FROST   Yes, I did.

CAMPBELL   Continue please.

FROST   As I approached the vehicle, I noticed that the driver only rolled his window down a few inches, which it was wintertime but generally when it's windy or even when it's rainy and snowy drivers still just hit the button on their car and roll the window down all the way so we can have a conversation, hand paperwork back and forth. I thought it was a little odd, but I continued with my traffic stop. I asked him, I went up and I believe I said hello or hi, could I have driver's license, registration, proof of insurance please. And I always on my traffic stops immediately say why I pulled somebody over. I don't want there to be any question as to why, so I just get it out. And as soon as I said that, he began arguing with me that I had my high beams on. As he was continuing to argue, I said I didn't. I again cordially asked him, driver's license, registration, proof of insurance please. At which time he still was repeating, he wanted to argue, he didn't want to provide paperwork, he didn't want to provide me with anything, and then he alluded that he didn't have it. At one point he told me he did have it, but that he didn't have to give it to me. Initially he asked me how do I know you're a police officer, I need to see three forms of identification, which in 9 years I've never been asked for three forms of identification when I'm in full uniform and the car's behind him. I explained to him, I'm Sgt. Frost of the Eaton County Sheriff's Office. You're being pulled over. This is a traffic stop. I need to see your driver's license, registration, proof of insurance please. He then asked me for my badge number. As I'm speaking with him, I say you can't see my badge number. At the time I'm

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 6

wearing a jacket with an embroidered star on it, and our badges don't physically have our badge number on them. But I identified myself at that point, and then he began recording me. And he says so you're telling me it's illegal not to give me your badge number. You're telling me you can't have it, and I said no. At that point I tried to say my badge number is, but he continued to interrupt me and cut me off. I tried to give it to him. I didn't, I wanted to, I have no issues with giving him my badge number. I wanted him to, I was trying to calm him down. He was obviously upset, so I was going to give him whatever I could to keep a dialog going. I wanted the dialog to continue so that we could figure out what's going on, find out where his ID is, and

CAMPBELL    At this point in the traffic stop or prior to where you're at right now, you have called for another car, correct?

FROST       .I did as soon as I got up there and I realized that he was upset and he was uncooperative, and he started asking me for three forms of ID, I started, and he began recording me and saying that not giving my badge number was illegal. To me it started sounding like somebody that may have some kind of sovereign citizen or militia ties, so I called for another car. At that point,

CAMPBELL    When you say sovereign citizen or militia-type thing, what exactly do you base that belief on?

FROST       I based it on we had seen some MSP Bulletins, we've had some in-service training given by Dep. Holliday that sets out some guidelines or some possible indicators for people that may not be, part of the sovereign citizen movement that maybe don't necessarily recognize certain laws. They may have their own printed driver's licenses that aren't actually in accordance with Michigan state laws, registrations, may not insure vehicles other than through their sovereign citizen movement, things like that.

CAMPBELL    So what he was saying to you and things that he was doing as far as not showing you a driver's license or

FROST       Right, and the three forms of ID and the badge number, and the immediate argumentativeness that came as well were indicators for me that there may be something more here than just somebody traveling between point A and point B. He may be part of a movement like that.

LETT        Would you have had three forms of ID on you?

IA 15-02 -- Interview with Sgt. Frost
July 2, 2015
Page 7


FROST        No.

CAMPBELL     So the things that he was doing, the actions at that point, and what you
             were observing, that was consistent with what you'd seen in the past in
             training bulletins and the in-service training that you've seen?

FROST        Correct.

CAMPBELL     I'm sorry I interrupted you at one point, so you were at the point where
             he's arguing with you at the traffic stop, and you have attempted to
             provide your badge number, correct?

FROST        Correct.

CAMPBELL     Continue from there.

FROST        And I did ask for another vehicle at point. I didn't ask it for priority
             because I was still standing outside the car, we were still discussing, I was
             still trying to get the dialog going. At that point I didn't feel I needed a car
             there right now because we were still, but I knew that there was one on
             the way, so hopefully if it came to an arrest point, then I would have
             another vehicle there. I knew that the County cars were a ways out, but I
             also knew that there were Grand Ledge cars within the city limits. As the
             conversation kept going, at one point I explained to him you're not the first
             one to flash me with your bright lights tonight. I went in to, I was trying to
             put him at ease a little bit and let him know that this is where it started, this
             is where it's going, let's try to reel this back in and give me your
             identification you know so we can get a move on with this. He wouldn't
             converse with me. He wouldn't stick and say my driver's license is here or
             I don't have one, or I left it somewhere. At some point he mentioned that
             he left it somewhere. I said well where is it, but he wouldn't actually tell
             me where it was. He said he was coming from, I think he was dropping
             his brother off at a church and then heading back somewhere, and I even
             tried to figure out for sure, and I asked him, so you don't have your driver's
             license on you? I was trying to get at least somewhere so that we could
             proceed because at that point I could say where is it. Once I found out
             where it is, let's try to identify you, you know, and go from there. He said
             that he didn't have it on him then all of a sudden he said I do but you can't
             see it. Well I do need to see it, you're operating a motor vehicle, you've
             been pulled over. I went through these things with him. I went through
             the fact that it's a misdemeanor to not provide your identification while
             you're driving and you've been pulled over.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 8

CAMPBELL  So at one point he's telling you he's got it, you can't see it, or you don't need to see it, something to that affect

FROST  Correct.

