UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

BRIAN GUILFORD, as Personal Representative
of the Estate of Deven Guilford,

        Plaintiff,

v.

SGT. JONATHON FROST,
in his individual capacity

        Defendants.

Case No. 15-1053
Hon. Paul L. Maloney
Mag. Ray Kent

_____/

# Exhibit 10

# Frost Deposition Transcript

# *In The Matter Of:*

## Brian Guilford, et al. v. Eaton County, et al.

## Sergeant Jonathon Frost

## September 9, 2016



Court Reporting and Video

Sergeant Jonathon Frost
September 9, 2016

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| ) | |
| BRIAN GUILFORD, as ) | |
| Personal Representative ) | |
| of the Estate of Deven ) | |
| Guilford, ) | |
| ) | |
| ) | |
| Plaintiff, ) | CASE NO. 15-1053 |
| ) | |
| vs. ) | HONORABLE PAUL MALONEY |
| ) | |
| EATON COUNTY and ) | |
| SGT. JONATHON FROST, in ) | |
| his individual capacity, ) | |
| jointly and severally, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

The Videotape Deposition of
SERGEANT JONATHON FROST, taken before me,
Patricia J. Hankerd, CSR-5430, Notary Public for the
County of Jackson, on Friday, September 9, 2016, at
822 Centennial Way, Suite 270, Lansing, Michigan,
commencing at or about 10:45 a.m.

Sergeant Jonathon Frost
September 9, 2016

```
                                                    Page 2
 1    APPEARANCES:
 2           CONSTITUTIONAL LITIGATION ASSOCIATES, P.C.
             BY:  HUGH M. DAVIS
 3                CYNTHIA HEENAN
                  JOHN C. PHILO
 4           450 W. Fort Street, Suite 200
             Detroit, Michigan 48226
 5           (313) 961-2255
 6                   Appearing on Behalf of the Plaintiff.
 7
 8           SINAS, DRAMIS, BRAKE, BOUGHTON &
             MCINTYRE, P.C.
 9           BY:  JAMES F. GRAVES
             3380 Pine Tree Road
10           Lansing, Michigan 48911-4207
             (517) 394-7500
11
                     Appearing on Behalf of the Plaintiff.
12
13
             JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C.
14           BY:  JAMES L. DYER
             822 Centennial Way, Suite 270
15           Lansing Michigan 48917
             (517) 886-3800
16
                     Appearing on Behalf of the Defendants.
17
18
19    ALSO PRESENT:
20           MR. BRIAN GUILFORD
             MR. CHRISTOPHER DELACRUZ, Videographer
21
22
23
24
25
```

Sergeant Jonathon Frost
September 9, 2016

Page 3

1                            INDEX
2                          EXAMINATION
3    Witness Name                                    Page
4    SERGEANT JONATHON FROST
5        Examination By Mr. Davis ......................... 5
6
                             EXHIBITS
7
     Exhibit                                          Page
8
     Exhibit No. 1   MVC 257.700                      4
9
     Exhibit No. 2   MVC 257.699                      4
10
     Exhibit No. 3   Autopsy Report                   4
11
     Exhibit No. 4   Supplemental Report              4
12
     Exhibit No. 5   Frost Face Photo                 90
13
     Exhibit No. 6   Frost Hospital Photo             90
14
     Exhibit No. 7   Frost Head Photo                 90
15
     Exhibit No. 8   Guilford Photo (elbow)           103
16
     Exhibit No. 9   Guilford Photo (side)            103
17
18
19
20
21
22
23
24
25

Sergeant Jonathon Frost
September 9, 2016

Page 4

1                    Friday, September 9, 2016

2                    Lansing, Michigan

3                    10:45 a.m.

4               (Exhibit Nos. 1 through 4 were

5          marked.)

6          THE VIDEOGRAPHER:   We're now on record.   This is

7     the video deposition of Sergeant Jonathon Frost.

8     Today's date is Friday, September 9th, 2016.   The time

9     is 10:45:58 a.m.   We are located at 822 Centennial Way

10    Suite 270, Lansing, Michigan.

11         We're here in the matter of Brian Guilford as

12    personal representative of the estate of

13    Deven Guilford versus Eaton County and

14    Sergeant Jonathon Frost.   Case No. 15-CV-1053 for the

15    United States District Court, Western District of

16    Michigan being held before the Honorable Paul Maloney.

17         My name is Chris Delacruz video technician for

18    Carroll Court Reporting and Video.   Will the court

19    reporter please swear the witness, and counsel briefly

20    identify themselves for the record.

