UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

BRIAN GUILFORD, as Personal Representative
of the Estate of Deven Guilford,                          Case No. 15-cv-01053

                    Plaintiff,                            Hon. Paul L. Maloney

V

SGT. JONATHON FROST,
in his individual capacity, jointly and severally,

                    Defendant.

_____/

Hugh M. Davis (P12555)                    James L. Dyer (P32544)
Cynthia Heenan (P53664)                   Andrew J. Brege (P71474)
Attorneys for Plaintiff                   Attorney for Defendant
Constitutional Litigation Associates, P.C.   Johnson, Rosati, Schultz & Joppich, P.C.
450 W. Fort St., Ste. 200                 822 Centennial Way, Ste. 270
Detroit, MI 48226                         Lansing, Michigan 48917
(313) 961-2255/Fax: (313) 922-5130        (517) 886-3800
Davis@ConLitPC.Com                        jdyer@jrsjlaw.com
Heenan@ConLitPC.Com                       abrege@jrsjlaw.com
Info@ConLitPC.com

James F. Graves (P14288)
Stephen Sinas (P71039)
Attorneys for Plaintiff
Sinas Dramis Brake Boughton & McIntyre, P.C.
3380 Pinetree Rd.
Lansing, MI 48911-4207
(517) 394-7500
jimgraves@sinasdramis.com
stevesinas@sinasdramis.com

John C. Philo (P52721)
Maurice & Jane Sugar Law Center For Economic &
Social Justice
4605 Cass Ave.
Detroit, MI 48201-1256
(313) 993-4505
johnphilo1@comcast.net

_____/

**DEFENDANT'S REPLY BRIEF TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (DKT. 53)**


**\*\*\*Oral Argument Requested\*\*\***

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................ii

INDEX OF AUTHORITIES .........................................................................................iii

I.      Introduction ................................................................................. 1

II.     Response to Plaintiff's Standard ................................................................ 1

III.    Response to Plaintiff's Factual Assertions ..................................................... 2

IV.     Response to Plaintiff's Arguments and Claims Made by Plaintiff's
        Experts ...................................................................................... 4

CONCLUSION .....................................................................................................10

## INDEX OF AUTHORITIES

### Cases

*Anderson v. Creighton*, 483 U.S. 635 (1987) .................................................................... 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 1

*Baker v. Union Twp*, 587 Fed. Appx. 229 (6th Cir. 2014) .................................................. 5

*Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) ........................................................ 5

*County of Los Angeles v. Mendez*, __ U.S. __, 137 S.Ct. 1539 (2017) .............................. 4

*Graham v. Connor*, 490 U.S. 386 (1989) ........................................................................... 5

*Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010) ........................................................... 8, 9

*Lewis v. Adams Cty.*, 244 Fed. Appx. 1 (6th Cir. 2007) ...................................................... 7

*Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005) .......................................................... 9

*Muehler v. Mena*, 544 U.S. 93 (2005) ................................................................................ 5

*Rush v. City of Lansing*, 644 Fed. Appx. 415 (6th Cir. 2016) ......................................... 8, 9

*Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000) ........................................................... 9

*Scott v. Harris*, 550 U.S. 372 (2007) ................................................................................ 10

*Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003) ............................................................. 1

### Michigan Statutes

M.C.L. § 257.700(b) ........................................................................................................... 4

## I.      INTRODUCTION

Plaintiff fails to present a genuine issue of material fact upon which this Court may deny Sgt. Frost's entitlement to qualified immunity.  Plaintiff's response is riddled with unfounded speculation and conjecture, while simultaneously requesting this Court adopt a new standard of reasonableness to police interactions with recalcitrant suspects.  Essentially, Plaintiff would have this Court require law enforcement officials to refrain from interacting with those that knowingly violate the law, so long as the violators are persistent in their obstinacy.  For the reasons stated in Sgt. Frost's Renewed Motion for Summary Judgment, together with those below, Defendant respectfully requests this Honorable Court dismiss Plaintiff's case and enter judgment in his favor.

## II.      RESPONSE TO PLAINTIFF'S STANDARD

Plaintiff asserts that his "version" of the facts must be accepted, unless blatantly contradicted by video evidence.  However, Plaintiff's "version" of the facts itself must be based on evidence, not imagination.  To create a genuine issue of material fact sufficient to defeat summary judgment, Plaintiff must present admissible evidence, not speculation and conjecture, to raise an issue beyond the cast of metaphysical doubt.  That is, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 247–48 (1986) (Emphasis added); ***Weaver v. Shadoan***, 340 F.3d 398, 405 (6th Cir.2003).  To be "material," the facts must be such that they might affect the outcome; to be "genuine," the dispute must concern evidence upon which the jury could reasonably return a verdict for the non-moving party. ***Anderson***, *supra* at 248, 252.  Plaintiff has failed to make such a demonstration.

