UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN GUILFORD,                          )
            Plaintiff,                   )
                                         )        No. 1:15-cv-1053
-v-                                      )
                                         )        HONORABLE PAUL L. MALONEY
JONATHON FROST,                          )
            Defendant.                   )
_____ )

## OPINION AND ORDER

On a cold winter night in 2015, seventeen-year-old Deven Guilford was driving his girlfriend's 2010 Ford Focus on M-43 near Mulliken, Michigan. He had just finished playing basketball at his church with his brother. Sergeant Jonathon Frost of the Eaton County Sheriff's Department was driving in the opposite direction in a new 2015 Ford Explorer.

The ships on M-43 should have merely "pass[ed] in the night."[1] Tragically, as fate would have it, one would never pass.

Guilford, believing the driver of the Explorer had his high beams on, briefly "flashed" his own high beams. Frost pulled Guilford over for the mere flash; in turn, Guilford refused to fully cooperate with Frost, at least initially.

Much of what happened during the initial traffic stop is captured on camera; the legal questions there have straightforward answers—Frost is protected by qualified immunity up until the point he fires his taser into Guilford's back while Guilford lied prone.

---

[1] Ships that pass in the night, and speak each other in passing,
Only a signal shown and a distant voice in the darkness;
So, on the ocean of life we pass and speak one another,
Only a look and a voice, then darkness again and a silence.
Henry Wadsworth Longfellow, *The Theologian's Tale: Elizabeth* pt. 3, *in Tales of a Wayside Inn* (1873).

What happened when both men eventually ended up in the ditch was not captured, and far from easy to evaluate. Frost tells a tale of being straddled and pummeled, nearly losing consciousness, and fearing death at Guilford's hands; forced to make a split-second decision while pinned, Frost shoots Guilford seven times. Guilford's experts, who must stand in Guilford's stead, tell a much different tale—one where Frost kicks Guilford so hard a boot impression remains on his torso, and one where Frost shoots Guilford from angles impossible to reconcile with Frost's account, culminating in a contact round, rendered downward and "execution style," to Guilford's head.

Officers who put themselves in danger to keep our communities safe "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Nevertheless, "[e]ven a split-second decision, if sufficiently wrong, may not be protected by qualified immunity"; and "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified." *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007); *see id.* at 889 ("[W]hether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses *at that moment*.").

Accordingly, while Frost is entitled to qualified immunity as to Plaintiff's Fourth Amendment claims for an unlawful stop, seizure, and force up to a point, a jury could view the videotape, forensic evidence, and the lay and expert testimony and conclude Frost violated Guilford's Fourth Amendment right to remain free from excessive force.

## I.   BACKGROUND

On February 28, 2015, seventeen-year-old Deven Guilford was driving his girlfriend's car, after playing some basketball with his brother and friends. (ECF No. 61-5 at PageID.744.) At about 8:20 p.m., Guilford was returning to his girlfriend's house. (*Id.*) As he traveled westbound along M-43, an undivided two-lane highway, Guilford approached an oncoming vehicle that appeared to have very bright lights. (ECF No. 61 at PageID.707.) Believing that the vehicle was driving with his high-beam headlights on, Guilford briefly flashed his lights to alert the approaching driver. (*Id.*) The oncoming vehicle was a new police SUV, driven by Sergeant Jonathon Frost of the Eaton County Sheriff's Department. (ECF No. 53-5 at PageID.503, PageID.505; ECF No. 61-9 at PageID.754.)

In response to being "flashed," Frost turned around and pulled Guilford over. (ECF No. 62-1 at PageID.846–47.) Before Frost exited his vehicle to approach Guilford's, he indicated—while speaking to his body camera—that he "did not have [his] brights on." (ECF No. 67 at 0:02-04.) When Frost met Guilford at his driver's side window, Frost asked for Guilford's driver's license, proof of insurance, and proof of registration. (*Id.* at 0:24-30.) Guilford did not comply with the request, and he and Frost began arguing about whether Frost's high-beam lights were on or not. (*Id.* at 0:30-45.) The argument devolved; Guilford and Frost sparred about a variety of issues, including Frost's badge number. (*Id.*) Frost continued asking Guilford for his driver's license, proof of insurance, and proof of registration until Guilford indicated that he did not have it. (*Id.* at 0:045-55.) Eventually, Frost told Guilford that he was driving a brand new vehicle, had been flashed a few times, stopped a couple of other vehicles, and issued no citations to those vehicles because the headlights

were brand new and brighter than those on normal cars. (*Id.* at 3:20-30.) Frost once again asked again for license, registration, and insurance, and Guilford responded by saying, "I do not have to give you that." (*Id.* 3:35-50.) Frost responded by calling for "priority" back-up and telling Guilford that he did indeed have to produce his driver's license. (*Id.* at 3:56-4:05.)

After Guilford apparently attempted to make a phone call, Frost opened the driver's side door to Guilford's vehicle. (*Id.* at 4:10-12.) Then, Frost forcefully grabbed Guilford and ordered him out of the vehicle. (*Id.* 4:13-4:20.) Guilford recoiled, saying, "Do not touch me, Officer!" (*Id.*) Frost's tone from this point forward reflected frustration and anger. (*Id.*) After the failed attempt, Frost again ordered Guilford out of the vehicle. (*Id.* at 4:30.) Frost continued trying to pull Guilford from the vehicle while yelling, "You're gonna get tased!" (*Id.* at 4:30-41.) Then, Frost stepped back, unholstered his taser, and pointed it at Guilford. (*Id.*) Frost again ordered Guilford out of the vehicle or he was going to be tased. (*Id.*)

Guilford began to get out of his car with his cell phone in hand, recording. (*Id.* at 4:43-45.) Guilford proceeded out of the car, closed the door, and kneeled facing Frost. (*Id.* at 4:44-47.) Meanwhile, Frost continued to command Guilford to get "down on the ground" and to face him. (*Id.* at 4:45-49.) Guilford responded, "What do you mean?" (*Id.* at 4:56.) Frost then commanded that Guilford "get on [his] belly, right now." (*Id.* at 4:56-4:58.) Guilford immediately complied but continued filming with his cellphone despite Frost's insistence that he put the phone down. (*See id.* at 5:00-5:10). Frost then approached Guilford and batted his phone from his hands, as Guilford informed Frost that he did not have a weapon. (*Id.* at 5:11-5:13.) Frost then jumped on Guilford's back to immobilize him. (*Id.*) Guilford reacted in alarm, stating, "You can't do that!" (*Id.* at 5:14-5:16.) Frost ordered

Guilford to get his hands behind his back, then informed him for the first time that he was under arrest. (*Id.* at 8:29:56-59.) Guilford responded, "Officer, what are you doing?" (*Id.* at 5:16-5:17.) Frost interrupted, telling him for a second time to get his hands behind his back. (*Id.* at 5:18-5:20.) Almost contemporaneously with that second order, Frostf fired his taser in dart mode into Guilford's back. (*Id.* at 5:21-5:24.)