CAMPBELL  At another point he's saying he doesn't have it with him, and he was going to get it, and then he's back to

FROST  Correct.

CAMPBELL  So he's changed

FROST  He's changed his story, and to me it almost began to feel like he was stalling. I mean because this could have been done and over with in 5 minutes. At this point it's, I don't know why he's taking so long to give me an answer and then not give me an answer. So I began to think that maybe he was stalling. I don't know if he was waiting for something. I didn't know what his mindset was. I couldn't get a grasp on what he was thinking.

CAMPBELL  Was there anything about that changing stories in the middle of the traffic stop in your experience that you've had previously does that indicate anything to you?

FROST  It made me suspect that something else may be going on either with the vehicle or maybe where he's coming from, and I was trying to communicate with him, but his constant change of story showed some form of untruthfulness. At one point, once he told me I didn't need to see his ID, at that point I called for another car priority because at that point I realized we're probably going, I'm probably going to have to arrest him if this is ever going to go any further. I couldn't at that point, I don't know where he's coming from, I don't know who he is, I don't know what happened, I don't know anything about him. I can't just let him go at that point. I don't know if he just came from a crime, broke in to someplace, somebody's hurt somewhere, I don't know him from anybody. So at that point I felt obligated that I needed to progress this and take him into custody and at least identify him through one means or another. So I called for another car priority because our dialog seemed to be breaking down.

CAMPBELL  Ok that's what I was going to ask you. What specifically made you step it up from I need another car to I need another one priority?

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 9

FROST      He seemed to be shutting down.  He wasn't talking as much anymore, and
           then he just went straight from a story about his ID to you don't need to
           see it and I'm not going to give it to you kind of attitude.  At that point then
           I was like this is going to have to be taken to the next level because he's
           done cooperating at this point.

CAMPBELL   Ok.

FROST      Once I asked for another car priority, he quit videotaping me right around
           that time and then started dialing his phone.  He was calling somebody,
           which at that time I began to get concerned because we're out, I know my
           cars are a ways out still, Grand Ledge is one of the closest cars for the car
           I called for priority and now he's calling somebody.  With the sovereign
           citizen, militia-type comments and that kind of feeling I was getting, I
           suspected that he may be calling for somebody to come help him.  He had
           been stalling so long at this point I didn't know if he was calling somebody
           a couple houses down, a couple miles away, but I feared that he may be
           calling somebody to come help him because at this point he obviously
           doesn't want to just provide me with identification and get this moving.

CAMPBELL   And he didn't make any indication of who he was calling or

FROST      No.

CAMPBELL   didn't tell you I'm making a phone call.  You just saw him dialing the
           phone?

FROST      Correct.

CAMPBELL   Mr. Lett, you have something?

LETT       From the time that you pulled around and stopped him, you get out of your
           car, do you run his plate first?

FROST      No.

LETT       So you get out of your car and walk up, you stop him, how long before you
           actually get to his window?

FROST      Maybe 20 seconds.

LETT       He could have called somebody during that period of time?

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 10

FROST          Correct. As soon as I see him dial the phone and I don't know who he's calling, I have these other suspicions, I feel as though he may have been stalling at one point, he's been untruthful, at that point I had to make the decision to go into the car and attempt to take him into custody on my own. I had intended on waiting for another car before taking him into custody, but when he began to dial the phone and he completely shut down and wouldn't talk anymore, at that point he wasn't conversing. He didn't try to tell me who he was calling, he didn't say my driver's license is here, let me call him real quick. He didn't do any of that. He just stopped recording and starting dialing. At that point I felt for my safety I needed to take it to the next level and try to affect my arrest.

CAMPBELL       And the reason being what, you're concern that if you wait

FROST          I'm concerned that if I wait, he's going to get on the phone, possibly call one, two, three, five people that are all of the sudden going to show up either at the same time, before my backup arrives, or even after my backup arrives, and we're taking him into custody and then we have a bigger issue.

CAMPBELL       So you're basically intending to affect that arrest to prevent that phone call and therefore prevent his backup from

FROST          Correct.

CAMPBELL       eventually arriving?

FROST          Yes.