21                    SERGEANT JONATHON FROST,

22    the witness, being sworn by the Notary Public to

23    tell the truth, the whole truth and nothing but the

24    truth, testified as follows:

25         MR. DAVIS:   Hugh Davis for Plaintiff.

Sergeant Jonathon Frost
September 9, 2016

Page 5

1          MR. PHILO:  John Philo from Constitutional

2     Litigation Associates for the Plaintiff.

3          MS. HEENAN:  Cynthia Heenan for the Plaintiff.

4          MR. GRAVES:  Jim Graves for the Plaintiff.

5          MR. DYER:  James Dyer for the Defendants.

6          MR. DAVIS:  We're ready?

7          THE VIDEOGRAPHER:  Yes, sir.

8          MR. DAVIS:  All right.

9          Sergeant Frost, my name is Hugh Davis.  I'm one

10    of the attorneys for the estate of Deven Guilford, and

11    I'll be doing the questioning.  If you think I don't

12    understand an answer -- I am, in fact, bilaterally --

13    clinically deaf; and therefore, I do misunderstand a

14    lot.  Secondly, if you don't understand the question

15    that I ask, please ask me to explain it again and so

16    that you're clear on whatever it is you're answering.

17                        EXAMINATION

18    BY MR. DAVIS:

19    Q.   Your full name?

20    **A.   Jonathon Michael Frost.**

21    Q.   Are you employed?

22    **A.   Yes, I'm employed.**

23    Q.   By whom?

24    **A.   The Eaton County Sheriff's Office.**

25    Q.   For how long?

Sergeant Jonathon Frost
September 9, 2016

Page 6

1   A.   I've been with the Easton County Sheriff's Office for

2        ten years.

3   Q.   Were you employed before that?

4   A.   I was employed as a -- yes, I was.

5   Q.   Where?

6   A.   I was employed through college at Lone Star Steakhouse

7        in Mt. Pleasant.

8   Q.   Okay.  And where did you go to college?

9   A.   I went to college at Mid-Michigan Community College.

10  Q.   And did you take a degree?

11  A.   Yes.

12  Q.   And did you have a specialty or a major that you took

13       your degree in?

14  A.   Yes.  I got my associate's degree in criminal

15       justice.

16  Q.   Was that the only institution of higher learning that

17       you attended after high school?

18  A.   Yes.

19  Q.   And when and where did you graduate from high

20       school?

21  A.   I graduated from Greenville High School in 1999.

22  Q.   Where is Greenville?

23  A.   Greenville is approximately 45 minutes northeast of

24       Grand Rapids.

25  Q.   Okay.  And these questions are not ones that will

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 7

```
 1           likely come into the trial, but are you married?

 2      A.   Yes.

 3      Q.   And do you have children?

 4      A.   Yes.

 5      Q.   Have you been married more than once?

 6      A.   No.

 7      Q.   When you were in high school, did you have

 8           employment?

 9      A.   Yes.

10      Q.   What?

11      A.   I worked at a Pizza Hut, and I worked at an animal

12           clinic.

13      Q.   Have you ever given a deposition before?

14      A.   Yes.

15      Q.   Under what circumstances?

16      A.   I gave a deposition for an accident claim.  I was one

17           of the responding officers to a personal injury

18           accident, and I was subpoenaed for a deposition at

19           that time.

20      Q.   Okay.  So that was a personal injury case involving

21           third parties and not involving you in your official

22           capacity?

23      A.   Yes.

24      Q.   Is that the only time you've been deposed before?

25      A.   Yes.
```

Sergeant Jonathon Frost
September 9, 2016

Page 8

```
 1   Q.   In preparation for today's deposition, can you tell me
 2        what, if any, materials you reviewed?
 3   A.   I met with my attorney.  We reviewed the video of my
 4        traffic stop, and we answered and went over some other
 5        materials.  I didn't read anything, but we just spoke
 6        about the case.
 7   Q.   Okay.  You wrote a report in this matter, did you
 8        not?
 9   A.   Yes, I did.
10   Q.   Did you review that in preparation for today's
11        deposition?
12   A.   No, I didn't.
13   Q.   Is that because you didn't think you needed to or it
14        just didn't occur to you?
15   A.   I just didn't review it.  I haven't reviewed anything
16        pertaining to this case really.
17   Q.   Prior to today but since the incident itself, you have
18        been interviewed or given statements regarding the
19        incident, have you not?
20   A.   Yes.
21   Q.   Can you tell me when, where, to whom, and on how many
22        occasions?
23   A.   The -- let me think.  I was interviewed for an
24        internal investigation.  I don't remember the exact
25        date.  I was spoken to by Captain Campbell who was
```

Sergeant Jonathon Frost
September 9, 2016

Page 9

1      doing the internal -- internal affairs

2      investigation.