1

### III.    RESPONSE TO PLAINTIFF'S FACTUAL ASSERTIONS

Misrepresentation, misstatement, and mischaracterization do not create questions of fact.  In the interest of judicial economy, only a few of the most blatant misstatements or misrepresentations from Plaintiff's statement of facts will be addressed here.  First, Plaintiff implies the Eaton County Sheriff's Department employs and trains its officers on a "use of force continuum," which is essentially a tool that teaches to only use the least intrusive means, or one level of force above the type of resistance presented by the suspect.  (See ECF 61, at PageID.711-712).  However, Sgt. Kelly Bricker, who administered the Eaton County Sheriff's Department training program, was specifically questioned on this issue:

> Q    Okay.  Does the department still employ the use of force continuum in its training?
>                                    *   *   *
> A    No, we do not.
> Q    And do you know why that's no longer utilized?
> A    Well, for the same reason that we wanted to fashion our deadly force policy after Graham versus Connor.  It's impossible to pigeonhole behaviors.   Those words that are on that force continuum, they mean different things to all different people. What I think might be passive resistance somebody else might believe that it's active resistance.  And if you look at the Graham versus Connor decision it talks about how it's impossible to precisely and mechanically predict or project, you know, what an exact behavior means and what's coming next.    (Exhibit 1, Bricker at 54)(Emphasis added).

Plaintiff claims that Medical Examiner Dr. Markey had difficulty reconciling the bullet trajectories with Frost's version of events.  This is not merely misstatement, but fabrication. When citing to Dr. Markey's transcript, Plaintiff does not provide any necessary context for the asserted "quotes" from that testimony.  In reality, Dr. Markey testified that he had a difficult time reconciling the bullet trajectories with Plaintiff's counsel's hypotheticals.  (See, generally, Exhibit 2, Markey at 115-125, with Plaintiff posing multiple, hypothetical questions).  As for his opinion on what actually occurred, Dr. Markey testified:

2

> Q        Did you -- do you have any opinions regarding where they were standing, sitting, laying?
> A        My opinion would be that based on the range of fire and the various locations of the injuries and the various trajectories that the gunshot wound paths have that one or very likely both of them were in motion and moving either parts of them, the gun, the bodies.  It's the only real explanation that I have for gunshot wounds on different sides of the body with different trajectories and with the range of fire all being very close to the same range. It indicates to me that there was probably a lot of movement, otherwise there's no way that I can reconcile all of these gunshot wound injuries with everything being relatively static, both the shooter, the gun, and the --
> Q        Okay.
> A        And the decedent.
>                                      *   *   *
> A        Twisting, turning, leaning forward, leaning sideways, moving extremities, all or some of those things likely occurred.
> (ECF No. 53-16, Markey dep 134-135, 136, PageID.650)

Dr. Markey further testified that in his opinion, the gunshot wounds were all consistent with the

description of the incident provided to him by his own investigator, the police, and the

prosecuting attorney.  (Exhibit 2, Markey at 141-142)  That is,

> A        My, I think, statement to members of the prosecuting attorney staff that were here that were -- you know, given the information that I was told about the altercation, that the range of fire and the differing locations, et cetera, would be consistent with an altercation like that described to me.
>                                      *   *   *
> Q        I have to ask, what was described to you as the altercation that you're saying that it was consistent with?
> A        Essentially that the decedent and the officer involved were in an altercation.  It was similar to the locations of the bodies that you gave in your scenario where the officer was lying on the ground and the decedent was on top of him, straddling him, and that both bodies were obviously moving, that the individual on top was striking the individual, indicating that he was moving, and that the officer stated that he was able to get his gun and start shooting.  But I don't think there was -- I don't think I had any details about, you know, where the location of the gun and stuff was, and it would have been my interpretation that obviously things were in motion.  And based on the locations of the wounds as we've discussed, the varying trajectories that we've discussed, and the range of fire, <u>it was my opinion that those injuries could</u>

3

<u>have been sustained in the type of altercation that was described</u>.
(*Id.*) (Emphasis added)