Guilford reacted immediately to being hit by the taser and stood up—either in response to shock or his own volition—and he appears to approach Frost. (*Id.* at 5:24-5:26.) Frost testifies that Guilford hit him in the left side of his head. (ECF No. 44-4 at PageID.218.) Frost also testifies that he began backpedaling to try and move the confrontation away from the road. (*Id.*) The video appears to show that Frost remained near the road as late as 8:30:12. (ECF. No. 67 at 5:30.)

Approximately six seconds lapse from this point where Frost appears to remain on the road until the bodycam captures audio of Frost's shots. During this period, the facts are hotly contested. Frost's bodycam captures only blurry moments in time and muffled audio. For a discussion of the factual disputes, see *infra* Section III.F.2. However the events progressed, the outcome is clear: Frost fired seven shots in 3.5 seconds. (ECF No. 53-10 at PageID.607.) Guilford's body was peppered with gunshot wounds from various angles, some steeply downward—and one contact wound to the head; Guilford's body also reflected a defined boot-print impression on the right side of his torso. (ECF No. 65-11 at PageID.1075; ECF No. 65-7 at PageID.1062.)

## II.   LEGAL FRAMEWORK

### A.    Legal Framework: Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see, e.g.*, *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008).

The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the non-moving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once the moving party has carried its burden, the non-moving party must set forth specific facts, supported by record evidence, showing a genuine issue for trial exists. Fed. R. Civ. P. 56(e).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). The question, then, is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that [the moving] party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252; *see, e.g.*, *Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) (citing *Anderson,* 477 U.S. at 249) (noting the function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

B.      Legal Framework: Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity is a legal question for the Court to resolve. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Elder v. Holloway*, 501 U.S. 510, 516 (1994)). When resolving an officer's assertion of qualified immunity, the court determines (1) whether the facts the plaintiff has alleged or shown establishes the violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the incident. *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (citing *Pearson v. Callahan* 555 U.S. 223, 232 (2009)). Courts may examine the two prongs in any order, depending on the facts and circumstances of each case. *Id.* at 567-68.

Once the qualified immunity defense is raised, the plaintiff bears the burden of demonstrating both that the challenged conduct violates a constitutional or statutory right and that the right was so clearly established at the time that "'every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In determining whether a law is clearly established, ordinarily this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012) ("When determining whether a constitutional right is clearly established, we look first to the decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeals."); *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

The clearly established prong will depend "substantially" on the level of generality at which the legal rule is identified. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Ordinarily, the right must be clearly established in a particularized sense, and not in a general or abstract sense, *id.* at 640—"[t]his standard requires the courts to examine the asserted right at a relatively high level of specificity and on a fact-specific, case-by-case basis." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997).

However, on the other hand, the Sixth Circuit recently affirmed that "reading the[] cases together, the Supreme Court has made clear that the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015). Thus, "[w]hile it is apparent that courts should not define clearly established law at a high level of generality, it is equally apparent that this does not mean that 'a case directly on point' is required"; the question is, again, whether "precedent [has] placed the statutory or constitutional question beyond debate." *Id.* (citing *al-Kidd*, 563 U.S. at 741).

## III.   ANALYSIS

Plaintiff has asserted various Fourth Amendment claims that fit neatly into chronological segments. Thus, the Court will analyze each claim in that fashion. *See, e.g.*, *Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996)) ("In this circuit, courts faced with an excessive force case that involves several uses of force must generally 'analyze the . . . claims separately.'").

### A.   Count I (Fourth Amendment: Unreasonable Stop & Seizure)

#### 1.   Sergeant Frost had at least arguable probable cause for the traffic stop.

Count I of Plaintiff's Complaint asserts a claim against Sergeant Frost based upon his allegedly unreasonable stop and seizure. Plaintiff argues that briefly flashing high beams under the circumstances did not violate Michigan traffic laws.

"Stopping and detaining a motorist 'constitute[s] a 'seizure'' within the meaning of the Fourth Amendment." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (alteration in original) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

"When a defendant's claim of probable cause rests on a state . . . statute, as it does here, 'the precise scope of [the federal constitutional right] uniquely depends on the contours of a state's substantive . . . law.'" *Youbyoung Park v. Gaitan*, 680 F. App'x 724, 731 (10th Cir. 2017) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300–01 (10th Cir. 2012)).

Sergeant Frost indisputably initiated the traffic stop solely because he believed he had probable cause that Guilford—who momentarily flashed his high beams at Frost—violated Mich. Comp. Laws § 257.700(b). Mich. Comp. Laws § 257.700(b) states:

> Whenever the driver of a vehicle approaches an oncoming vehicle within 500 feet, such driver shall use a distribution of light or composite beam so aimed that the glaring rays are not projected into the eyes of the oncoming driver. . . .

The Michigan Supreme Court has not interpreted this statute's application to a momentary flash. Thus, this Court "must predict how the state's highest court would interpret the statute." *United States v. Simpson*, 520 F.3d 531, 535 (6th Cir. 2008).

"Courts must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory." *Koontz v. Ameritech Servs.*, 645 N.W.2d 34, 39 (Mich. 2002). "Undefined statutory terms must be given their plain and ordinary meanings, and it is proper to consult a dictionary for definitions." *Halloran v. Bhan*, 683 N.W.2d 129, 132 (Mich. 2004); *accord Koontz*, 645 N.W.2d at 39 ("In those situations, we may consult dictionary definitions.").

The relevant statute provides "that the *glaring* rays" must "not [be] projected *into the eyes* of the oncoming driver." Mich. Comp. Laws § 257.700(b) (emphasis added). The word "glaring" means "shining with or reflecting an uncomfortably bright," or "brilliant," "light." *Webster's New Collegiate Dictionary* 484 (1st ed. 1979). Put another way, "glaring" means shining "dazzlingly or harshly bright," *The Random House College Dictionary* 559 (Rev. ed. 1982), or "intensely and blindingly," *The American Heritage Dictionary* 770 (3d ed. 1992).

The Minnesota Court of Appeals has interpreted a nearly identically worded statute in a similar manner by referencing the latter definition.

In *Sarber v. Comm'r of Public Safety*,[2] the trial court held that an officer lawfully stopped a motorist who had briefly flashed his high beams at the approaching officer two times. 819 N.W.2d 465, 467 (Minn. Ct. App. 2012). The trial court held it sufficient that the defendant's headlights had been "directly [and] frontally visible to oncoming traffic" when he flashed his high beams. *Id.* at 467. The court concluded the term "glaring" did not mean the State was required to show "that the light was distracting or impairing the oncoming vehicle." *Id.* at 467–68.

The court of appeals reversed the trial court's finding. Since the statute did not define "glaring rays," it held the trial court should have referenced the dictionary. *Id.* at 468. The court of appeals interpreted "glaring" in Minn. Stat. § 169.61(b) to mean shining "intensely and blindingly." *Id.* at 469 (citing *The American Heritage Dictionary* 770 (3d ed. 1992)). There was no evidence in the record to support that the high beams "were glaring or projecting into [the officer's] eyes." *Id.* at 470. Thus, "appellant's behavior did not violate the statute," and the officer lacked probable cause to effect the stop. *Id.* at 472.