CAMPBELL       So to your knowledge did he actually make a phone call, complete a phone call?

FROST          I don't think he completed the phone call. He was focused on his own phone either dialing numbers or looking up contacts when I went in the car.

CAMPBELL       Alright, so take it from that point, what happened next?

FROST          As soon as I opened the car door, I reach in and I grab a hold of his right hand, which is, excuse me, his left arm, his left wrist, and his phone is in his right hand. I realized as soon as I opened the door, I couldn't just pull him out because the, his seatbelt was on. So I grabbed a hold of his wrist. I reached in with my left hand and unbuckled his seatbelt. Once I did that

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 11

and I tried to pull him, he began resisting. He pulled back into the car. At that time I decided to disengage and draw my taser because we are right on the side of 43, which is a 55 mile per hour road. I didn't want to get into a pulling and pushing match at his driver's side door and have one of us end up in traffic. Once I disengaged, he was actually yelling at me telling me officer you can't open my door, you can't touch me, and yelling. He was obviously upset, which was another reason I decided to disengage. He was angry. I disengaged, pulled out my taser, I loudly ordered him to get out of the car. As he got out of the car, I stepped back towards mine to create some, a bit of a reactionary gap and some distance. He was following orders somewhat. I was trying, I told him to get down on the ground, get on your belly at one point, and I was able to articulate to him, get on your belly, arms out at your side, and he began recording again as he's getting out of his car. He's also speaking into his camera or into his phone; something about this is what it's come to in America, something to that affect. As he's getting out and I'm giving him orders to get down on the ground, I start taking into account all the environmental factors around and I realize that I in my position, as he's on the ground, I'm standing between my patrol vehicle and his. I also begin to realize that he's laying just inside the fog line of 43. I had contemplated waiting for my other car to arrive while we staying there, but I felt it was unsafe for both of us being that if somebody were to come along and hit my car at 50, 55 miles an hour, then we're both going to have a really bad day. I'm possibly going to get crushed between the cars; he's possibly going to get run over. It's not uncommon for cars to hit police cars, unfortunately. I didn't feel that either one of us were still safe where we were at. In my mind I knew I had to go up and try to secure him so that I could get him into a vehicle and that we could both be, we would both be safer there than we would be on the side of the road.

CAMPBELL   Ok, and he's on the ground and appears to be complying with your orders

FROST   Somewhat. I keep telling him to put the phone down and put his arms out to his side. He won't do it. He put one arm kind of half out to the side, but he was still recording me. I moved around his right side and I knelt down on the lower part of his back because he had been argumentative, he had been upset, he had been angry, I wanted to make sure that I had a clear target area for my taser if I needed to use it. That's why I went lower on him instead of upper. I knew that I wanted to avoid any kind of physical fight on the side of the road, so I was relying on my taser to prevent that so that we could, if we did have to, if it did turn into a scuffle, I didn't want either one of us tumbling out onto 43 and getting hit by a car.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 12


CAMPBELL  So your taser's still in your hand at this point

FROST    Correct.

CAMPBELL  your moving around kind of to his back

FROST    Yes, and he's watching me the entire time. He's keeping his eyes on me, he's telling me he doesn't have a weapon, he doesn't have, which is neither here nor there, as far as I was concerned. He'd been untruthful

CAMPBELL  Just because he says he doesn't have one

FROST    Doesn't mean he doesn't. He'd been untruthful at this point. I mean in police work a lot of the time people will say I don't have something when in fact they do, so that took in to no account. Moved around to his right side, put my knee on his lower back, and I wasn't incredibly hard. It wasn't stomping on him. It wasn't necessary at this point. He was listening, he was complying. As I moved around to his back, I tried to, I told him you're under arrest; put your hands behind your back. He refused to let go of the cell phone. And as I'm behind him, he keeps turning over his left and right shoulders. He was watching me. Through some of the in-service training that we've had through our self-defense tactics and things like that, I recognized it as "targeting". He was watching me; he didn't want to be at a tactical disadvantage. To me that tells me that he has possibly some kind of fighting experience. He understands that if he's going to counter attack to a point, then he's got to be able to see me, so he kept looking over his left and right shoulders constantly. I was trying to get his arm, he kept pulling it away, you're under arrest, give me your arm, put your phone down. I realized he was fixated on that phone and that he needed to have it running, so I reached out with my left hand, put the phone in front of him, tried to get his arm back. As soon as I pulled that phone out and put it in front of him, he arched back, he arched up with his back and tried to come up. At that time I deployed my taser into his upper back. I knew that I was close so that there was a chance that the taser wouldn't have a full affect, but it should have some affect.  And I knew that once the probes were in, I could then take the taser unit itself and stick it into another part on his body and get the full muscle tension that we would want so that I could affect my arrest. As soon as I deployed the barbs, he came up fast. I didn't have time to reposition the taser into another point on his person to get the full affect because he came up so fast. When he came up, the taser was still arching, I could hear it. He came up and came at me. I had already decided that I wasn't going to fight on the side of 43, so when he came up and bumped me back; I just kind of back peddled and went with

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 13

it. I wanted to come back in front of his car so that, when this fight happened, which it was coming at me, then we're not right on the side of 43 fighting where either one of us could get hit by a car.