3  Q.  Okay.  And that's the only one?

4  A.  Yes.

5  Q.  Are you aware that there was a Michigan State Police

6      investigation into this incident?

7  A.  Yes.

8  Q.  Were you interviewed in connection with that?

9  A.  I was not directly interviewed.  I was asked some

10     questions the night of the incident.

11 Q.  When you say asked some questions, you mean through

12     the chain of command or by an MSP officer?

13 A.  By a detective, I believe.

14 Q.  I'm sorry?

15 A.  By a detective, I believe.

16 Q.  MSP?

17 A.  Yes, sir.

18 Q.  Did that take place at the Eaton County Sheriff's

19     Department or at an MSP post?

20 A.  That took place at the hospital immediately following

21     the incident.

22 Q.  I see.  And is that the only time you've spoken with

23     the MSP?

24 A.  Yes.

25 Q.  Do you agree that the flashing of lights at an

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 10

1          oncoming vehicle is legal?

2               MR. DYER:  Object to the foundation, and it calls

3          for a legal conclusion.

4               Answer to the best of your ability.

5               THE WITNESS:  I'm sorry, can you ask me again?

6     BY MR. DAVIS:

7     Q.   Two vehicles are approaching each other in opposite

8          directions, let's say, on a two-lane road.  For

9          whatever reason, one or both of them flash their light

10         at the other.  Is there anything illegal about that?

11              MR. DYER:  Object to the question based upon lack

12         of foundation.

13              THE WITNESS:  Yes.

14    BY MR. DAVIS:

15    Q.   Huh?

16    A.   It is illegal.

17    Q.   It is illegal to flash lights?

18    A.   Yes.

19    Q.   And you base that on?

20    A.   Michigan law.

21    Q.   So according to you, any time vehicles flash their

22         lights at each other, it's illegal?

23    A.   Yes.

24    Q.   And is that because you were trained that way?

25    A.   That is the way that I understand the Michigan law

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 11

```
 1        that covers the activation of high beams towards an

 2        oncoming vehicle within 500 feet.

 3   Q.   Do you distinguish between steady activation of high

 4        beams and/or flashing lights to get the other vehicle

 5        to cut down their high beams?

 6   A.   As -- I'm trying to understand your question.

 7   Q.   Okay.

 8   A.   Whether the high beams are steadily on or whether they

 9        are they're flashing, my interpretation is that they

10        are both illegal actions according to the Michigan

11        Motor Vehicle Code.

12   Q.   So nobody should ever flash their lights?

13   A.   Correct.

14            MR. DYER:  That question assumes there's an

15        oncoming vehicle, of course?

16            MR. DAVIS:  I'm sorry?

17            MR. DYER:  That question assumes there was an

18        oncoming vehicle, of course?

19            MR. DAVIS:  I'm real deaf.

20            MR. DYER:  Your previous question assumed that

21        there was an oncoming vehicle.  I assume that question

22        also assumes there was an oncoming vehicle?

23            MR. DAVIS:  Yes, you're right.

24   BY MR. DAVIS:

25   Q.   Is there anything a driver can do to attempt to get an
```

Sergeant Jonathon Frost
September 9, 2016

Page 12

| 1 | | on coming vehicle to lower their high beams if they |
|---|---|---|
| 2 | | are within 500 feet and obstructing the vision of the |
| 3 | | vehicle which is being driven toward it? |
| 4 | A. | The safest thing a driver can do when faced with a |
| 5 | | situation like that is to not operate their high beams |
| 6 | | than take the risk of having both drivers having |
| 7 | | difficulty seeing.  Instead, it's my understanding, |
| 8 | | that the driver should look at the fog line and use |
| 9 | | that as a reference to continue in their current |
| 10 | | direction. |
| 11 | Q. | Is that a part of your training? |
| 12 | A. | No. |
| 13 | Q. | You did go to a police training academy, did you |
| 14 | | not? |
| 15 | A. | Yes. |
| 16 | Q. | Where? |
| 17 | A. | I went to Mid-Michigan Police Academy at Delta College |
| 18 | | in Bay City. |
| 19 | Q. | And how long was that course? |
| 20 | A. | That course was part of my associate's degree, and the |
| 21 | | course ran for a semester of college. |
| 22 | Q. | During that course, was any part of it traffic |
| 23 | | enforcement? |
| 24 | A. | Yes. |
| 25 | Q. | And did any part of it touch on the topic which we've |

Sergeant Jonathon Frost
September 9, 2016

Page 13

1    been discussing which is the handling of high beams of

2    approaching vehicles?