## IV.   RESPONSE TO PLAINTIFF'S ARGUMENTS AND CLAIMS MADE BY PLAINTIFF'S EXPERTS

At the outset, Defendant must point out that in ***County of Los Angeles v. Mendez***, __ U.S. __, 137 S.Ct. 1539 (2017), the Supreme Court unanimously rejected the Ninth Circuit's provocation rule, finding it "is incompatible with our excessive force jurisprudence."  Plaintiff sought leave and was allowed to file an amended complaint based on the hope the Supreme Court would adopt that provocation rule.  However, the Supreme Court's decision puts this issue to rest.  As such, there is no legal support for Plaintiff's claims that the alleged constitutional violations asserted in Counts 1 through 5 proximately caused Guilford's death. Therefore, Defendant requests that part of each claim—the assertion that the alleged violation proximately caused Guilford's death—be dismissed.

Plaintiff's reliance on a Minnesota state court case on the issue of flashing lights has no relevance here.  While the state of Minnesota may have a statute similar to M.C.L. § 257.700(b), a Minnesota Court of Appeals opinion cannot be used to defeat the objective reasonableness of Sgt. Frost's belief that flashing lights at oncoming traffic *in Michigan* is a traffic violation.  This is particularly so where the Michigan Secretary of State—the state agency charged with administering driver's licenses—has explicitly indicated in its driver training manual that such a practice is inappropriate in all instances.  Here, it is undisputed Guilford flashed Sgt. Frost.  Therefore, a reasonable officer in Sgt. Frost's position would have believed he had probable cause to initiate the traffic stop.

Plaintiff's claim that Sgt. Frost used unreasonable force in opening the car door and attempting to remove Guilford by placing his arm on him is similarly without merit.  Plaintiff provides no support, either legal or factual, that the mere act of opening the vehicle door or

4

placing an arm on Guilford constitutes "excessive" or unreasonable force. A police officer is authorized to use the amount of force reasonable to effectuate a detention. *Muehler v. Mena*, 544 U.S. 93, 98-99 (2005); *Graham v. Connor*, 490 U.S. 386, 396-397 (1989) (holding that not every push and shove necessarily results in a violation of the Fourth Amendment). Plaintiff's assertion that Sgt. Frost must have first given Guilford an order to exit the car before opening the door has no support from any published case law. Rather, Plaintiff cites several cases that held tasing an individual may be unreasonable if it is done without warning. See, e.g., *Baker v. Union Twp*, 587 Fed. Appx. 229 (6th Cir. 2014). Unlike these taser cases, Sgt. Frost did not have to provide any verbal command to exit the vehicle before he could attempt to effectuate the arrest. Sgt. Frost had already given Guilford multiple opportunities to comply with his orders, and even warned him that failure to do so would result in arrest. There was simply no evidence that Guilford was ever going to comply, particularly in light of his multiple explicit refusals to do so. Therefore, it was not unreasonable, let alone excessive force, to open the door and attempt to remove Guilford.

Plaintiff relies heavily on the opinions of their experts to support their excessive force claims related to the taser use and shooting.[1] The "story" created by their "expert" Ernest Burwell should play no role in this Court's review of the record.[2] Mr. Burwell's theory—which is

---

[1] Plaintiff's "expert" Robert Kane, with no police experience, relies on his criminal justice doctorate to opine on Frost's alleged motivations, essentially calling him an asshole cop who did not like his authority being challenged. This opinion offers next to nothing with regard to this Court's role in determining the objective reasonableness of Frost's actions, which is based on the "information possessed" by the officer, without regard to the officer's subjective beliefs at the time of the incident. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Whether Plaintiff and his experts have a problem with Sgt. Frost's personality makes no difference in the determination of whether he responded reasonably to Guilford's continuing resistance.

[2] Given the page limitation on reply briefs, there is not sufficient space here to address all of the improprieties of Mr. Burwell's opinion. For example, his opinion is rife with ultimate conclusions on the objective reasonableness of Frost's actions. This alone is sufficient for this Court to reject them. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (holding that

that both Guilford and Frost would have been incapacitated by the initial Taser deployment, that Guilford did not rush or attack Frost, that Guilford ran away from Frost but tripped over the Taser wires, and that Frost ran after and shot him—is supported by no admissible evidence and exists only in the mind of an expert paid to produce a favorable report. To accept his opinion would require a rejection of the admissible evidence in favor of fantasy.