> Briefly flashing one's high beams at another driver does not, standing alone, amount to use of a light "intensely and blindingly." A bright light of extremely short duration does not amount to "glaring rays." Accordingly, it is a common practice for drivers to flash their high beams to warn other drivers of hazards, or to signal others to adjust their own headlights.

*Id.* at 469.

---

[2] Both states have enacted a version of the Uniform Traffic Code, and thus *Sarber* is persuasive precedent.

This Court finds the reasoning in *Sarber* cogent.[3] In this case, Sergeant Frost has never asserted that Guilford's brief flash was shining uncomfortably or harshly bright, or brilliantly, dazzlingly, or intensely and blindingly, let alone "into [Frost's] eyes." *Compare Webster's New Collegiate Dictionary* 484 (1st ed. 1979); *The Random House College Dictionary* 559 (Rev. ed. 1982); *The American Heritage Dictionary* 770 (3d ed. 1992); *see Halloran*, 683 N.W.2d at 132. Rather, Frost has baldly asserted from the outset that since Guilford "flashed" his high beams, he was (strictly) liable for the offense under § 257.700(b). (*See, e.g.*, ECF No. 53-5 at PageID.503.) Indeed, ironically—as Sergeant Frost admitted (*see* ECF No. 67 at 3:20)—his *own headlights* on his new vehicle that night shined "uncomfortably or harshly bright" to multiple drivers. This traffic stop was not authorized by the referenced traffic code provision.

Nevertheless, the Court concludes that Sergeant Frost's error of law was not objectively unreasonable under the Fourth Amendment. *See Heien v. North Carolina*, 135

---

[3]     Courts can look to decisions from the state courts of appeals to guide their analysis. *See Simpson*, 520 F.3d at 535. While the authority from the Michigan Court of Appeals is relatively scant, the applicable decisions at least suggest that a brief flash does not alone suffice to support probable cause under Mich. Comp. Laws § 257.700(b).

In *Constantino v. Citizens Ins. Co. of Am.*, the court of appeals suggested the purpose of § 257.700(b) is to prevent a driver from "obstruct[ing]" or "interfering with the vision of an oncoming driver." 2012 WL 104892, at *6 (Mich. Ct. App. Jan. 12, 2012) (citing *Knoor v. Borr*, 53 N.W.2d 667 (Mich. 1952)). At a minimum, this supports giving necessary effect to the word "glaring." If a flash of light neither "obstruct[s]" nor "interfere[s]" with an oncoming driver's vision, it is difficult to see the purpose of a stop or citation.

Interestingly, in *People v. Omecinskyj*, 2007 WL 4179350, at *1 (Mich. Ct. App. Nov. 27, 2007), the court of appeals defined the statute as follows: "A motorist's *failure to dim* his or her high-beam headlights in the presence of oncoming traffic is a traffic violation." *Id.* (emphasis added) (citing Mich. Comp. Laws § 257.700(b)). The court noted "[t]he record simply does not support defendant's contention that the troopers were traveling so fast that he could not respond to *their signal to dim his lights.* Because the troopers personally observed a violation of MCL 257.700(b), even *after defendant had time to comply with the statutory requirements,* they were justified in stopping defendant's vehicle." *Id.* at *2 (emphasis added). The case suggests the officers themselves "signal[ed]," or flashed, the defendant to warn him "to dim his lights," and the defendant "had time to comply" with the warning and "statutory requirement." *See id.*

S. Ct. 530, 539 (2014) (holding an "officer's error of law was reasonable" to justify the stop). As Sergeant Frost notes, the statute at issue makes no exceptions for temporary or intermittent flashes, as do other states' statutes. *See, e.g.*, Wis. Stat. § 347.12(1)(b). While Sergeant Frost's interpretation of the statute was in error, it was not irredeemably so.

From this point forward, an officer in Michigan may not effect a stop solely for a mere flash pursuant to § 257.700(b), absent any truly "glaring rays" shining into his or her eyes; however, at the time in question, Sergeant Frost had at least "arguable probable cause," and thus is not liable for a constitutional violation. *See, e.g.*, *White v. Jackson*, __ F.3d __, 2017 WL 3254496, at *5 (8th Cir. 2017) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)) ("'[A]n officer is entitled to qualified immunity if there is at least arguable probable cause.' . . . There is arguable probable cause 'even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'"); *Redd v. City of Enterprise*, 140 F.3d 1378, 1384 (11th Cir. 1998) ("[W]hen an officer has *arguable* probable cause to believe that a person is committing a particular public offense, he is entitled to qualified immunity from suit."); *accord Greene v. Barber*, 310 F.3d 889, 898 n.2 (6th Cir. 2002); *see also Heien*, 135 S. Ct. at 540 (noting the inquiry employed in that case, which found an error of law sufficiently reasonable to satisfy the Fourth Amendment, "is not [even] as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity").

> **2.   At a minimum, Sergeant Frost is entitled to qualified immunity because the law was not clearly established at the time of the stop.**

Even assuming Sergeant Frost lacked even arguable probable cause, this Court cannot conclude the initial stop violated *clearly established* law.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal citation and quotation marks omitted). Thus, while a citation under § 257.700(b) under these circumstances likely would have been dismissed as a matter of law in traffic court, it does not follow that a subsequent claim for money damages survives qualified immunity in a civil suit. *See, e.g., Quinn v. Young*, 780 F.3d 998, 1010 (10th Cir. 2015) ("reciting the overarching requirement of probable cause does not pass muster in a qualified-immunity clearly-established-law assessment").

No authority from Michigan courts sufficed to put Sergeant Frost on notice that his stop was not supported by probable cause under the unique factual circumstances and statutory intricacies of § 257.700(b).[4] Moreover, while certainly not dispositive, the Michigan Secretary of State's Driver's Manual states (albeit mistakenly): "It is illegal to use *or even flash* high-beam headlights within 500 feet of an oncoming vehicle." (ECF No. 53-16 at PageID.655 (emphasis added).)

Indeed, while Plaintiff cites to *Sarber*, counsel at oral argument candidly admitted that the law prior to the instant opinion was not clearly established that Sergeant Frost had no probable cause to stop Guilford for a violation of § 257.700(b) under these circumstances.

---

[4] The Minnesota Court of Appeals' decision in *Sarber* did not suffice to make the law clearly established.

(*See* ECF No. 61 at PageID.722–23.) Thus, Sergeant Frost remains entitled to qualified immunity on Count I.

> 3. **Since the stop did not violate the Fourth Amendment, Sergeant Frost acquired probable cause to arrest Guilford during the traffic stop.**

As a final matter with respect to Count I, since the traffic stop did not violate the Fourth Amendment, Sergeant Frost's *initial* actions thereafter can hardly be criticized.

Frost obviously had the authority to request Guilford's license, registration, and proof of insurance. Once Guilford refused to produce his license—and indeed, admitted he did not have his license with him—Sergeant Frost incontestably had probable cause to arrest Guilford for a misdemeanor under Mich. Comp. Laws § 257.311. *See* Mich. Comp. Laws §§ 257.901, 764.15(1)(a); *Hoover v. Walsh*, 682 F.3d 481, 499 (6th Cir. 2012) (holding officers had probable cause to arrest a suspect for failing to keep and produce his driver's license before asking him to exit his vehicle, putting him in handcuffs, and transporting him to the police station).