CAMPBELL    So you intentionally tried to get out of the road?

FROST    Correct. I've been told and trained that that's one of the last places you want to fight with cars, I mean cars will slow down to maybe 50, if they slow down at all, especially on a major highway like that. So as I'm coming around the side of the car, he gets up and just start, his hands are balled up in fists and he's coming at me ready to fight. At that time the taser was arching, but it wasn't having any affect. He came at me swinging. I dropped the taser, brought up my left arm to try to protect my face because I saw him swinging, and at the same time, I put my hand on my gun to protect that because I assumed this fight was probably going to go to the ground. Just between training and experience, that's generally where they end up. I wanted to protect my weapon because he's obviously, he is engaging me at this point. He didn't, as I was back peddling, he didn't try to leave. He came at me, so in my mind he's coming at me to cause me harm. So I put my hand on my weapon and put my arm up.

CAMPBELL    Now at this point have you actually been struck by him yet?

FROST    At that point when I put my hand on my gun and my arm up, and I hadn't been struck yet, that was my defensive mechanism. As I started coming around the car, his car, I think I got blinded by my own spotlight. That was showing from my vehicle into his driver's side and through, and then I got hit hard on the, right around my left temple. At that point everything just kind of went dark for a second. I don't remember losing consciousness, but I have a memory lapse between when he hit me and when we're in the snow. I don't remember falling into the snow. I just remember getting hit.

CAMPBELL    Do you know what you got hit with? Was it a fist?

FROST    I think it was a fist. I didn't see anything on him when he was coming at me. I'm pretty sure it was just his fist, but it was right, had to have been his right hand and my left temple. So the last thing I remember is getting hit and my hand on my gun to protect that. The next thing that is vivid is I'm in the snow, I assume out from the vehicles, and he's on top of me. He is, I am on my, kind of my right hip back area, so my entire right hip is in the ground, and I'm in the snow. He is on top of me. I can feel him on top of me and I can feel him hitting my head and my face. The back of my

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 14

head, the side of my head, my forehead, my eyes, I kept, he kept hitting me to the point that I kept, I could see his, it was almost like I could see his fists coming because I couldn't see, it just was constantly dark, but I kept getting hit as I was trying to move around. I had my left arm up covering the left side of my head, but it still left my face, like my eye/forehead area exposed because I was kind of on my right side so I wasn't facing him directly. He would have been facing the left side of my face and his hand was coming in underneath my arm that was up, and he was also hitting the back of my head with his other hand.

CAMPBELL    Now when you said he's on top of you, are you stuck in the snow? Can you move at all?

FROST    I can't. I was stuck, he was on my hips, and I was stuck in the snow. I couldn't, anytime I would try to plant a foot, it would just sink. My shoulders and my upper body were stuck in the snow. I couldn't really move.

CAMPBELL    So he's got his legs more on his knees or is he

FROST    He would have been on his knees.

CAMPBELL    So he's holding you down with his body

FROST    Correct.

CAMPBELL    sort of like a full mount-type position?

FROST    Top mount.

CAMPBELL    Top mount?

FROST    Yep. He's on top of me, and he's just swinging, and he's not stopping. There's no reprieve, there's no pause, there's no, it's like he wasn't even thinking about it. He was just full on not stopping. As I'm laying there I can feel the, I can feel blood running down my face. I'm having a hard time seeing because I keep getting hit. I have my left arm, my other arm is somewhat kind of pinned under my body. It's extended, but I can't move it. And as I'm under him, I realize that my gun is in my hand. As he's continuing to hit me, I realize it's not stopping, I can't move, I can't get out of this. I camp my gun and pull the trigger out of desperation. I had no, I didn't know what else to do. I started losing consciousness, excuse me, I wasn't losing consciousness, but I started feeling like it was coming.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 15

I've had a couple surgeries, and it's when you get under anesthesia and it starts to get slowly darker, and it's like everything's just kind of coming in. That's how it felt. I had extreme pain in my head, blood was in my face. I didn't know how bad he'd hit me.

CAMPBELL  Go ahead.

FROST  So I turned my gun towards him, I pulled the trigger, and nothing happens. It went click.

CAMPBELL  You heard it click?