3  A.  **That was a long time ago, and I can't say for sure**

4    **whether we covered that specific topic or not.**

5  Q.  Okay.  Are you familiar with an organization called

6    MCOLES?

7  A.  **Yes.**

8  Q.  What is it?

9  A.  **The MCOLES is the Michigan Certification on Law**

10    **Enforcement Standards.**

11  Q.  Okay.  And did you get MCOLES certification?

12  A.  **I was MCOLES certifiable coming out of the academy.**

13  Q.  Since you joined the Eaton County Sheriff's

14    Department, I take it that you have either regular or

15    periodic training updates?

16  A.  **Yes.**

17  Q.  Since you've been a member of the department, have any

18    of those updates had to do with traffic enforcement?

19  A.  **There are a lot of different aspects of traffic**

20    **enforcement.  Are you referring to -- what aspect**

21    **exactly are you referring to that you would like me to**

22    **discuss.**

23  Q.  Well, the first question is:  Does any of it have to

24    do with traffic enforcement?

25  A.  **Yes.**

Sergeant Jonathon Frost
September 9, 2016

Page 14

1   Q.   Okay.  What aspects of traffic enforcement training do

2        you recall receiving since being employed by the

3        Sheriff's Department?

4   A.   **I have received training on sobriety tests related to**

5        **traffic enforcement.  I have received training on**

6        **officer safety related to traffic enforcement and --**

7   Q.   What does that mean?

8   A.   **How to properly approach a car, how to watch for**

9        **traffic when on a traffic stop.**

10  Q.   Okay.  Go ahead.

11  A.   **As far as the specifics related to law, I don't**

12       **specifically remember any at this time.**

13  Q.   Okay.  Does the Eaton County Sheriff's Department on

14       occasion issue bulletins?

15  A.   **Yes.**

16  Q.   Okay.  And what are the nature of those bulletins?

17  A.   **There's numerous natures of the bulletins from legal**

18       **updates to lookouts to anything that the State Police**

19       **or other police agencies in the area choose to**

20       **share.**

21  Q.   Okay.  When you say legal developments, you mean

22       changes in the law or legislative alerts --

23  A.   **Correct.**

24  Q.   -- that might affect your job?

25  A.   **Yes.**

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 15

1    Q.   Other than to your attorney and your interview by

2         internal affairs with the Sheriff's Department after

3         this incident and the interview at the hospital with

4         the Michigan State Police, have you ever given any

5         other statements regarding this incident?

6    A.   No.

7    Q.   Has it been a matter of, let's say, station house

8         discussions at the department?

9    A.   To an extent, yes.

10   Q.   In what aspect?

11   A.   People ask me how I'm doing.  Of course, it's just

12        like any other organization.  At times people like to

13        talk and figure out what happened and see what's going

14        on.

15   Q.   Okay.  When you first came to the department, did you

16        come -- you came as a certified officer; is that

17        right?

18   A.   No, that is not.  I came to the department as a

19        certifiable officer.  I needed to be employed before

20        getting certified through MCOLES.

21   Q.   Okay.  And how long did that take?

22   A.   Once I began my employment and made it through the

23        training process I was certified in a certain amount

24        of time.

25   Q.   Two or three months?

Sergeant Jonathon Frost
September 9, 2016

Page 16

1   A.   I don't recall remember exactly how long the MCOLES --

2        I don't know if it's instant you're certified or if

3        it's a certain amount of time or through probation.  I

4        don't know exactly how that works.

5   Q.   Whenever the certification kicked in, as you put it,

6        were you then a patrol officer?

7   A.   Yes.

8   Q.   And how long did you remain in that role?

9   A.   I remained as a patrol officer until getting promoted

10       to sergeant.

11  Q.   I'm sorry?

12  A.   I -- I remained as a regular deputy until getting

13       promoted to sergeant.

14  Q.   Okay.  And how long was that?

15  A.   Approximately eight years.

16  Q.   Did you have any other special assignments such as

17       plain clothes, narcotics, other particularized roles

18       other than patrol officer during those eight years?

19  A.   I did do some work with our organization that we tried

20       to work with, with the Lansing violent crimes unit.