Mr. Burwell first makes the incorrect assumption that both Frost and Guilford were disabled for the five second-discharge of Frost's taser. There is no admissible evidence to support the claim that either Frost or Guilford would have been disabled by the taser, even if the prongs were discharged at what Plaintiff describes as too close of a range.[3] Sgt. Bricker testified that neuromuscular incapacitation only occurs if both probes are actually embedded in the skin and there is sufficient distance between them. (Exhibit 1, Bricker at 68, 74-76). If the probes are not embedded, the electrical current does not transmit through the nervous system, but arcs through the air. (*Id.* at 75-76). Sgt. Bricker also testified an officer could possibly feel some of the effects of the electrical current if he or she touched the probes or put his or her hand in between where the probes are embedded on the suspect curing the cycle. (*Id.* at 77-78).[4] However, there is no admissible evidence of an officer becoming incapacitated, as hypothesized by Mr. Burwell, simply by being in contact with taser probe wires. A further necessity of this ridiculous theory is that both taser probes effectively embedded into Guilford

---

"[w]hen the rules speak of an expert's testimony embracing the ultimate issue, the reference must be to stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue.").

[3] This is inconsistent with Sgt. Bricker's testimony. She testified that the taser can still be effective in close quarters, as many interactions tend to be, because the taser can operate on both the neuromuscular incapacitation and through attempted pain compliance. (Exhibit 1, Bricker at 74). This is one reason she trains the officers to use the taser in probe mode, regardless of how close the officer may be to the resisting suspect—even if the probes are ineffective, the pain compliance option may still work. (*Id.* at 76).

[4] She has also heard some officer make complaints about feeling the electrical current when the taser lines had come into contact with a wet aluminum bleacher during the cycle. (*Id.* at 78).

6

and the taser delivered an effective electrical charge to cause neuromuscular incapacitation. However, both Guilford's autopsy *and the video* clearly demonstrate this did not occur.  Only one probe was embedded in Guilford's back.  More importantly, less than one second after the probes were deployed, Guilford was not incapacitated, but up on his feet and moving directly toward Frost with his arms raised.  Mr. Burwell's "theory" is nothing more than a hyperbolic conspiracy created from whole cloth.  It has no basis in admissible evidence, and requires a rejection of the actual physical and video evidence.  It cannot be used to create a genuine issue of material fact sufficient to defeat Frost's entitlement to qualified immunity.  See ***DeMerrell v. City of Cheboygan***, 206 Fed. Appx. 418, 427 (6th Cir. 2006) (rejecting a "use of force" expert's opinion because "even if the expert's report had not improperly stated legal conclusions, it still does not change the result that there is no genuine issue of material fact in the instant case because the report consists entirely of premises that contradict the uncontroverted facts."); see also ***Lewis v. Adams Cty.***, 244 Fed. Appx. 1, 10 (6th Cir. 2007) (rejecting an expert's opinion that it was "highly unlikely" plaintiff's decedent was pointing his rifle at officers on scene because it contradicted testimony of officers and "the opinion of the medical examiner that the physical evidence was consistent with the officers' testimony . . .").

Further, Dr. Dragovic's "opinion" does not provide Plaintiff the required "genuine" issue of "material" fact.  Essentially, Dr. Dragovic claims that any of the shots would have incapacitated Guilford, thus rendering the remaining shots unnecessary.[5]  However, this fails to

---

[5] Dr. Dragovic further opines on the cause of the injuries suffered by Sgt. Frost based on his review of a few photographs.  This testimony cannot seriously be considered as creating a question of fact as to whether Sgt. Frost received multiple blows to the head from Guilford. The implication that the laceration in Sgt. Frost's forehead was caused by a sharp object is directly rejected by Dr. George Ayad, the physician who provided *actual physical examination and medical attention* within a week of the incident to Sgt. Frost. (See ECF No. 53-15, George at 13-16, PageID.646, testifying that the forehead cut was a pressure wound, most likely caused by a fist).

take into consideration that all 7 shots occurred within 3.5 seconds, and there is no way to determine the actual order of the shots.  Dragovic admits there is evidence Guilford hit Sgt. Frost at least once, causing injury.  He provides no explanation for the other injuries to Sgt. Frost's head and face, which must have also occurred at some point during this altercation. However, and without explanation, he would have this Court believe that Sgt. Frost then (1) shot Guilford, incapacitating him; (2) realized he had incapacitated Guilford; and (3) repositioned himself and Guilford so he could deliver the "execution style" shot to the head. The undisputed evidence establishes all of this must have occurred within 3.5 seconds.  Dr. Dragovic cites no factual support for his assertions, or explanation as to how all of this could have occurred in such a short period of time.  Rather, the case law supports Sgt. Frost's entitlement to qualified immunity when facing such a rapidly evolving situation.  *See Rush v. City of Lansing*, 644 Fed. Appx. 415, 423-424 (6th Cir. 2016) (finding officer was entitled to qualified immunity where he fired a second shot at plaintiff with a knife, only seconds after the first shot, because it was not unreasonable for the officer to conclude the plaintiff "as still posing a threat when he fired the second shot, even if he was ultimately mistaken in making a split-second assessment.").