Thus, the remainder of Plaintiff's complaint that alleges constitutional violations in connection with probable cause for arrest are without merit.

> **B.     Count II (Fourth Amendment: Excessive Force—Attempting to Remove Guilford from Vehicle)**

Count II alleges, as a standalone claim, that Sergeant Frost violated Guilford's Fourth Amendment right to remain free from excessive force "by attempting to remove Guilford from the vehicle," particularly since Frost failed to first "order[] or ask[] Guilford to exit the vehicle." (ECF No. 49 at PageID.394.) This claim fails.

At this juncture, Sergeant Frost had probable cause to arrest Guilford for a misdemeanor. *See supra* Part III.A.3. Merely reaching in and attempting to pull Guilford out of the car (*see* ECF No. 67 at 4:15) was "[no] more than *de minimis* force," and thus was not excessive as a matter of law. *Leary v. Livingston Cty.*, 528 F.3d 438, 443 (6th Cir. 2008); *cf. Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.").

In response to Sergeant Frost's attempt, Guilford merely responded, "Do not touch me!" (ECF No. 67 at 4:25.) He did not cry out in pain or give any indication that he was injured during this timeframe. Plaintiff has presented no evidence of "objectively verifiable injury" under this claim (alone), and thus Sergeant Frost's conduct during this timeframe did not violate Guilford's Fourth Amendment rights. *See Leary*, 528 F.3d at 443.

## C.    Count III (Fourth Amendment: Excessive Force—Pointing Taser at Guilford)

Count III alleges, as a standalone claim, that Sergeant Frost violated Guilford's Fourth Amendment right to remain free from excessive force by "pointing his taser at Guilford and ordering him to exit his vehicle." (ECF No. 49 at PageID.395.)

The Sixth Circuit has "never found that pointing a taser, as opposed to actually discharging one, constitutes the use of excessive force." *Evans v. Plummer*, __ F. App'x __, 2017 WL 1400495, at *6 (6th Cir. 2017); *see, e.g., Stricker v. Twp. of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) (holding show of force, including pointing a taser, did not violate the Fourth Amendment in part because the plaintiff had "repeatedly disobeyed lawful officer commands").

Since the video clearly demonstrates Sergeant Frost had probable cause to arrest Guilford, and Guilford refused to exit the car as lawfully ordered, *see supra* Part III.A.3, the Court cannot conclude that Sergeant Frost violated Guilford's Fourth Amendment rights by merely pointing his taser at Guilford. Moreover, Plaintiff has not submitted any evidence of "objectively verifiable injury" under this claim (alone). *See Leary*, 528 F.3d at 443.

At a bare minimum, no clearly established law forbade Sergeant Frost from pointing his taser at Guilford under these circumstances. *See Evans*, 2017 WL 1400495, at *6.

### D.     Count IV (Fourth Amendment: Excessive Force)

Count IV alleges Sergeant Frost used "unreasonable and excessive force in forcing Guilford to lie down on his belly on the shoulder of the road next to his car." (ECF No. 49 at PageID.396.) Plaintiff suggests that "Frost could reasonably have directed Guilford to the front or rear of his vehicle and effected the arrest without unreasonably placing himself and Guilford in danger." (*Id.*) This claim, just like the second and third claims, lacks merit.

The Fourth Amendment of the United States Constitution is not a policy handbook that prescribes "best practices" for arrests. The fact that Plaintiff wishes that Sergeant Frost would have attempted arrest in a different manner or place matters not. A suspect does not have a constitutional right to be arrested in a manner to his liking. Plaintiff's cited cases for the proposition that Sergeant Frost pointed the taser at Guilford "for the malicious purpose of inflicting gratuitous fear" are inapposite. The Eighth Amendment governed those cases, whereas the Fourth Amendment governs this one. Simply put, Frost's "subjective intent" when he pointed the taser "is irrelevant." *Evans*, 2017 WL 1400495, at *7. Moreover, Plaintiff has not submitted any evidence of "objectively verifiable injury" under this claim

(alone). *See Leary*, 528 F.3d at 443. Admittedly, in a layman's sense, Sergeant Frost's order directing Guilford to the ground seemed utterly unnecessary. However, that does not mean that Sergeant Frost violated the *Constitution* by ordering Guilford to the ground.

### E.   Count V (Fourth Amendment: Excessive Force—Firing Taser at Guilford)

#### 1.   Factual Context

As this Court has discussed, Sergeant Frost clearly had probable cause to arrest for a 90-day misdemeanor; Guilford did not comply with orders to produce his license, registration, and proof of insurance, and he did not initially exit the vehicle as ordered. Sergeant Frost appropriately called for back-up. (ECF No. 67 at 4:00.) But, as the video clearly demonstrates, Sergeant Frost escalated matters.

After Sergeant Frost pointed his taser and threatened to tase Guilford if he did not exit the vehicle, Guilford was clearly startled and became more compliant.

Guilford exited the car, as ordered (*id.* at 4:45); Guilford went to the ground, as ordered (*id.* at 4:50); Guilford lied prone, as ordered (*id.* at 4:57); Guilford placed his arms out to the side, as ordered (*id.* at 5:10).

Admittedly, Guilford failed to put his phone down, as ordered. (*Id.*) But, in response, Sergeant Frost—who had clearly lost some patience at this time—aggressively punched Guilford's phone out of his hands. (*Id.* at 5:12.) (At about this time, Guilford said, "I do not have a weapon!" (*Id.*))

Sergeant Frost suddenly jumped on Guilford's back. (*Id.* at 5:13.) Guilford, clearly startled, yelled, "Hey!" and asked Frost what he was doing. Sergeant Frost did not inform Guilford that he was under arrest until the 5:17 mark in the video. (*Id.* at 5:17.) Sergeant

Frost ordered Guilford to put his hands behind his back. (*Id.* at 5:19.) Guilford responded with mere words: "Officer!" "You can't do that!" "What are you doing?" Sergeant Frost ordered him to put his hands behind his back again. (*Id.* at 5:22.) One second later, Sergeant Frost fired his taser into Guilford's back while Guilford was still laying prone. (*Id.* at 5:23.) Sergeant Frost fired his taser less than six seconds after informing Guilford that he was under arrest and less than four seconds after telling him to put his hands behind his back. (*Id.* at 5:17–23.) Curiously, Sergeant Frost admitted that he knew he was too close to Guilford for the taser to have its intended effect. (ECF No. 61-10 at PageID.772.)

### 2. A jury could conclude Sergeant Frost used constitutionally excessive force by firing his taser into Guilford's back.

"The Fourth Amendment prohibits the use of excessive force by an arresting officer," including the use of a taser,[5] under certain circumstances. *Correa v. Simone*, 528 F. App'x 531, 533 (6th Cir. 2013). This Court must apply an objective reasonableness test and "look at the totality of the circumstances, including three factors," *id.*: first, "whether the suspect poses an immediate threat to the safety of the officers or others"; second, "the severity of the crime at issue"; and third, "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 397; *Correa*, 528 F. App'x at 533.