FROST  I heard it click. It's probably the loudest click I've ever heard. Because that was supposed to be what was going to get him off of me. At that time we have trained and trained and trained on the range for remedial action drills, which is you bring the gun in, you reseat the magazine, you work the action, or pull the slide back to eject whatever round was in there, get a new one in, you reassess, or reengage. The way I was laying on my right hip, I couldn't, I didn't have good movement with my arm, but I was able to pull it in underneath me a little bit more so that I could get the weapon close enough that I had to, that I could drop my left arm because I couldn't reach all the way across my body, plus I was still getting hit. I was able to pull it in close enough. I had to drop my left arm and fully expose my face, but I knew if I didn't then I was just going to continue to get hit. It wasn't stopping even after I tried to fire the round. I was able to do the remedial action underneath or right in close to my body and as soon as I worked the slide, I just started pulling the trigger again. I started feeling more at that point like I was going to pass out. I was going to, it was fading. I mean it was starting to

CAMPBELL  You're still getting hit during this

FROST  Correct.

CAMPBELL  what you call the remedial action

FROST  Right. There was no stopping. There was no, he wasn't saying anything. I couldn't say anything. I kept getting hit so hard I was having a hard enough time staying with it.

CAMPBELL  Ok.

FROST  So I worked the action on the weapon, and as soon as I thought it was back in, I just started shooting. I couldn't see where I was shooting. I

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 16

didn't know where I was shooting. I didn't even know if I was hitting him. I continued to shoot until the threat stopped. After the first few rounds, he was still hitting me, so I didn't know if I had even hit him. So I continued to shoot until the threat stopped, until I stopped getting hit.

CAMPBELL  Now, so you knew you had fired more than one round at this point

FROST  Yes.

CAMPBELL  but you don't know if they've hit Mr. Guilford?

FROST  Correct.

CAMPBELL  You don't know if they've had any affect at this point. All you know is your still getting hit?

FROST  Yes. I had no, I couldn't see, I wasn't aiming, it was, the gun was right up near my chest, and I just started shooting. And I was shooting out of desperation. I didn't have, I was stuck in the snow. I had no other avenue. He was on top of me, and he just, he wasn't stopping.

CAMPBELL  Let's stop and back up for a second before I forget to ask, at the point where you're pinned and he's got what you described as a top-mount position on you, is there anything in your training that you're taught that you can try to escape from that?

FROST  There is. There is the ability to bridge, which would be planting your feet, thrusting your hips up, and trying to throw this person off you, which at one point I had tried to do, but because of the way he had me pinned on my side, I wasn't flat on my back, so I'm not able to bridge, plus my feet were sinking in the snow. I could also try to curl into a fetal position, but with the way he was on my hips, my knees were back underneath his to the point that I couldn't just curl up. Plus with my right arm being and my torso being stuck in the snow I couldn't, I didn't have full body movement to be able to do this. It's not like laying on the floor, or on a mat, or on a street that's solid. There was no area to move in. I couldn't move.

CAMPBELL  Alright, so at this point you've fired a number of rounds.

FROST  Correct.

CAMPBELL  You don't know how many?

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 17


FROST        No.

CAMPBELL  At some point you probably found out how many,

FROST        Yes.

CAMPBELL  but at that time you don't know.

FROST        I had no idea.

CAMPBELL  What happens next?

FROST        After the attack stops, I stop firing.  Once I quit getting hit, I had took my
             finger off the trigger, and he fell to my left side.  He fell to my left side, and
             at that time I had to crawl out from underneath him, so I pull myself up and
             pull out, and I try, I want to, I don't know how many times I've hit him at
             this point.  I don't know if he's dead.  I don't know if he's going to come
             back after me.  I don't know anything.  All I knew is he fell.  So I pull myself
             up from underneath him and I stand up, and I immediately fall back down
             into the snow.  At this point I'm fighting not blacking out, so I took a knee,
             got on the radio right away.  I was having a hard time forming a thought.  I
             just needed to tell them that I had shot one, and that's exactly what came
             out.  I shot one.  And as I'm kneeling there, I know there's blood on my
             face, and I can see it splashing down on my gun and in the snow, and I
             got on there to say that I was bleeding.  I didn't know how bad I was hurt.
             I just knew that I needed to stay there because I was able to stay
             conscious staying there.  Where I was afraid if I stood up and tried to
             move somewhere I was going to, I may black out.  And I was afraid if I
             blacked out and he wasn't dead that maybe he was going to come back
             after me.  So I stayed there.  I kept my gun on him, and just waited for
             backup to arrive.

CAMPBELL  Can you see very well at this point?

FROST        It's blurry.  I still got blood running into my face.  I can see, but

CAMPBELL  You can see where he's at

FROST        I can see where he's at.  There's still the lights from the cars, and I can
             see him in the snow.  And I'm, I don't think I was anymore than 6 or 8 feet
             from him at that point.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 18

CAMPBELL   Alright so you stay in this position and you're still fighting blacking out you said.