21       We did that.  I worked as a specified traffic

22       enforcement deputy with the traffic division in

23       Delta Township.

24  Q.   What is a specialized traffic enforcement --

25  A.   My job was to enforce or recognize traffic violations

Sergeant Jonathon Frost
September 9, 2016

Page 17

```
 1        and help reduce the amount of accidents happening in
 2        Delta Township.
 3   Q.   How do you do that?
 4   A.   My job was traffic enforcement.  It was to either be
 5        in the car or on the motorcycle recognizing traffic
 6        violations and then enforcing those as necessary.
 7   Q.   Okay.  Other than that, did you have any specialized
 8        assignments?
 9   A.   Outside of my normal duties as a deputy, I have
10        certain certifications; but they're not necessarily my
11        primary responsibility.
12   Q.   What are them?
13   A.   I am a member of our special response team.  I am an
14        evidence technician.  I'm a field training officer.
15        I'm a member of our honor guard.  I am the human bias
16        instructor for our department.
17   Q.   I'm sorry?
18   A.   Human bias.
19   Q.   What is that?
20   A.   The bias training?  It's to help police officers
21        understand that everybody, not just police officers
22        exhibit some kind of human bias, and it is a training
23        program brought forth by our sheriff to help our
24        officers understand when bias may be coming into play
25        and how to circumvent that situation.
```

Sergeant Jonathon Frost
September 9, 2016

Page 18

1  Q.  Okay.  These specialties and/or special assignments,

2      were they things for which you volunteered?

3  A.  **Some of them were voluntary, the majority of them.**

4      **The only one that I don't believe that I fully**

5      **volunteered for was maybe the evidence technician**

6      **position, but I willingly took it on.**

7  Q.  Okay.  A few questions back you talked about -- if I

8      heard correctly -- the Lansing area violent crimes

9      task force.  Maybe I got it wrong but something like

10     that?

11 A.  **Yes.**

12 Q.  Okay.  And was that something that you were the only

13     Eaton County deputy or officer assigned to, or were

14     there numerous ones?

15 A.  **There were two or three depending on manpower.  It was**

16     **a pilot program to help combat some of the more**

17     **heinous crimes that may be affecting Delta Township**

18     **and the Lansing area.**

19 Q.  And that was a multi-jurisdictional task force with

20     officers from various departments?

21 A.  **No.  It was specifically within the deputies of**

22     **Delta Township; and at times we would work with the**

23     **units from Lansing.  But it wasn't**

24     **multi-jurisdictional as far as that goes.**

25 Q.  Give me some idea of what it actually entailed.

Sergeant Jonathon Frost
September 9, 2016

Page 19

```
 1   A.   A lot of it we were having some problems at the local

 2        Motel 6 with lots of prosecution, lots of drug deals.

 3        Our job was to be an impact team on the area whether

 4        it be on foot, in vehicles and try to either make

 5        arrests or develop investigations that would remove

 6        the problems that we were having.

 7   Q.   Also a few questions back, you indicated that you

 8        either are or were a part of the county special

 9        response force or team?

10   A.   Yes.

11   Q.   Is that a SWAT team?

12   A.   Yes.

13   Q.   Are you still in that capacity?

14   A.   Yes.

15   Q.   And is it a regular occurrence that you're -- you're

16        required to act in that role or is it an unusual?

17   A.   It depends from year to year.  This year we've had

18        minimal call-outs.  I want to say we've been activated

19        three or four times.  We do hold monthly trainings to

20        work on tactics and work as a team.  So it's -- it's

21        hit or miss as to when we actually get called out and

22        when we don't.

23   Q.   All right.  Sergeant, first, I'm going to now direct

24        your attention to the incident with Deven Guilford.

25        All right?
```

Carroll Court Reporting and Video
586-468-2411

Sergeant Jonathon Frost
September 9, 2016

Page 20

1  A.  **(Witness moves head up and down.)**

2  Q.  I take it you recall it?

3  A.  **Yes, sir.**

4  Q.  Throughout the entire incident, did you ever see

5      Mr. Guilford with a weapon?

6  A.  **No.**

7  Q.  Did you ever think or fear that he had a weapon that

8      you couldn't see?

9  A.  **I didn't know.**

10 Q.  Did you consider it?

11 A.  **I considered it a possibility, yes.**

12 Q.  Okay.  And when you said you didn't know, did you ever

13     pat him down?

14 A.  **No.**

15 Q.  When you decided to order him out of the car, he

16     ultimately complied, right?

17 A.  **Yes.**

18 Q.  Why didn't you pat him down then?

19 A.  **I never had an opportunity.**

20 Q.  He got out of the car?

21 A.  **Yes.**

22 Q.  And instead of saying go around to the front of the

23     car or the other side of the car and put your hands on

24     the hood, you could have done that, couldn't you?

25 A.  **Based on the situation I was in, I didn't believe that**

Carroll Court Reporting and Video
586-468-2411