Plaintiff asserts that this Court should essentially reject Sgt. Frost's testimony—and, ostensibly, that of Dr. Markey—because the person best suited to contradict it is deceased, citing *Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010).  In *Jefferson*, the officer claimed he shot the plaintiff in response to a flash of light he believed was a gunshot directed at him.  In finding there was a question of fact about what the officer saw, and therefore, whether his response was reasonable, the Sixth Circuit was not faced with a situation where only the officer provided testimony.  Rather, the plaintiff was able to provide conflicting testimony about the

lighting which tended to discredit the claimed "flash."   Further, the officer's own actions were

inconsistent with an objectively reasonable belief that he was under fire:

> Officer Lewis only saw a flash; he heard no corresponding
> gunshot before he "returned" fire. Additionally, Officer Lewis did
> not chamber another round in his shotgun or seek cover, which
> one might expect an officer to do if he reasonably believed that
> he was being fired upon. *Id*. at 462.

Here, however, there is no admissible, conflicting evidence with Sgt. Frost's testimony.

Further, Sgt. Frost's actions were directly consistent with his reasonable belief that force was

necessary.  See *Rush*, *supra*.

Plaintiff's implication that Sgt. Frost should have simply written Guilford a ticket,[6] given

him a warning, waited for back up, or instructed Guilford—who to that time had not complied

with any of Sgt. Frost's orders—to stop making phone calls is nothing more than an attempt to

resurrect the oft-rejected theory in excessive force cases that officers must use the "least

intrusive" force available.  As the Sixth Circuit stated:

> The question is whether the undisputed facts demonstrate that a
> hypothetical reasonable officer would have known that his actions,
> under the circumstances, were objectively unreasonable, not
> whether [the officer] used the least intrusive means available.

*Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (internal quotations omitted) (*citing*

*Scott v. Clay County*, 205 F.3d 867, 877 (6th Cir. 2000)).  Sgt. Bricker explained this as the

very reason the Department moved away from the static use of force continuum.  (See Exhibit

1, Bricker at 54).  There is no legal or factual merit to Plaintiff's position.

Further, Plaintiff's assertion that Sgt. Frost should have let Guilford off with a warning or

simply issued him a ticket is particularly troublesome.  Essentially, Plaintiff is asking this Court

---

[6] It is difficult to determine who Plaintiff assumes Sgt. Frost should have written that ticket to,
given Guilford's refusal to provide identification.

to reward Guilford's poor choices and criminal behavior.  The Supreme Court has rejected a similar argument in the context of using deadly force to put an end to dangerous car chases:

> Second, we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. <u>The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness.</u> Instead, we lay down a more sensible rule: A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.

*Scott v. Harris*, 550 U.S. 372, 385–86 (2007) (Emphasis added).  Here, accepting Plaintiff's arguments would essentially endorse a rule that police allow recalcitrant and argumentative drivers to simply go on their way if they are insistent on their refusal to identify themselves or produce their required license, registration and proof of insurance, or otherwise fail to comply with lawful orders.  There would be no incentive for any driver to ever cooperate with a traffic stop.  Such an absurd rule has no place in our jurisprudence.

## CONCLUSION

For the above stated reasons, and those more thoroughly addressed in Defendant's motion and brief in support (ECF No. 53), Defendant requests that this Court find that no constitutional violation occurred and that Sgt. Frost is entitled to qualified immunity.

**WHEREFORE**, Defendant request this Honorable Court grant summary judgment and award attorney fees and costs wrongfully sustained herein.

Respectfully submitted,

JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C.

/s/ Andrew J. Brege
Andrew J. Brege (P71474)
Attorneys for Defendant
822 Centennial Way, Ste. 270
Lansing, MI 48917
(517) 886-3800
Dated:  June 14, 2017            P71474

## PROOF OF SERVICE

I hereby certify that on June 14, 2017, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system which will send notification of such filing to the

attorneys of record identified in the caption.

Respectfully submitted,

JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C.

/s/ Andrew J. Brege
Andrew J. Brege (P71474)
Attorneys for Defendant
822 Centennial Way, Ste. 270
Lansing, MI 48917
(517) 886-3800
Dated:  June 14, 2017            P71474

11