Viewing the video and surrounding facts in the light most favorable to Guilford, the totality of the circumstances here did not justify as a matter of law the use of a taser; a jury

---

[5] The use of a taser, particularly in "dart mode," caus[es] temporary paralysis and intense pain." *Thomas v. Plummer*, 489 F. App'x 116, 125 (6th Cir. 2012). "Put simply, 'tasers . . . constitute an intermediate or medium, though not insignificant, quantum of force.'" *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)).

could view the video and conclude Sergeant Frost's decision to fire his taser at Guilford under these circumstances violated Guilford's right to remain free from excessive force.

### i.    *Guilford posed no immediate threat to Sergeant Frost's safety.*

Arguably the "'most important factor' under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Bryan*, 630 F.3d at 826 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)). Here, the video shows Guilford posed *no* threat while lying prone on the ground. *Compare, e.g., Braswell v. McCamman*, __ F. Supp. 3d __, 2017 WL 2666449, at *10 (W.D. Mich. 2017) (noting the factual record supported the conclusion that officers had reasonable suspicion to believe Braswell was armed and dangerous).

Although Guilford's stubbornness and confusion delayed compliance, he nonetheless complied with each order. Sergeant Frost's decision to suddenly jump on Guilford without explanation only amplified Guilford's confusion—leading him to ask, "Officer, what are you doing?" Sergeant Frost pinned Guilford down with his knee; Sergeant Frost did not have reason to believe Guilford was armed with anything more than a cell phone, let alone a weapon[6]; Guilford made no verbal or physical threats; Guilford, a wiry seventeen-year-old boy, was not about to overpower a taller and heavier Sergeant Frost, a military veteran and expert in hand-to-hand ground combat. (*See* ECF No. 62-1 at PageID.838–39.) In sum, Guilford was going *nowhere* and was threatening *no one* when he lied prone on the ground.[7]

---

[6] Sergeant Frost's assertion that he suspected Guilford held so-called "sovereign-citizen" amounts to nothing more than a post-hoc rationalization devoid of any support on the night in question.

[7] While Frost asserts that Guilford tried to nudge him away while on the ground, the video does not definitively establish that fact and does not change the analysis or the outcome of this issue. (*See* ECF No. 64-7 at 5:22.)

Moreover, Sergeant Frost fired his taser into Guilford's back mere seconds after first informing Guilford he was under arrest—and immediately after telling Guilford to put his hands behind his back after informing him he was under arrest. (ECF No. 67 at 5:22); *cf. Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 497 (6th Cir. 2012) (holding a district court's factual finding that thirty seconds prior to using a taser did not give a suspect "adequate time to comply" with an order was not "blatantly and demonstrably false"). For all these reasons, the first factor weighs heavily against Sergeant Frost.

ii.     *Guilford had, at most, committed a civil infraction and non-violent misdemeanor.*

The second factor—the severity of the crime at issue—also weighs heavily against Sergeant Frost. Guilford was very disrespectful, to be sure. However, the questionable traffic stop was ostensibly for briefly flashing high beams, at most a civil infraction, and the subsequent probable cause was simply for failing to carry or produce a license while driving, a mere misdemeanor for which most offenders are issued a summons to appear. Yet, without audio, one might view the video and assume Sergeant Frost had just encountered an armed felon with an extensive rap sheet.

iii.     *At least two reasonable interpretations of the video show Guilford's conduct did not rise to the level of "active resistance."*

The final factor is admittedly less clear. The question here is whether the video reflects Guilford "actively resisting arrest." *See Rudlaff v. Gillespie*, 791 F.3d 638, 641–42 (6th Cir. 2015) ("A simple dichotomy thus emerges: When a suspect actively resists arrest,

the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.").[8]

The Court would certainly not characterize the video as reflecting any sort of "active resistance" as that term is commonly understood. *Compare, e.g., Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 96 (6th Cir. 2012) (holding an "intoxicated," "suicidal," "threatening," "unstable," and "uncooperative" suspect "actively resisted" arrest when he warned he would "fight the officers so that they would have a reason to kill him," had to be "taken to the ground," and posed "a threat to officer safety"); *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008) (holding a suspect that had "a lot of physical strength and . . . brute force" "actively resisted" arrest when "attacked two officers," "used closed-fisted blows," and knocked one down). Guilford exited the car, dropped to the ground, lied prone, and extended his arms, all as ordered. The compliance during this timeframe was not seamless, but it hardly constituted "active resistance."

Sergeant Frost wants to paint the video as one where Guilford actively resisted *arrest* from the outset—a curious argument considering most of Guilford's so-called "resistance" came at a time when he *did not even know he was under arrest*, which explains his repeated question, "Officer, what are you doing?" *See* (ECF No. 67 at 5:12); *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) (collecting authority) (noting that a suspect does not "resist" arrest when he has not even been "told [he] [was] under arrest").

---

[8] One potential problem with the "simple dichotomy" in *Rudlaff* is that it disregards the other factors that *Graham* tells courts they must consider. In effect, it over-simplifies the analysis by making one of three factors dispositive—and distilling a "simple dichotomy" from a robust test for the "totality of the circumstances."

Indeed, the video clearly shows Sergeant Frost jumping on Guilford with no explanation or assertion that Guilford was under arrest. Such an aggressive step without notice would surely startle even a sedated suspect; Guilford yelled, "Hey!" and asked what Sergeant Frost was doing to him. (*Id.*)

Prior to Sergeant Frost firing his taser into Guilford's back, Guilford had neither attempted to flee from nor attempted to assault Frost. Other than Guilford's failure to put his hands behind his back quickly, there were hardly accompanying "acts of defiance." *See Rudlaff*, 791 F.3d at 641 (citing *Caie*, 485 F. App'x at 94, 96–97) (noting "active resistance" "includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance")[9]; *cf. Galinis v. Cty. of Branch*, 660 F. App'x 350, 355 (6th Cir. 2016) ("Although Galinis refused to cooperate with officers' orders, his conduct amounted to little more than passive noncompliance.").

Rather, again, Guilford expressed his shock and confusion once Sergeant Frost abruptly jumped on Guilford's back and pinned him down; Guilford asked Sergeant Frost what he was doing, and was clearly taken aback by Frost's sudden weight on his back that came without any explanation or justification. (*See* ECF No. 64-7 at 5:15.)

Thus, in light of all the relevant factors, including the totality of the circumstances, and viewing the video in its context at that time, a jury could easily conclude that Guilford's actions did not justify what was otherwise Frost's marked escalation through the taser shot.

---

[9] In *Caie*, the Sixth Circuit went out of its way to note that the taser was in "drive-stun" mode, a lower level of force than when a taser is in dart-mode. *See Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) ("In [drive-stun] mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode.").