FROST   Yes.

CAMPBELL   So you don't want to necessarily stand up or move anywhere else?

FROST   Correct.

CAMPBELL   Alright.  Do you recall how long was it at all before your first, the first backup officer arrives?

FROST   I don't know how long it was.  It felt like forever.  I remember at one point kneeling in the snow, one of my first thoughts is, was why.  I didn't understand how it went from the traffic stop to where we ended up.  I remember saying that to myself, then at one point I remember saying to myself come on guys because I didn't know, I was still I guess maybe in shock.  I was still kind of trying to put everything together.

CAMPBELL   So it stays like that until your first backup arrives?

FROST   Right.

CAMPBELL   What do you remember from there?

FROST   The first person to arrive was Officer Schlossberg from Grand Ledge.  He showed up, he pulled right up, he saw me, and he went in the ditch.  He came over.  He asked me if I was alright.  I said I think so.  He kept telling me to, he goes stay with me.  I don't know if I looked like I was going to pass out or something at that point, but I remember him saying stay with me, you're alright.  He stood with me for a minute.  He looked over and saw the body in the snow and said is he dead.  Actually I don't even remember if he said is he dead, but he said we need to secure him.  I said ok, I'll cover him, you cuff him.  And at that point I stay covered down on Guilford and Schlossberg moved over and secured him in handcuffs.  So we didn't know if he was deceased or not.

CAMPBELL   Alright, so after that he's secured

FROST   Correct.

CAMPBELL   in handcuffs.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 19

FROST        Yes.

CAMPBELL     After that what?

FROST        After that I remember Sgt. Tietsort showing up. Sgt. Tietsort, of course,
             came from Delta. He arrived. He helped me up out of the snow. When
             he helped me up out of the snow, I went to reholster my gun, but I couldn't
             because my holster was so full of snow that it wouldn't go back in. So as
             we're walking up I still have my gun in my hand, and I'm tangled in taser
             wire. At some point during the fight the probes that must have been in Mr.
             Guilford were then tangled up amongst both of us. I took my gun and my
             hands were getting incredibly cold. I set it down on the bumper of my
             vehicle, the push bumper of my vehicle. I told Sgt. Tietsort I said that's my
             gun I can't holster it. And then he went and sat me down in Dep.
             Dahlgren's car.

LETT         Deputy who?

FROST        Dahlgren. Preston.

LETT         Ok.

CAMPBELL     Ok, so at that point you're in Dep. Dahlgren's car and waiting for an
             ambulance?

FROST        Correct. As I'm sitting there I can feel the vibration of the battery pack
             from the camera, so I knew something was wrong. I looked down and I
             see that the head's gone from the camera, but I know the battery pack's
             still in my vest. So as he's coming, he was going to take me up to
             Cochran Road to meet the ambulance there. The ambulance goes by and
             then I see who I thought was Lt. Wriggelsworth come by, and I told
             Dahlgren, I said he's going to want my battery pack. He's going to want
             my body camera. So he got on the radio. Lt. Wriggelsworth came over. I
             pulled it out of my vest, gave it to him, he asked me briefly what had
             happened. I gave him the quick rundown, then I ended up meeting the
             ambulance there I believe.

CAMPBELL     Alright, so what do you recall, you went to the hospital.

FROST        Correct.

CAMPBELL     Do you recall what your injuries ended up being?

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 20


FROST          I ended up having a concussion.  When I initially arrived at the hospital,
               they thought that I was going to have broken bones in my eye and
               possibly my jaw.  They sent me in for a CT scan.  Both came back
               negative for breaks.  I had severe swelling on the back of my head, left
               side of my head.  I had a cut on my forehead that required glue or stitches.
               They said we can do both.  They said the glue may not hold, but if we do
               stitches, it's going to scar a lot worse, so we decided to opt for the glue.  I
               had injuries to both of my eyes.  They were both swollen.  My mouth was
               swollen.  My jaw was incredibly sore, that area was swollen.  I wasn't able,
               I didn't have a straight bite, like I couldn't put my teeth together, which we
               ended up figuring was just from all the swollenness in my face.

CAMPBELL   How long was it before you started feeling like you didn't have any affects
               from the injuries?