3.   **Sergeant Frost is not entitled to qualified immunity with respect to the use of the taser because the law was clearly established when viewing the facts in the light most favorable to the Plaintiff.**

The next question is whether the law placed Sergeant Frost on sufficient notice that firing his taser into Guilford's back in February 2015 under these circumstances was objectively unreasonable under the Fourth Amendment. Since a jury could conclude Guilford did not "actively resist" arrest, the answer is clearly "yes." *See Rudlaff*, 791 F.3d at 641–42 (noting that whether qualified immunity is appropriate depends on whether a suspect, as a factual matter, "actively resists arrest").

In addition to the first two *Graham* factors that weigh heavily against Sergeant Frost, reasonable interpretations of the video with respect to the third factor foreclose qualified immunity. *See, e.g., Eggleston v. Short*, 560 F. App'x 561, 564 (6th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (dismissing an appeal for lack of jurisdiction) ("[B]ecause viewing the video in Eggleston's favor could reasonably lead to a finding of excessive force, this case does not fall within the limited exception under which the plaintiff's account may be disregarded because it is 'so utterly discredited by the record as to be rendered a visible fiction.'").

First, a jury could conclude that Guilford did not "actively resist" *arrest* because Guilford simply reacted (as any person would) to Frost jumping on his back without informing him he was under arrest—and then failed to immediately comply with Frost's order to place his hands behind his back.

Sergeant Frost asserts that after he informed Guilford he was under arrest, Guilford disobeyed two orders to put his hands behind his back. Assuming Guilford had time to

comply, he "disobeyed [Sergeant Frost's] commands." *Thomas*, 489 F. App'x at 126 (holding an officer's use of a taser was constitutionally unreasonable). "But obedience is not an on-off switch." *Id.* Mere "non-compliance" with an officer's orders, as a jury could find here, is quite clearly not enough to justify the use of a taser. *See, e.g.*, *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) ("If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more."); *Brown v. Chapman*, 814 F.3d 447, 471 (6th Cir. 2016) (analyzing active resistance as one of the three *Graham* factors) ("Accordingly, for the purpose of summary judgment, we assume that the facts show that Brown broke away from the officers in order to avoid further injury, that he was standing still at the time Chapman tasered him, and that therefore Brown was not actively resisting or evading arrest.")[10]; *see also Howard v. Wayne Cty. Sheriff's Office*, 417 F. App'x 465, 471 (6th Cir. 2011) ("[I]n August 2006, the principle of law was already clearly established that use of pepper spray on an arrestee who was not accused of a serious crime, was not posing an immediate threat to the safety of the officer or others, and was not actively resisting arrest or seeking to flee is constitutionally unreasonable.").

Alternatively, a jury could conclude that Guilford did not actively resist arrest because Frost belatedly informed him he was under arrest and Guilford lacked sufficient time to comply with the subsequent orders to put his hands behind his back. Sergeant Frost fired his taser into Guilford's back almost simultaneously with his second order that followed, "You

---

[10] Although *Brown* post-dates the incident in this case, all of the authority for the Sixth Circuit's clearly-established inquiry relied on pre-2015 cases. *See id.* at 461–62.

are under arrest!" (*See* ECF No. 67 at 5:17–24.) For over two decades, clearly established law has held that even pepper spray—a lower level of force than a taser in dart mode—may not be used on suspects who have "not been told they were under arrest." *Grawey*, 567 F.3d 311 (citing *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994) and *Atkins v. Twp. of Flint*, 94 F. App'x 342, 349 (6th Cir. 2004)). And clearly established law also provides that an officer must give a suspect "adequate time to comply" with an order prior to using force in connection with an arrest. *See, e.g., Austin*, 690 F.3d at 497. Indeed, the Sixth Circuit has sustained a district court's factual finding that *thirty seconds* was not sufficient time prior to deploying a taser on a subdued suspect in an attempt to obtain compliance. *Id.*

By contrast, the cases Sergeant Frost relies upon are readily distinguishable from the facts in this case.

One category of cases he cites "turns on whether" a court has made a factual finding that a suspect "active[ly] resist[ed]" arrest. *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ("The constitutional analysis . . . turns on whether Mr. Nall's refusal to exit his apartment after Officer Soto asked him to do so constitutes 'active resistance,' as opposed to passive resistance or no resistance at all.").

In *Hagans*, the Sixth Circuit held the law was not clearly established "in May 2007 that using a taser repeatedly on a suspect *actively resisting* arrest and refusing to be handcuffed amounted to excessive force." *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (emphasis added). In that case, however, Hagans *admitted* "that he was actively resisting arrest." *Id.* at 510. Indeed, "Hagans was out of control and continued *forcefully* to resist arrest"—fleeing and "scuffl[ing]" with three officers on the ground. *Id.* at

511 (emphasis added). That factual premise was crucial to the Court's holding. *Id.* at 509; *see also Rudlaff,* 791 F.3d at 641–42. By contrast, a jury could conclude Guilford neither actively resisted nor had meaningful time to comply after first being informed he was under arrest. *See Bouggess,* 482 F.3d at 896 ("When the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury, the jury becomes the final arbiter of a claim of immunity."); *accord Austin,* 690 F.3d at 497.

Another category of cases he cites granted qualified immunity on the grounds that *no* case provided an officer with fair notice.

In *Cockrell,* for example, the Sixth Circuit held that a misdemeanant did not have a clearly established right to remain free from an officer's use of a taser after he *fled. Cockrell v. City of Cincinnati,* 468 F. App'x 491, 496 (6th Cir. 2012) ("Yet flight, non-violent though it may be, is still a form of resistance."); *see also Azevedo v. City of Fresno,* 2011 WL 284637, at *8 ("[A]lthough Azevedo was not physically resisting arrest, he was actively fleeing. . . . The *active evasion* or flight by a non-felon generally favors a police officer's use of non-deadly force." (emphasis added)). Here, Guilford did not flee; Guilford was immobile and prone.

Guilford did not immediately put his hands behind his back after he was ordered to do so following Frost's first assertion he was under arrest. A jury *could* ultimately conclude Guilford "actively resisted" arrest in those very few seconds. But, a jury could obviously conclude otherwise. Given the short timeframe, road noise, and Guilford's confusion and questions, a jury could conclude he was merely taken aback by Sergeant Frost's sudden decision to jump on his back without warning or that Guilford did not have time to process Frost's order and so quickly comply to Frost's liking after Frost first informed him he was

under arrest. In short, because reasonable interpretations of the video show Guilford's pattern of compliance after Sergeant Frost ordered him out of the vehicle, and at most mere non-compliance within a four-second timeframe, a jury could conclude Guilford's conduct "cannot be deemed active resistance." *Eldridge*, 533 F. App'x at 535.

### F.   Count VI (Fourth Amendment: Deadly Force)

#### 1.   Legal Framework: Deadly Force

Excessive force claims are analyzed under the Fourth Amendment's reasonableness standard, which looks to "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007).

"[C]ourts must be careful to avoid unduly burdening officers' ability to make split-second decisions." *Bouggess*, 482 F.3d at 893–94. With that said, "[e]ven a split-second decision, if sufficiently wrong, may not be protected by qualified immunity." *Id.* at 894. And the law has evolved to the point that "only in rare instances may an officer seize a suspect by use of deadly force." *Whitlow v. City of Louisville*, 409 F.3d 689, 697 (6th Cir. 2005); *accord Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).