FROST          I didn't finally get cleared and feeling that I wasn't, I after the, it took about
               4 weeks.  I started, I had some short term memory loss issues and I had
               some vision issues.  I, of course, didn't recognize the short term memory
               loss, my wife did.  She noticed a couple patterns where I had asked for
               something, and she would bring it and then a minute later I would ask for it
               again.  After she had already brought it and I had thanked her for it, I'm
               asking her for the same thing again.  And she noticed issues like that and
               talked to me about it, and I'm like.  I didn't realize it, of course, but she did.
               I had some balance issues.  I remember being at the doctor, which I guess
               goes with the concussion.  He would have me close my eyes and put my
               arms out, and I guess I would just sway back and forth.  I didn't have that
               sense of balance.  The vision issues I was having, I couldn't see long
               distances, which I'm usually pretty good at.  I couldn't read street signs.
               We were sitting in the gas station, and I had looked across the street.  I
               remember we specifically were at the Quality Dairy in Charlotte getting
               gas, and I looked across the street and I couldn't read the street sign
               across the street, which is abnormal for me.  Usually I have pretty good
               eyesight, so I had to go get my eyes checked and evaluated.

CAMPBELL   And you don't wear any kind of corrective lenses?

FROST          No.

CAMPBELL   Prior to this incident, did you have any other medical issues or injuries that
               were

FROST          No, none.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 21

CAMPBELL  Healthy?

FROST  Yes.

CAMPBELL  So any injuries were as a result of this?

FROST  Yes.

CAMPBELL  Ok. How tall are you?

FROST  5 foot 9.

CAMPBELL  5'9" and how much do you weigh?

FROST  190.

CAMPBELL  Alright. At this point I think let's just take a break for a minute. Does that work for you?

FROST  Yes.

CAMPBELL  It is about 10:10 in the morning, and I'm going to stop the tape for a minute to let Sgt. Frost have a break and then we will proceed from there.

We are back on the tape. It is 10:33 a.m. Still in the room is Sgt. Frost, Mr. Lett, and Capt. Campbell.

Sgt. Frost, I think we were talking about your injuries. So you said it was about 4 weeks before you were cleared, and what did you mean by "cleared"?

FROST  It took 4 weeks for the Work Health doctor to say that I was good enough to come back to work. Because I was continuing to have issues from the concussion. I had some severe headaches for awhile. I was having balance issues. I was starting to feel better, but I still wasn't cleared from the concussion yet, and I still had some pretty obvious marks on my face. My eyes were pretty black.

CAMPBELL  So during that 4-week period, you weren't at work at all?

FROST  Correct.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 22

CAMPBELL   Ok. Describe for me some of the affects you were talking about, some of the

FROST   I had pretty severe headaches. I got nauseous often if I stood up and tried to do too much, my wife actually grounded me to the chair at one point because I was trying to put on a tough front and be tough around my family and my kids, but I was having bad headaches. I was taking like 800 mg Ibuprophen pretty regularly to curb the headaches. I had difficulty sleeping for awhile, just remembering and playing through everything in my head again. The headaches, the balance was a big thing. I had, my head was, had so many injuries on it, after the first couple nights at home, it was difficult to even lay down because as soon as my head touched the pillow, no matter which way I layed, it hurt.

CAMPBELL   Did that get better over

FROST   It did. As the time went by, of course, it began to heal.

CAMPBELL   Do you have any lasting effects from it at this point right now?

FROST   I don't have any lasting effects. My headaches seem to be going to away. Every once in awhile I'll still, it may keep me up at night thinking about it. The, I got a scar on my head that's sensitive to the touch. It's difficult sometimes to put a hat on that pushes on it too hard. And I've got another little knot above my left eye that used to be the size of a pea, and it's gone down to a smaller pebble size now.

CAMPBELL   Let's go back to some of your training for a minute here. Now prior to working for the Sheriff's Office here, you were with the Marine Corps, correct?

FROST   Correct.

CAMPBELL   Tell me about that. When did you start in the Marine Corps?

FROST   I enlisted in 99 immediately after high school. I served 4 years active duty from 99 to 03. During that time, I went to boot camp, got selected for a Security Forces position. Did my Security Forces training, ended up in Washington, D.C., at the 8th MI Barracks while I waiting for a Top Secret security clearance. Once my security clearance came through and I was considered a good candidate, I went to the Presidential Retreat Camp David to work a security position. During that time I was responsible for security for the President and the First Family when they were aboard the

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 23

installation. We worked hand-in-hand with the Secret Service. We were a, being that the President was there, we did carry weapons. We did extensive training on Deadly Force, when to use it, and the responsibilities that come along with it. During my time there, I got promoted, and I worked my way through the ranks, and eventually became a React Team Commander and a Corporal of the Guard. I was responsible for everything my team did or failed to do in that position, and I was also authorized to give the orders to use Deadly Force if necessary.

CAMPBELL   The training that you received as part of your duties there, is that in any way inconsistent with what you're trained

FROST   No.

CAMPBELL   Is there differences as far as when you're allowed to use Deadly Force and things like that?

FROST   There is no differences. We were, back at that time, using a continuum. Of course, it was a military base. We had the President there. And during the time I was there was actually considered a time of war, of course, after the September 11th attacks through when I got done. But we carried batons, and we carried pepper spray, and we carried handcuffs, and these kinds of things. But we needed to be trained on when to properly use Deadly Force. We were all, the majority of us up there were between the ages of 20 and 25.