In *Bouggess*, the Court affirmed "[t]he relevant time for the purposes of th[e] inquiry is the moment *immediately preceding* the shooting." 482 F.3d at 890 (emphasis added). In other words, if a suspect does not "pose[] an imminent danger of serious physical harm to

[the officer] or others" at the moment *immediately preceding* the application of deadly force, then the Officer may not use deadly force. *Id.*; *see, e.g., Sherrod v. Berry*, 856 F.2d 802, 805–06 (7th Cir. 1988); *accord Dickerson*, 101 F.3d at 1162 n.9; *see also Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."). That rings true "even when a suspect has a weapon." *Bouggess*, 482 F.3d at 896.

### 2. Genuine disputes in material fact preclude summary judgment as to Plaintiff's deadly force claim.

This claim presents the most elemental of factual disputes: What happened in the ditch? Did Guilford "pose[] an imminent danger of serious physical harm to [Sergeant Frost] at the moment immediately preceding the application of deadly force" or did he not? These questions are impossible to answer at this stage—in part because Sergeant Frost's bodycam has little evidentiary value from the time Guilford comes to his feet after being shot by the taser until his death. The proverbial fact-finder indeed must find the facts.

Sergeant Frost urges the Court to accept his testimony—along with one medical examiner's report that he asserts supports his version of the facts—to the exclusion of other expert testimony, forensic evidence, time, and common sense suggesting his story does not stand up to scrutiny. Plaintiff's expert alleges Sergeant Frost more or less executed a defenseless Guilford after they ended up in the ditch.

It is not the Court's role to accept or reject these inconsistent stories. The Court can only conclude that Plaintiff has produced sufficient evidence—even though Guilford is no longer here to tell his version of what happened—to create genuine disputes in material fact.

After the taser was fired, Plaintiff concedes Guilford got up. Both parties suggest that Guilford struck Sergeant Frost in the eye as they retreated around the front of Guilford's car.

Sergeant Frost does not remember anything until he found himself lying on his back and right side in the ditch approximately twenty to thirty feet away. (ECF No. 62-1 at PageID.866; ECF No. 64-6.) He asserts not to even recall drawing his gun. (ECF No. 62-1 at PageID.866.)[11] Thus, he cannot say whether he took Guilford to the ground or vice versa. Sergeant Frost's story from that point, however, is difficult to reconcile with other evidence.

Sergeant Frost claims to have regained his memory while lying in the ditch. He now asserts Guilford somehow managed to straddle his hips and began "pummeling" him in the head. (ECF No. 62-1 at PageID.866.) He claims that he was in a "very violent fight that [he] was losing." (*Id.*) Thus, he claims he fired seven times and "had to crawl out from underneath [Guilford's body]." (*Id.*) He also claims Guilford "fell over [Frost's] left side." (*Id.*) He claims that every shot he fired he was "rolled over on [his] right side," and at *no* time when he was shooting was he above him. (*Id.* at PageID.871.)

Although Frost had extensive military and police training and experience in hand-to-hand combat, and was taller and nearly thirty pounds heavier than Guilford, Sergeant Frost claims he had no option but to shoot his weapon. (*See* ECF No. 67 at 5:28.))

But inconsistencies exist.

First, Frost's story seems difficult to square with the marked limited timeframe. Guilford and Frost first made contact on the road at the 5:26 mark of the video. The

---

[11] This memory-lapse alone suggests a jury must find the facts between the gaps given the *Bouggess* standard. *See* 482 F.3d at 890.

bodycam video seems to show Frost remained on the road and near the car at least at the 5:30 mark. (ECF No. 64-7 at 5:30.)[12] Assuming so, which the Court must do, all of the following must have happened in *approximately six seconds*: Guilford and Frost managed to traverse twenty-five feet into a snowy ditch; Guilford, a wiry teenager, managed to pin down and straddle Frost, a well-built officer with hand-to-hand combat expertise; Guilford punched Frost nearly ten times, "pummeling" Frost to the point where Frost nearly lost consciousness; Frost drew his weapon; Frost's first shot failed and managed to clear the chamber with both hands (all while continuing to be pummeled); and Frost began shooting Guilford. (*Id.* at 5:30–36.) Frost's account, which almost certainly would have required *at least* three times the amount of time the audio allows for, could be rejected by the jury due to impossibility based upon the timing.

Second, Frost claimed he could not see when he shot because he "had blood running into his eyes." However, photos taken at the scene and the hospital show only a small amount of blood above his eyebrows and running down the top of his nose from a cut in the center of his forehead. (ECF No. 65-1.) Frost admits that he had not wiped and blood away. (*See* ECF No. 62-1 at PageID.865.)

Third, Frost claimed Guilford hit him "multiple times" while they were still in front of the car. When he regained memory and found himself lying on his back and right side in the snow, he asserts Guilford hit him ten more times. But the photos reflect only a single abrasion on his left temple and a bruise at the corner of his left eye, plus some abrasions and

---

[12] This is consistent with Frost's testimony that they both remained around "the front of the vehicle" and on the shoulder of the road for a period of time after Guilford initially made contact with Frost. (ECF No. 53-2 at PageID.497–98.)

an open cut in the center of his forehead. There is also a small trace of blood coming from the right side of Frost's head. (ECF No. 65-1.) For someone who claims he was being "pummeled" while lying on the ground, it remains curious that there were relatively few injuries to his face and almost no injuries to the back of his head. (ECF No. 65-3.) Frost told emergency personnel at the time that he was sure his head never hit the ground—despite claiming later that he was being pummeled *while on the ground.* (ECF No. 65-2.) Moreover, Guilford had not a single bruise or cut to his hands—almost inconceivable, a jury could conclude, if he was "pummeling" Frost to the point where he feared he would lose consciousness.

Dr. Ljubisa Dragovic, Chief Medical Examiner for Oakland County, Michigan, opined that the bruise of Frost's eye could have been caused by a single punch, but the other scrapes and abrasions were from contact with a rough surface. (ECF No. 65-8.) The autopsy revealed that Guilford was not wearing any rings. (ECF No. 65-4.)

Fourth, and concerningly, Sergeant Frost's account does not explain the rather vivid boot-print impression left on Guilford's right torso. (ECF No. 54-9 at PageID.594.) Dr. Dragovic found that consistent with "a violent application of footwear . . . likely resulting from kicking or stomping." (ECF No. 65-8.) Again, this does not square with Frost's account.

Finally, perhaps most significantly, the trajectories and paths of the bullets through Guilford's body are potentially inconsistent with Frost's re-constructed version of events, at least when viewed in the light most favorable to the Plaintiff. (*See* ECF Nos. 65-9–65-11.)

Recall, Frost claimed he was firing, with his right hand only, while lying on his back and somewhat on his right side, from his chest area, while Guilford straddled his hips. (ECF

Nos. 61-9–61-10.) The autopsy revealed that several gunshots exhibited a *downward* trajectory and some were fired into Guilford's *right side*. The upper right chest shot just below the collarbone was steeply downward, for example. (ECF No. 53-9 at PageID.592–93.) Likewise, the gunshot wound to the right side of Guilford's head exhibited a right to left downward trajectory. (*Id.*) It was fired at close range, which meant the gun was likely in contact with Guilford's skin because of the soot on the skin. (ECF No. 65-4.) Dr. Dragovic described it as a contact wound, rendered "execution style." (ECF No. 65-8.)