CAMPBELL   Go ahead Mr. Lett.

LETT   You mentioned the continuum. What's that?

FROST   Those are the, back then it was the amount of force that you could use based on a flowing chart where it goes from the least amount of force necessary to Deadly Force, and it encompasses everything in between. Whether it be physical restraints or pepper spray, because we didn't have tasers back then, or baton usage, to handcuffing, to back then it was pressure points or pain compliance techniques to affect an arrest or secure somebody.

CAMPBELL   Alright, so since you've been with the Sheriff's Office, you've had some defensive tactics training in addition to your firearms training, correct?

FROST   Correct.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 24

CAMPBELL   What kind of training has that been?

FROST      I have done the annual training with Det. Johnson and Dep. Schwartz who
           are our Defensive Tactics instructors. It encompassed everything from
           punches and kicks to ground fighting, baton usage, and possibly having to
           engage somebody that's on top of you. How to do escapes, arm bars,
           and things like that.

CAMPBELL   And you've successfully passed all of that training over the years?

FROST      Correct.

CAMPBELL   Something I want to go back to, you talked about, I think you used the
           term "targeting", prior to Mr. Guilford jumping up and attacking you

FROST      Yes.

CAMPBELL   you used the term "targeting" for some of the things that he was doing
           prior to that. Expand on that. What did you mean exactly by that? Why is
           that important to you?

FROST      It's important to me because a lot of the time they are considered pre-
           attack indicators. As I was moving around behind him, generally when
           I've arrested people on their stomachs, they're not turning around looking
           at me constantly. They will, they're following orders, or they're looking
           straight ahead, or they're laying on the ground. As I moved, he would
           continue to look up, and he wanted to know where I was on him. That's, I
           call it "targeting" because he is deciding whether or not if he is going to
           fight, where am I at when he engages. Because he wasn't just looking
           over his right shoulder and watching me, he was constantly moving left or
           right trying to get a better vantage point or better angle to where he could
           see me.

CAMPBELL   And from your training that's something that is important to look for?

FROST      Yes, I remember going over stuff like that with Det. Johnson in the annual
           training as to what to look for. And there's other indicators, I mean there's
           balling of the fists, there's heavy breathing, there's pacing can be in if
           you're in a situation like that, shoulders look intense. If the person's
           deciding whether they're going to flee or fight, they'll start to look around
           and see who's there and see if a backup unit's there, see if there's
           witnesses around.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 25

CAMPBELL   Ok, so other than him looking around or looking back at you as you're kind of moving in behind him to affect your arrest, other than that particular thing, was there any other what you would call pre-attack indicators that you noticed?

FROST   He, his, the only other thing that I would have, I believe I noticed, was when he was in the car and he was actively resisting. I was trying to affect an arrest, and he was pulling away. He didn't grab a hold of me or try to pull me in, but that there was an indicator that he's not, to me that says I'm not going to jail or I don't want to, and that put me on alert as well to start maybe looking at some of these other things.

CAMPBELL   At any point throughout this incident did you notice anything about his body or any signs of intoxication or anything about the environmental conditions that would have indicated

FROST   When I went into affect, when I opened his door and reached into get his seatbelt, I could smell the odor of marijuana in the car. I at that point I didn't give it a whole lot of thought because we had already amped it up and we were in the situation that we were in. I didn't visually see anything at that time, but I wasn't looking either, but I definitely noticed the smell of marijuana coming from the car.

CAMPBELL   Had you noticed any signs of intoxication?

FROST   Not at that point. I suspected when I was driving without my high beams on and I got flashed, that when I turned on it maybe this isn't a drunk driver, that their eyes are sensitive to the light for one reason or another or they're under the influence of something, and maybe that's why they thought my high beams were on. But as far as speaking to him, I didn't pick up on anything specific.

CAMPBELL   Ok, didn't notice any odors, didn't notice any speech or you know other physical signs that we would look for?

FROST   No, not at that time, and his window was only cracked a couple inches.

CAMPBELL   Do you have anything that you'd like to add or anything I didn't ask you that you feel would be important information?

FROST   Not that I can think of at this time.

IA 15-02 – Interview with Sgt. Frost
July 2, 2015
Page 26

CAMPBELL     Mr. Lett, do you have any additional questions, anything that you want to clarify?

LETT     No, I think you covered it pretty well Captain.

CAMPBELL     The time is now 1044. We're going to go ahead and end the interview and before we do that I just want to let you know that if any additional questions come up as part of the review, I may have to ask you to come in and continue the interview at that point, but at this point we are going to finish this interview at 1044 and the tape is ending.

# Tab 3

# Prosecutor Analysis