It will be for the jury to accept or reject whether Frost could have maneuvered his gun into such a position with his right hand (while being pummeled and attempting to fend off blows with his left arm) to fire shots into the right side of Guilford's body and "downward," "execution-style." (*Id.*)

The medical examiner himself, Dr. Markey, acknowledged that several shots were difficult to reconcile with Frost's testimony. (ECF No. 53-9.) The right chest shot? The left armpit shot? The shot to the elbow area? All difficult to reconcile. (*Id.*) Frost disingenuously argues that Dr. Markey fully supports his own account. However, Dr. Markey broadly said the shot angles were consistent with an "altercation." (*See* ECF No. 68-3 at PageID.1131–32 ("I have to ask, what was described to you as the altercation that you're saying that it was consistent with?" "Essentially, that the decedent and the officer involved were in an altercation . . . .").) He did not undertake a granular analysis comparing Frost's account with the forensic evidence. (*See id.* at 1132 ("But I don't think I had any details about, you know, where the location of the gun and stuff was . . . .").) By contrast, Dr. Dragovic provided a much clearer picture of how the autopsy evidence was inconsistent with Frost's account. (*See*

33

ECF No. 65-8 at PageID.1068 ("[T]he account does not provide any logical explanation for the physical findings at the autopsy of Deven Guilford and the actual gunshot wounds [sic] trajectories.").) Other forensic evidence and expert testimony refute Frost's testimony.

The facts and inferences drawn therefrom in the light most favorable to Plaintiff paint a far different tale.

The autopsy and photos suggest the head wound bled profusely. Frost, of course, claims that he fired all shots while Guilford was still on top of him; but, a photograph of Frost after the incident does not appear to show any of Guilford's blood on Frost's face or uniform where Guilford's head would have fallen. (*See* ECF No. 27.) Schlossberg's drawing, by contrast, correctly placed Guilford's head at the only spot in the snow that showed any serious accumulation of blood. (ECF No. 65-13.) Interestingly, the photo shows a large area of disturbance in the snow to the east and north of Guilford's body, but none to the west and south of his body, where Frost seems to claim he was pinned and pummeled by Guilford.

Burwell opined that his review of the evidence suggests a much different scenario. Whether or not Guilford initially struck Frost, Guilford began to run away, but became tangled in the taser wires. Frost recovered himself and ran into the ditch and started shooting while Guilford held his arms up in an attempt to protect himself. (ECF No. 64-1.) The autopsy photos show taser wires wrapped around Guilford's calves and right hand. (ECF No. 65-14.) The shot through his abdomen would have brought him to his knees, explaining the downward trajectories from multiple directions, according to Burwell's account. (*Id.*) The audio also seems to support this account—and Dr. Dragovic's description of the "execution-syle" shot to Guilford's head—because one can hear Guilford scream before the final shots.

If Guilford had been shot in the head prior to that time, he would have been immediately incapacitated.

While Sergeant Frost attacks Burwell's explanation, and his attorneys can vigorously cross-examine Burwell at trial, the Court cannot give Burwell's explanation less weight than Frost's at this stage. The Court must accept all the facts and testimony, and the inferences drawn therefrom, in the light most favorable to Plaintiff on this motion. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Frost essentially asserts Plaintiff's experts "provided nothing more than opinions," which, in his view, "cannot create a genuine dispute of material fact"; "[t]his proposition is simply incorrect." *Moore v. GEICO Ins. Co.*, 633 F. App'x 924, 931 (11th Cir. 2016) (collecting authority); *see, e.g.*, *Thomas v. Newton Int'l Enter.*, 42 F.3d 1266, 1270 (9th Cir. 1994) ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion"). It is certainly convenient for Frost to argue that his version is the only one grounded "in fact," but Guilford is not here to tell his own version. What else would a plaintiff under these circumstances present?

Further, Frost's plea that the Court should wholesale reject expert testimony at summary judgment must itself be rejected. First, Frost has never moved to exclude the expert testimony. *Compare, e.g.*, *E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749 (6th Cir. 2014) (affirming district court's order granting defendant's motion to exclude expert testimony under Fed. R. Evid. 702 prior to summary judgment). Second, ample other evidence—in the form of forensic and audio evidence, along with time and common sense—

supports Plaintiff's expert testimony and casts in negative light Frost's lay testimony. *Compare, e.g., Lewis v. Adams Cty.*, 244 F. App'x 1, 8 (6th Cir. 2007) (affirming district court's determination that a single expert affidavit that was inconsistent with all other evidence was insufficient to create a genuine dispute in material fact); *Burdine v. Sandusky Cty.*, 524 F. App'x 164, 169 (6th Cir. 2013) ("A single expert report that relies on the expert's contrary interpretation *of all other evidence* does not create a genuine issue of material fact." (emphasis added)).

The evidence "is [not] so one-sided that [Frost] must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252. Factual disputes abound—what happened in the ditch on that winter night requires a jury's evaluation of the entire record, including the forensic evidence, the time before and between shots, and common sense. Because a jury could view *all* the evidence and conclude that Sergeant Frost's story lacked any credibility and that Frost unjustifiably killed Guilford. *See Bouggess*, 482 F.3d at 887 (rejecting appellant's arguments "over the factual inferences made by the district court on summary judgment") ("To decide this case, we need only ask whether an officer who employs deadly force against a fleeing suspect without reason to believe that the suspect is armed or otherwise poses a serious risk of physical harm is entitled to either qualified immunity or immunity under the law of Kentucky. We hold that he is entitled to neither.").

Since what happened in the ditch is subject to vociferous dispute, the Court does not see any good-faith basis for an appeal on this claim because purely factual disputes preclude summary judgment. *See, e.g., Behrens v. Pelletier*, 516 U.S. 299, 313 (1996) ("[D]eterminations of evidentiary sufficiency at summary judgment are not immediately

appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that a particular conduct occurred, the question decided is not truly 'separable' from the plaintiff's claim, and hence there is no 'final decision' under *Cohen* and *Mitchell*.").

## III.  CONCLUSION

This case presents difficult questions concerning the tragic death of a teenager. With recognition that this motion has been evaluated "in the peace of a judge's chambers," *Graham*, 490 U.S. at 386 (internal citation omitted), "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In this case, a genuine issue remains for trial on two counts of excessive force.

## ORDER

For the reasons contained in the accompanying opinion, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for summary judgment.

Defendant's motion is granted as to Plaintiff's Fourth Amendment claims for unlawful stop, seizure, arrest, and excessive force prior to Sergeant Frost's decision to fire his taser into Guilford's back; but factual disputes preclude summary judgment on Plaintiff's final two Fourth Amendment claims for excessive force.

**IT IS SO ORDERED.**

Date:   August 18, 2017              /s/ Paul L. Maloney
                                     Paul L. Maloney
                                     United States District Judge